Pages 1 - 122

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

| | |
|---|---|
| SYMANTEC CORPORATION, ) | |
| ) | |
|   Plaintiff-Counterclaim Defendant ) | |
| ) | |
|   VS. ) | NO. C 11-5310 EMC |
| ) | |
| ACRONIS, INC., and ACRONIS ) | |
| INTERNATIONAL GMBH, ) | |
| ) | San Francisco, California |
|   Defendant-Counterclaimants. ) | Thursday |
| ) | November 8, 2012 |
| _____) | 9:30 a.m. |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs**:            QUINN, EMANUEL, URQUHART & OLIVER
                              50 California Street
                              22nd Floor
                              San Francisco, California 94111
                         BY:  **ERIC E. WALL, ESQ.**


                              QUINN, EMANUEL, URQUHART & OLIVER
                              500 West Madison Street
                              Suite 2450
                              Chicago, Illinois 60661
                         BY:  **AARON PEREZ-DAPLE, ESQ.**



           **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**



Reported By:    Debra L. Pas, CSR 11916, CRR, RMR, RPR
                 Official Reporter - US District Court
                 Computerized Transcription By Eclipse

Debra L. Pas, CSR, CRR, RMR, RPR
Official Reporter - U.S. District Court - San Francisco, California
(415) 431-1477

APPEARANCES:   (CONTINUED)


For Defendants:          FISH & RICHARDSON P.C.
                         One Marina Park Drive
                         Boston, Massachusetts 02210
                    BY:  STEVEN KATZ, ESQ.



                         FISH & RICHARDSON P.C.
                         12390 El Camino Real
                         San Diego, California 92130
                    BY:  ALEX EATON-SALNERS, ESQ.



                         FISH & RICHARDSON P.C.
                         222 Delaware Avenue
                         17th Floor
                         Wilmington, Delaware 19899
                    BY:  THOMAS HALKOWSKI, ESQ.

                           - - -

P R O C E E D I N G S

**NOVEMBER 8, 2012**                                        **9:32 a.m.**

**THE CLERK:**  Clerk calling case C11-5130, Symantec versus Acronis.

Counsel, please come to the podium and state your name for the record.

**MR. HALKOWSKI:**  Good morning, Judge.

**THE COURT:**  Good morning.

**MR. HALKOWSKI:**  Good morning.  Tom Halkowski on behalf of Acronis, and with me today are Steve Katz, and Mr. Alex Eaton-Salners.

**THE COURT:**  All right.  Good morning.

**MR. PEREZ-DAPLE:**  Good morning, your Honor.  Aaron Perez-Daple on behalf of Symantec Corporation.  With me is Mr. Eric Wall.

**THE COURT:**  All right.  Morning.

**MR. PEREZ-DAPLE:**  Good morning.

**THE COURT:**  All right.  Okay.  Now, you have asked for a court reporter this morning, I understand, but I do -- we should clarify sort of the ground rules here.  I'm assuming this is maybe for recordation purposes or for reference, but what is said here today is meant to be informal and have no evidentiary value.

So I'm assuming that there is not going to be any -- some point of argumentation at trial.  Nobody is going to try

to cross examine somebody or something.

MR. PEREZ-DAPLE:  We're in agreement.

MR. HALKOWSKI:  Exactly.  That's certainly what we understand.

We have also talked with the other side and just as a matter of logistics, they have got a presentation.  They are going to go through all the patents.  Then once they are done, then we'll get up.  And, actually, we've got them divided up between Mr. Katz and Mr. Eaton-Salners.  And then you know we should be good to go.

The one other thing I'll mention, Judge, is that we have.  We don't have actually a hard copy of our presentation, but -- because we had some final changes.  So we're going to submit hard copies when we get back to the office, if that's all right.  If you would like something now, we could probably get you something on a flash drive.  But, otherwise, we would submit a couple copies for you and your clerk when we get back to the office.

THE COURT:  All right.

MR. HALKOWSKI:  Okay.  With that, we're happy to address any questions.  Otherwise, we'll I guess let Mister --

THE COURT:  Why don't we get started?

MR. PEREZ-DAPLE:  Great.  Thank you.  Good morning your Honor.

THE COURT:  Good morning.

MR. PEREZ-DAPLE:  Good morning, your Honor.

I'll be going over some of the basic technology background that's relevant to understanding all of the patents-in-suit, and then I'll be turning the podium over to my colleague, Mr. Wall, who will be addressing some of the specific technologies relevant to the patents.

Please feel free to jump in at any time if you have any questions.

THE COURT:  You're going to assume a fairly novice level of knowledge on the part of the Court.

MR. PEREZ-DAPLE:  Yes, your Honor.

THE COURT:  With that said, you have the floor.

MR. PEREZ-DAPLE:  Next slide, please.

(Document displayed.)

MR. PEREZ-DAPLE:  So I will be discussing the background of backup and recovery; computer systems, computer architecture, computer storage, and then the different types of backup.  Those are all fundamental concepts that are important for understanding the technologies at issue in this case.

THE COURT:  Good.

MR. PEREZ-DAPLE:  Next slide, please.

(Document displayed.)

MR. PEREZ-DAPLE:  So all of the patents-in-suit are relevant to backup and recovery technology.  So software providers like Symantec have developed technology and products

that enable businesses and consumers to protect their data by backing up their computer systems by copying that data so that if the data is lost, it can be recovered from that copy.

Now, at the bottom of the slide we've illustrated examples of two Symantec products related to backup and recovery.  On the lower right-hand side is the Symantec backup Exec product.  That's software that is sold to our customers and they can actually install this software on their computer systems and use it to back up -- for the backup and recovery of data.

On the lower left-hand portion of the slide is Symantec's NetBackup product.  That's an actual physical hardware appliance that we sell to our customers.  They can then install that product on their network.  It comes with software pre-installed that allows them to do the backup and recovery processes.  I'm going to be talking to you more about that.

Next slide, please.

(Document displayed.)

So what is backup?  Well, in the '211 pat, which is one of the patents at issue here, in the file history they actually provide a definition of backup that I think is helpful.

That definition is:

"A collection of data stored on usually

removable non-volatile storage media for purposes of recovery in case the original copy of data is lost or becomes inaccessible."

And we'll be talking more about what non-volatile storage is, but basically that's storage that allows you to keep data for a long period of time.  That's the purpose of a backup, so that you have the data when you need it.

So at the bottom of the slide we've illustrated a simple illustration with a computer system that has the original data and then you're taking that data, copying it over to a backup storage device.  And we've shown in this illustration that backup storage device as a server, for example.  It could be something as simple as, you know, a USB drive that you attach to your computer and use to store the back-up.

Next slide, please.

(Document displayed.)

So recovery is the process of retrieving the data from the backup and making it accessible to the user.

So what are the situations in which you might want to recover data?  Well, one example would be if the original data is deleted or corrupted.  For example, if your hard drive on your computer crashes, you could lose all that data, but then you could replace the hard drive and recover that data from a

backup, assuming you had backed it up in advance.

Another example might be moving data from an old computer on to a newer computer system. So, you know, time to finally replace that old clunker and you get the brand new laptop and you want to transfer the data down; that's one way you could do that is from a backup.

So on the bottom slide there then we've shown a simple illustration of the data moving from the backup device onto the computer.

Next slide, please.

(Document displayed.)

Now I'm going to talk just a little bit about computer systems in general.

Next slide.

(Document displayed.)

So computer networks. Several of the patents-in-suit deal with some issues related to computer networks. Computer network is basic a collection of computers that communicate to share resources and information. Computer network may include numerous individual computers.

So on the right-hand side of the slide we've illustrated a very simple basic computer network. We've got three individual computer systems that are communicating with the server and those computers can share information with each other. They can also communicate information to and from the

server.

So that's an example -- obviously, in the real world computer networks may be much more complex and involve many more computers and systems.

Computer networks are commonly used by businesses for sharing information among employees and for storing information in a centralized location.  These days it's actually not that uncommon for individuals to have at least basic computer networks in their homes as well.

Next slide, please.

(Document displayed.)

So let's talk a little bit about the particular computer systems.  I'm sure your Honor is familiar with the basic individual computer which would normally contain, for example, a processor, memory, storage disk.  Then you have your user interfaces, which would be your monitor, keyboard, mouse. Laptop computer, of course, is another example of an individual computer system which has all those same components, just in a more compact form.

And then below that we have illustrated an example of the server computer system.  Those are generally much more complex computers.  They are designed to serve information to other computers on the network and those computers will often include multiple processors, multiple memory, multiple individual disks for storing information, because they are

being used much more and they are communicating with all these different computers on the network.

Generally those will be used by businesses.  It's not as common for those type of computer systems to be used by the individual.

Next slide, please.

(Document displayed.)

So I'll just talk a little bit about the distinction between computer hardware and computer software.  This will, I think, will come up with respect to some of the patents.

So the computer hardware are essentially the physical components and devices that make up the computer system.  We just talked about some of these.  They include the processor, the memory, the disk.  It's really the physical, tangible devices that you can hold in your hand.

The computer software, on the other hand, those are the programs that instruct the computer and cause the computer to perform various actions.

I suspect your Honor is familiar already with many of these examples that we have here, such as your word processing software, like Microsoft Windows -- I'm sorry.  Like, Microsoft Word; your operating system, which would be Microsoft Windows; and browser technologies, which would be, for example, Internet Explorer or Safari if you use the Mac.

Video games are another common example of an

application.  These are all programs that are -- of computer software.  These are all programs that cause the computer to do various things.

Next slide, please.

(Document displayed.)

Next I'm going to talk a little bit about computer architecture because some of these themes are going to recur when we get into the patents.

Next slide, please.

(Document displayed.)

So applications.  Well, first, what we've illustrated here is, obviously, a very simplified diagram of the key components within the computer architecture.  We've already talked a bit about the lowest component, which are the hardware -- the lowest piece, which are the hardware components; but I would like to address briefly in a little more detail the applications, the operating system and then the file system.

So let's start with applications.  Applications are programs running on the computer that require the operating system to access hardware resources and interface with the file system.  So we talked about some examples of applications earlier.  These would be, for example, your word processing software, your internet browser.  Those are examples of applications.

But the applications can't access the resources on the computer directly.  They have to go through the files -- I'm sorry.  They have to go through the operating system.

So if an application, for example, wants to display something on your screen, it does that via the operating system.  If the application wants to -- your word processing software wants to access a particular file on your computer, it's going to do that through the operating system.  We're going to talk about that a bit in the next slides.

Next slide, please.

(Document displayed.)

So the operating system.  As you see in the diagram the operating system is very central to the operation of the computer.  It's essentially what manages the computer hardware resources and it provides common services to application programs, including access to the file system.

So I already mentioned a couple of these examples, but when -- you know, for example, when your word processor wants to access a particular file on your computer, it does that through the operating system.  And, similarly, that's how the applications access the hardware.

Next slide, please.

(Document displayed.)

So the file system.  The file system is a logical structure for organizing data stored on a computer.  So, and

that's used to access data that's stored as files.  And, for example, the '211 patent explains the most basic task of a file system is to provide access to files.

And what we've shown here are a couple views of the file system on the far right-hand side of the slide.  The top view would be a typical user's view, which you would see, for example -- I don't know if your Honor uses Word or is PC or Mac.

**THE COURT:**  We're on PC here.

**MR. PEREZ-DAPLE:**  Okay.  So in the PC world, I'm sure your Honor is familiar.  If you go in, you'll see the holder structure and the folders contain the individual files.

Below that we've illustrated sort of the hierarchal view of the file system with the different folders and files contained within those folders.

Next slide, please.

(Document displayed.)

Now, I'm going to talk a little bit about computer storage.  Again, the concepts here are going to be very important for understanding the technology of the patents at issue.

Next slide, please.

(Document displayed.)

So first I'd like to talk a little bit -- I touched on this earlier, but I would like to talk a little bit about

the distinction between volatile memory and non-volatile memory.

So volatile memory, that's often in many computers called RAM.  That's used for temporary storage of data on a computer system.  That's used by the running programs on the computer to access data.  But the one thing about volatile memory and why it's called volatile is when you turn the computer off, all that data is gone.  So it's not used for long-term storage.  It's used for the active processing of information by the computer while its running.

So in contrast, non-volatile memory is used for the long-term storage of data on the computer system.  We've illustrated some examples on the lower left-hand corner of the slide.  For example a CD, a USB drive, tape, floppy disk, those are all examples of storage devices that you can remove from the computer.  Then, also, your hard disk is another example of non-volatile memory that's used for long-term storm of data. That can be used, for example, to store your files, your Word documents, and what-have-you.  It can also be used for storing backups of information.

The great thing about non-volatile memory, as you are probably aware, is when you turn the computer off, you still keep that data so it can be used to store data for long term and they are often kept separately from the computer.

Next slide, please.

(Document displayed.)

So storage devices, we already touched on this, but there are many different kinds of storage devices. And the '365 patent explains that storage technologies currently provide removable optical and magnetic disks, fixed and removable hard disks, hard disks, floppy disks, solid state storage devices. And new storage technologies are continually being, and developed.

There are many different kinds of storage devices. When choosing what kind of device you want to use for a backup, there are many options available. One of the main concerns is making sure that the storage device you choose has sufficient data capacity to store the backup that you want to make.

Next slide, please.

(Document displayed.)

So I'm going to spend a little bit of time on this slide because a lot of the concepts here -- there's a lot going on on this slide, but a lot of the concepts here are going to be relevant for the patents and important for understanding the patents.

So I wanted to talk a bit about disks. So a hard disk is literally a flat disk covered with magnetic -- or a material that can be magnetized to store data. That data is stored in binary format, ones and zeros. This is the lowest level of the computer system. So they magnetize different

physical regions on the disks to represent a one or zero, and that's the data on your computer system.

The disk drive, which we've illustrated there on the right, that disk rotates so that information can be written or read to it by the disk head, which is shown the illustration.

Now, the sectors  -- so a sector is actually a portion of the disk, or potentially another storage device, that stores a fixed amount of data on the disk.  So such as, for example, it might store 512 or 2,048 bytes.  So on the bottom portion of the slide we've illustrated an example of a sector.  We obviously haven't shown -- we haven't shown all 512 bites there because that would be much -- this is just for illustrative purposes, but that's the sector that actually stores the physical data which would be bytes.  And then on the disk you can see that corresponds to an actual physical location on the disk.

THE COURT:  In order to read, let's say, that sector, is the disks itself constantly spinning and the head knows when the --

MR. PEREZ-DAPLE:  Yes, sir.

THE COURT:  It just doesn't rotate back and forth? It's -- the whole disk is spinning?

MR. PEREZ-DAPLE:  That's correct, your Honor.  And the disk read will move so that it can read the appropriate region of the disk.  That's how it works in most disk drives.

**THE COURT:** And is the head, like a phonograph player, move in and out?  Obviously, I guess, there are different sectors in concentric circles away from the center.

**MR. PEREZ-DAPLE:** Yes.  That's my understanding, your Honor.

So when you go to a certain portion of the disk, when you try to access a particular sector, the head will move appropriately so that it can read that sector when it spins.

**THE COURT:** All right.

**MR. PEREZ-DAPLE:** And so a cluster or block, that's simply a group of one or more sectors.  And we've illustrated that below with a cluster or block having two sectors.  And that term block --

Next slide, please.

(Document displayed.)

The term block is actually going to -- it appears in many of the patents.  So it's an important term to understand. The block is a base unit for reading and writing to disk.

And, moreover, blocks are numbered.  And that's explained, for example, in the '380 patent, which states that:

"Read and write operations are performed
    in connection with data areas that have sizes
    that are divisible by the size of one block.
    Each block has its own number."

So we've shown on the right-hand side an illustration

as to process -- the computer processor writing to the disk and it does that in units of a block, which could be one or more sectors.

Next slide, please.

(Document displayed.)

So we've sort of touched on this, but I just want to bring it home with this slide that there is a difference in computers between the physical locations on the disk and the logical locations within the file system.

So the physical location is the actual location of data on the disk. So we've shown here an example of a couple numbered blocks. Obviously, in real life they would be much smaller. We have enlarged it for illustrative purposes.

So those would be two sectors with different sector numbers. And then on the other side of the slide we've shown an illustration of the file system with the logical locations which are used, which do not need to correspond to certain -- to any particular physical location on the disk.

**THE COURT:** And would, for instance, a photo in the file system occupy more than one block, or is it usually contained?

**MR. PEREZ-DAPLE:** It certainly could, your Honor. If it's large enough -- in fact, I would say most photos these days probably would occupy more than one block, several megabytes. The block size is usually on the order of

kilobytes.  I think the common block size, I believe, is 2,048 kilobytes.

So typically any given file will occupy multiple blocks on a disk.  And actually we're going to talk in a moment about how that works.

THE COURT:  Okay.

MR. PEREZ-DAPLE:  Next slide, please.

(Document displayed.)

MR. PEREZ-DAPLE:  So file -- I believe your Honor is familiar with files.  It's a collection of data stored on the disk that is accessible via the file system, and files are typically named.

So we've shown, for example, a few examples here. You go into your folder and you have your various Word files and Excel files and what-have-you, book one, document one, presentation one.

Next slide, please.

(Document displayed.)

This, I think, goes to your point earlier, your Honor, that a file compromises multiple blocks which may be stored at different locations on a physical disk.

So it's important to note here that a file actually with different blocks, they don't have to be located in a contiguous region on a disk.  They could be in different areas on a disk.  And there could be some kind of internal mapping

within the computer system that allows it to identify where on the disk the particular files are located.

THE COURT:  Is that a function of software or hardware, this internal mapping?

MR. PEREZ-DAPLE:  That would be software, but very low level software.  Usually that would be considered, I believe, part of the operating system.

Next slide, please.

(Document displayed.)

MR. PEREZ-DAPLE:  So a partition -- so now this is kind of stepping up a little bit bigger.  We're talking about blocks, which is very small areas on the disk.  And now larger areas on the disk are called partitions, and that's a logical region on one or more storage devices.

And this concept is explained in the '365 patent, which states that:

"A partition is a region on one or more storage devices which is or can be formatted to contain one or more files or disks."

The bottom we've shown an illustration, a now logical representation of a disk with two volumes on it; the C volume and the D volume.  So these would be large areas of the disk that can be accessed to store information.

THE COURT:  Is it a physical or is it just a conceptual region?

MR. PEREZ-DAPLE:  It's a logical region, so it's not actually -- there will obviously be a region -- and, actually -- next slide, please.  I think this might address his question.

(Document displayed.)

So I think this might go to your question, which is at the lower right-hand corner you see there, so there would be different regions of the disk that correspond to the partition, but it's really more of a logical division.  It's one physical disk and the partition is actually a logical structure that's used to divide the sections of the disk.

THE COURT:  And blocks would be contained in one partition or another?  You don't split blocks?

MR. PEREZ-DAPLE:  Correct, your Honor.

THE COURT:  But this is one disk that you're showing in the lower right-hand corner with two partitions.

MR. PEREZ-DAPLE:  Yes.

THE COURT:  And the partitions, are they actually a physical region like here you have it --

MR. PEREZ-DAPLE:  It -- oh, I'm sorry.  I didn't mean to interrupt.

THE COURT:  A circumference, et cetera.

MR. PEREZ-DAPLE:  They would generally correspond -- I don't know that it would necessarily have to be circumferential this way.  There may be other -- there are

probably other ways of dividing the disk, but generally there would be a region of a disk associated with a given partition.

THE COURT:  So there is some physical -- some physical aspect to a partition as well as an operational --

MR. PEREZ-DAPLE:  Correct, but you wouldn't actually need to change the hardware.  So you could go in and change the partitions without touching any of the hardware because it's a structure that's contained logically.

So if you wanted to redefine the size of the partition, for example, that's something that you could do using the software.  And it would just change which parts of the disk were associated with a given partition.  So that's what I mean by the logical versus physical distinction.

THE COURT:  Okay.

MR. PEREZ-DAPLE:  So on the top portion -- or, I guess, the middle, the user's view, the slide that's shown on the left.  So typically in the computer system, Windows computer systems in particular, the partitions are often shown as different disks.  That's what's indicated to the user.

So you don't realize that the C and the D, those are actually just two partitions on one physical disk, but they are actually illustrated as different disk drives.

THE COURT:  Okay.

MR. PEREZ-DAPLE:  Next slide, please.

(Document displayed.)

**MR. PEREZ-DAPLE:** My last topic will be different types of back. And this will be, I think, a good segue into the patent specific portion.

Next slide.

(Document displayed.)

So the parties have agreed on the construction of an image. An image is a block wise image of computer storage, not a file-by-file backup of computer storage.

So what that means is you're actually copying the blocks on the disk, not going through the file system. And that's illustrated there at the bottom.

Next slide, please.

(Document displayed.)

Images are typically stored in an interim format that's not recognized by the file system or operating system. This is explained in the '365 patent, which states that:

"The copy within the image is stored by a

program implementing the invention in an

internal format unknown to most or all file

systems, operating systems and conventional

applications."

So, for example, the image -- the format of the image in many cases would be compressed because you want to save space on a disk or it might be encrypted so that unauthorized people can't access that information.

Next slide, please.

(Document highlighted.)

Now, here we've shown an illustration of an image. Basically, the original disk is shown on the lower left.  And as you can see, that includes allocated blocks which are blocks that are actually storing data.

So those actually have the ones and zeros storing various information and then unallocated blocks, which is free space, not being used.  And so in an image you would copy that over, over.  And you can see there that only the allocated blocks are copied, but they don't necessarily have to be copied to the same locations.  I mean, in fact, you could copy the image onto a different size disk or whatever and they could be stored in the image within a contiguous region on the disk, although they don't have to be.

**THE COURT:**  An image is comprised by a bunch of blocks then.

**MR. PEREZ-DAPLE:**  Correct.

**THE COURT:**  How is that chosen?  How is that determined which blocks comprise a -- are there multiple images then that are possible?

**MR. PEREZ-DAPLE:**  You can make more than one imaged. So, for example, if you choose to make an image of an entire disk, then you would simply copy all the data on a disk.  All the blocks on a disk would be copied.  But you could also

choose a smaller portion of the disk.

For example, by choosing a folder, then that would select -- that could then lead to selecting the relevant portions of the disk that store that information and copying that onto the image.

THE COURT:  Okay.

MR. PEREZ-DAPLE:  Next slide, please.

(Document highlighted.)

MR. PEREZ-DAPLE:  So sector-by-sector image, that's really as described in the '517 patent.  Sector-by-sector images cluster-by-cluster images are examples of blockwise images and they are not filed by file backups.

So a sector-by-sector image, it copies all data, even data that is not included within the file system.  That's explained, for example, in the '365 patent, which states:

"A sector-by-sector image preserves optimizations, producing an exact image of the disk, with the exception that some images do not contain data from unallocated sectors."

THE COURT:  Wait.  Let me...

MR. PEREZ-DAPLE:  I'm sorry.  Go back.

THE COURT:  Why don't you go over that again?

MR. PEREZ-DAPLE:  Sure.  And I think maybe the next slide will help as well.

So basically a sector-by-sector image, it's just a particular type of a blockwise image.  And because you're copying all of the blocks, you're actually going to capture some information that's not within the file system.

And when you're ready, I'll go to the next slide and I think that may help.

Next slide, please.

(Document displayed.)

So, for example, deleted files would not appear within the file system, but that data in many cases would still actually be on the disk until it's overwritten.  So you can still have the deleted files on disk, but they don't appear in the file system.

So when you take a sector-by-sector backup, you would actually copy those deleted files into the image.  So that's an advantage, but one potential advantage -- there are advantages and disadvantages to both mechanisms, the file approach and sector approach; but one thing that's good about the sector-by-sector image is that you will capture that kind of information.  So later if you wanted to try to recover a deleted file from your image, it would be there.

**THE COURT:**  So it's not discriminatory.  It sounds like you're copying a whole -- when you say "sector," it's almost like not region, but sectors of the -- within the partition, whatever it contains.

MR. PEREZ-DAPLE:  Exactly.

THE COURT:  You're just sort of replicating it?

MR. PEREZ-DAPLE:  That's exactly correct.

Next slide, please.

(Document displayed.)

Let's talk about in contrast to file-by-file backup. So that's a backup that's made by accessing the file system to identify and retrieve the particular files we backed up, or basically you would identify those blocks that are associated with the files and just back up those blocks, not back up the whole region.

So there are some disadvantages to file-by-file backups when compared to sector-by-sector images and that's explained in the '365 patent, which states that:

"They may miss important files, such as registry or system configuration files and they do not back up data from deleted files even if the sectors holding the data have not been overwritten."

So that's what we saw in the previous slide where -- so the file-by-file backup doesn't capture those deleted files, but sector-by-sector does.

In addition, the file-by-file backups increase restoration time -- I'm sorry.  The sector-by-sector -- right.

(Brief pause in the proceedings.)

I'm sorry.  So the file-by-file backups also increase restoration time and, also, increase the chances of a disk head crash.  Earlier we were talking about how the disk head has to move to go to the different areas of the disk.

**THE COURT:**  It's got to pick and choose all over the place.

**MR. PEREZ-DAPLE:**  Exactly.  Exactly.

Next slide, please.

(Document displayed.)

And so this slide, I think, captures that.  So the file-by-file backup only captures blocks from the files listed within the file system.

So you start with the file system.  You identify the blocks of the file and then you just copy those blocks onto the storage device.

Next slide, please.

(Document displayed.)

And with that, I will turn it over to Mr. Wall.

**THE COURT:**  Great.  Thank you.

**MR. WALL:**  Good morning, your Honor.

**THE COURT:**  Good morning.

**MR. WALL:**  So in this second part of the presentation we're going to get a little bit more specific with respect to the technologies.  And the way I'm going to organize it is I'm going to organize specific technological introductions to each

of the patents-in-suit.

I'm going to start with the Symantec patents, which are the '365 patent, the '655 patent, the '010 patent, the '517 patent, and the '086 patent.  And then I'll move on to Acronis' patents-in-suit, and those are the '211 and '380 patents.

Next slide, please.

(Document displayed.)

So let's start with the '365 patent.  And we're going to integrate some of the concepts that my colleague was talking about earlier, which -- and we're going to talk about an image stored in a particular partition.  Typically a backup image was stored in a separate partition from the partition that included the user programs and data.

As my colleague explained, you can logically divide up a disk into separate partitions.  What would happen is you would have one partition called the C drive in which you would store data, user application information, and a separate partition in which this image would be kept.  This is reflected in the '365 patent.  The highlighted language states:

" The partition, 106, often contains
    little or nothing more than an image of the
    first partition, 100."

And that's referring to that second partition that's including an image.

(Document displayed.)

Now, sometimes the second partition would be hidden from the user. So the first illustration on the slide shows local disk, and underneath it is a listing of the space on that disk. And in this case it's 67.99 gigabytes.

But even though the user can only see that there is a C drive on the disk and it has that much -- and that 67.99 gigabytes is its size, there might be another partition on the disk that the user can't see.

And that's illustrated in the drawing below. In this case there is a D drive, which is 32.01 gigabytes. That means that we have a disk that has a storage capacity of 100 gigabytes, but the user is only aware of this one partition that has 67 gigabytes.

Next slide, please.

(Document displayed.)

One of the problems addressed by the '365 patent is consumer confusion over the size of the disk. So if the consumer has ordered a computer. He thinks he's getting a computer with a disk drive of 100 gigabytes and then he turns on his computer. He looks at his C drive and he says: Well, the C drive is only 67 gigabytes. This can lead to confusion, and the '365 patent talks about that:

"This mistaken but understandable
conclusion leads to consumer dissatisfaction
and increases the vendors's support costs."

For example, if you have these users calling in and asking what's wrong with their computer.

So that's sort of the background technology of the '365 patent and the issues that it addresses.

I would like to move on to the '655 patent.  Next slide, please.  And you can move on to Slide 37.

(Document displayed.)

So for the '655 patent we're going to talk about particular types of backups.  The first is a full backup.  The '655 patent defines a full backup.

"A full backup set means that all of the files in the data volume are copied, regardless of how recently they have been modified or whether a previous backup set exists."

There are advantages and disadvantages to a full backup set.  The advantage is at the restore step, it's easy to perform a full restore of the volume because the full backup has all of the files that you need to restore the volume.

The disadvantage is it's time intensive to create and requires a lot of memory to store.

And that makes sense because as illustrated here, the entire -- it's an image of the entire system or a copy -- at any rate a backup of the entire system, I should say.

Moving on to Slide 38.

(Document displayed.)

There is another type of backup, which is called an incremental backup.  The '655 patent defines that, too.

"An incremental backup means that only files of the data volume that have changed since some previous event -- for example, a prior if you will backup or incremental backup -- are copied."

So unlike a full backup, an incremental backup does not include all data necessary to fully restore the computer system.  Again, there are advantages and disadvantages of this approach.  I'll get into those is in a bit.

But next slide, please.

(Document displayed.)

I just want to illustrate what an incremental backup looks like first.

So in this diagram on the left side we have certain files that we've highlighted in blue and purple.  Those indicate that files have changed.  So your incremental backup only going to back up information corresponding to those two changed files.

Next slide, please.

(Document displayed.)

So let's talk about some of the advantages of the incremental backup.

The advantages occur at the time of backup. Typically incremental backups are much smaller than full backups.  The '655 patent explains this.

"If backups are done daily or even more frequently, it is not uncommon for less than one percent of files to change between backups.  An incremental backup in this case copies one percent of the data that a full backup would copy."

And below are simply illustrations that show that.  I think it's a pretty intuitive concept.  If you're only changing some of the files, then you're only going to back up those changed files and you don't need as much memory to store them.

Next slide, please.

(Document displayed.)

It's also faster and more efficient to create these incremental backups.  That's explained by the '655 patent.

"For most applications incremental backup is preferable at backup time since, in most cases, the number of files of the data volume that change between backups is very small compared to the number of files in the entire data volume and since the backup window is small."

However, there are disadvantages, which we talk about

in the next slide.

(Document displayed.)

And perhaps the obvious disadvantage is that incremental backups alone are not sufficient to enable a restore of the system.  So what do we do to restore the entire system?  We have to use our incremental backups in connection with a previously created full backup to restore the entire system.  And what we need to do is to create a synthetic full backup to restore that system.

And I'm going to explain in just a minute what a "synthetic full backup" is.  But the disadvantage that this raises and which really the patent grapples with is that it's costly in terms of the time needed to create these synthetic backups.

And let me explain why.  Next slide, please.

(Document displayed.)

So:

"An synthetic full backup consolidates
   the changes captured in the incremental
   backups and preceding full backups to
   represent the most recently backed up state
   of the full data volume."

And what this means and what is shown below -- and why don't I explain this diagram below?

So on the far left we have the full backup, which I

was explaining before.  And then we have a series of incremental backups.  Incremental backup one is taken at some point in time, A, after the full backup is made.  And in that time the user has only changed one file, which is highlighted in green.

Sometime later, let's say time B, a second incremental backup is taken.  At this point two different files have been changed, highlighted in blue and purple.

In order to create this synthetic full backup, what we have to do is we have to take these of these backups and combine them to get what would essentially would be equivalent a full backup taken at time B.  And that's what you see in the result.

At the right you have all of the files that haven't changed at all since the time the full backup has occurred, but you also have updated the full backup by including these modified files.  And so the full data volume may be restored from the synthetic full backup.

Please go to slide 45.

(Document displayed)

The '655 patent focuses on inefficiencies in prior art methods of creating synthetic full backups.  And the quoted portion of the patent states:

"Fig. 4 shows that a substantial amount
    of processing is needed for backup server 18

to create the synthetic full backup set on tape 34."

The '655 patent, as we'll explain it in the Markman hearing, addresses particular ways of speeding up that process and making -- the process of making that synthetic full backup more efficient.

Next slide, please.

(Document displayed.)

Now, I'm now going to move on to the '010 patent, another patent asserted by Symantec.

Next slide, please.

(Document displayed.)

The '010 patent is generally speaking about mapping of resources, and this slide sets up the problem.  Users often want to restore backed up data having a particular configuration to a new system.  The new system may have different disks with different characteristics, for example, more space or a different number of disks.

This is illustrated below.  Let's say we have an old computer system.  This computer system has two hard drives. Those hard drives in and of themselves may be partitioned in particular ways.

Now I purchase a new system and this new system now has three hard drives and they are as yet unpartitioned maybe. The question is:  How do I convert the data that's on these two

hard drives onto these three hard drives?

Next slide, please.

So there are a few things you need to do in order to restore the information from the old computer onto the new one.

First, you select the source of the information to be restored.  So, you know, where from the old hard drives?  What information from the old hard drives we're going to try to restore?  It's like the destination to which the data will be restored.

Here where, you know -- here the new computer system.  Then we're going to map the selected resources from the source to the destination.  I'm going to explain what that means in just a minute.  And then you're actually going to execute that mapping.  You're going to copy the selected resources to the new system.

So please turn to -- please go to Slide 49.

(Document displayed.)

Mapping is the process of determining how to configure the backed up data on the new system.  That's confirmed by the '010 patent, which describes:

"The mapping tool, 28, may determine a

suitable location for the selected volume in

the new configuration."

That's illustrated in Fig. 5 of the '010 patent.  So let's take a look at that.

(Document displayed.)

So here we have an original disk layout and we have a mapped or new disk layout on the bottom.  The original disk layout is labeled 96.  The mapped new disk layout is labeled 98.  The original disk layout has three disks, labeled Disk 0, Disk 1, and Disk 2.  And the new layout has four disks labeled Disk 0, Disk 1, Disk 2, Disk 3.

And what's being shown here is that Volume F from Disk 1 in the original system, a determination is being made that it should be mapped to Disk 1 of the new system, and as you can see, those disks have different properties.

And what I would also like to point out, this may not be the best example because it may not be as simple as saying: Well, we're just going to copy the contents of Disk 1 onto Disk 1.

There may be different sized volumes and there may need to be a determination of what is that -- the partition needs to be mapped onto some other disk or something like that.

Next slide, please.

(Document displayed.)

The '010 patent addresses deficiencies in prior art interfaces, which did not aid the user in determining how one configuration could be mapped onto a new configuration.  And the '010 patent explains that in some cases it is difficult for the user to envision the effect of the changes on the

configuration prior to actually making the changes on the computer system.

So what you want is this interface to simplify the process of moving this information onto a new one.  If you manually do this yourself and you don't have an interface that allows you to visualize those changes, you may find yourself copying a large amount of information to a new system and your new configuration, either you may not have enough room on one disk because you calculated wrong, or it may not be the most efficient configuration for your information.

THE COURT:  The mapping technology before did not have -- wouldn't have figured that out for you?  I mean, isn't part of the mapping figuring out where enough resources are available and how most efficiently to allocate that?

MR. WALL:  I don't want to go into too much detail here because one of the terms we're going to discuss is "automatically mapping" it.

But what the '010 patent does is it combines a user interface along with functionality to automatically determine how you're going to configure particular information on that first computer onto the second one.  And the prior art didn't have that particular interface claimed by the '010 patent.

THE COURT:  Okay.

MR. WALL:  So I would like to move on to the '517 patent.  Next slide, please.

(Document displayed.)

And the '517 patent is generally directed to something called "bare metal restore."  And probably the easiest way to explain that is to say it involves creating -- restoring an old configuration onto just a brand new -- onto brand new computer hardware.  And that's illustrated at the very bottom here in the diagram.

You have an old computer, and we've perhaps overly emphasized that by giving it a floppy disk drive and everything.  And what you do is you take an image of that old computer and you store it in a backup storage device.

Now you want to restore that to a new laptop that you have purchased.  The issue is is that that laptop has different hardware than that original computer configuration.  You may be -- it may have a new processor.  You may be hooking it up to a new printer.  And somehow you have to make sure that that old image is able to interface with the hardware of your new computer.

So let's go back up to the bullet points.

Computer users sometimes need to replace old computer hardware when it fails or becomes obsolete.

However, changing hardware can cause problems that prevent the computer from running properly.  For example, new hardware may require different drivers other interface modifications not provided by the old hardware.

And drivers are simply software that allows the computer to interface with these different pieces of hardware. For example, printer drivers are a very common example of that because whenever you need to hook up a new printer, you need a new printer driver to interface and make sure, for example, that your Word document is able to print out on that printer. If you don't have the right driver, your Word document may not print out.

And so bare metal restore technology is used to modify an image of the old computer system to run on the new hardware.

**THE COURT:**  Doesn't that apply as well if the new hardware has a new software, has different software versions?

**MR. WALL:**  So I believe what we're talking about in this instance is -- is just a completely.  I'm trying to think. I might ask my colleague here Mr. Perez-Daple.

Does it have any software on it?

**MR. PEREZ-DAPLE:**  Typically in this scenario what we're dealing with is there wouldn't be any software and the image actually would include within the image the operating system as well, but then you still need to reconfigure the operating system in the other software to be able to run on that new hardware.  So that's the cases that would typically be addressed here.

**THE COURT:**  That's a later stage.  The bare metal

restore --

            **MR. WALL:**  The way I would think about it is, you have a computer that doesn't have any software on it and you are going to get all of your software from that image.  And so you're trying to get -- the problem that you have is that that software has been configured to interface with a particular type of hardware.  And the problem you have is that if that software hasn't been configured to interface with the hardware of the new system, that new system may not be able to run properly.  And so what you want to be able to do is to just take all that software from the image --

            **THE COURT:**  From the image?

            **MR. WALL:**  Exactly.  And just modify it enough so that it's able to work on your new computer.  It's able to interface with that microprocessor.  It's able to interface with that printer on the new system.

            **THE COURT:**  So that image brings with it, you're saying, components of the old operating system.

            **MR. WALL:**  Absolutely.  As well as the applications. For example, Word or Excel.  And it will also bring with it user data, the files that you created with Microsoft Word, the files that you created in Excel.

            So you're trying to get all that information from that image.  I mean, a way to think about this might be, you know, you have some catastrophic failure where you like your

laptop just fine.  Your laptop gets run over.  Fortunately, you have a image of it and you buy a new laptop.  That laptop has new hardware.  And you just want your laptop back and all the software that was running on it, but you're going to need to modify it somewhat if this laptop has different hardware.

And that's the issue that's being addressed in this patent.  That's what bare -- what we were talking about when we talk about bare metal restore.  We're talking about bare metal because we're talking about the hardware of the computer, as opposed to a computer that also has a bunch of software loaded on it.

THE COURT:  Okay.

MR. WALL:  Next slide, please.

(Document displayed.)

MR. WALL:  One of the problems addressed by the '517 is modifying an image to run on new hardware.  An image to match new hardware identified in the target computer information is one of the technologies it's describing.  So that's the '517 patent.

I would like to move on to the '086 patent.  Next slide, please.

(Document displayed.)

So for the '086 patent, we're going to have to bring in a technology that we haven't really talked about yet, and that's virtual machine.  A virtual machine, or VM, is a

software model of a physical machine complete with its own virtual hardware capable of running operating systems and other applications.  A virtual machine can be thought of as a separate computer system.

A computer system executes one or more -- let me take a step back.

The '086 patent describes these virtual machines:

"A computer system executes one or more virtual machines, each of which may include one or more applications."

I think the diagram to the right might be helpful in explaining this.  Here we have a diagram of that server that we showed earlier, and we have emanating from that diagram three desktop computers.  These desktop computers don't actually exist as functional discrete desktops which have their own hardware to them.  They don't have their own disk drive and their own memory and their own -- maybe not their own software loaded on them.  Really, these computers reside on one server and the server has allocated particular memory to each of these.  Particular applications are loaded for each of these. Particular memory is used to run each of these virtual machines.

So they all physically exist on this server, but as I'm going to explain on the next slide, the user experiences them as its own computer.  A single computer, for example, a

server may run multiple VMs at the same time.  This is frequently used by businesses and they have -- because VMs have advantages to them.  The employees may access the VMs remotely through some sort of portal.

So whatever computer they log onto, they can access this machine.  They don't have to carry around a laptop or anything like that.  They don't have to carry around their work desktop, which is impractical.

And these servers and virtual machines are easy to administer and control.  Rather than some sort of IT specialist at the business modifying, for example, every individual desktop or laptop that employee might have, he can just go through the server and make changes that he needs to update applications or something like that.

And what we show below is just the user experience. The employee will access his virtual machine over a network. And we have highlighted in red one of those machines.  And so to him after he goes through this portal, it's like he's running on his own particular machine.

THE COURT:  You're on slide 56 now, correct?

MR. WALL:  That's correct.  I'm on slide 56.  I apologize.

If we could now go to slide 57?

(Document displayed.)

So virtual machines are also subject to failure and

data loss, because despite their name they physically reside on a server and that server can crash or become damaged.  So like physical machines, virtual machines can also be backed up.

THE COURT:  Can these various virtual machines actually be employing the same hard drive?  I mean, it's all -- you don't have -- you need separate physical components?

MR. WALL:  That's exactly right.  You can partition out a hard drive and each of those virtual machines might access one of those partitions, for example.

So we've prepared an animation here to explain how backing up an '08- -- a virtual machine must have occurred in the prior art.

Next slide, please.

(Document displayed.)

One method of backing up a VM is to suspend the VM and then copy the data.  Suspending the VM ensures that the system is in a quiescent or stable state.  And then when a VM is -- when the VM is suspended, it's primarily prevented from executing.  That's all that suspension is referring to.

After suspension, execution of the VM may be resumed. Those are the steps that I'm going to show you.  So -- on this slide of the screen, this is the easiest way to see this.  This is an animated presentation.  We suspend animation of the VM.

Next, please.

(Document displayed.)

What we do is while the machine is suspended and in the stable state, we copy or back up the information that is on that VM.  Then once we've stored that information, we allow the VM to resume.

And that's the next slide, please.

(Document displayed.)

So the virtual machine is resumed after that.  Fairly straightforward.

But before I go on, I just want to sort of explain the importance of that stable state.  The reason you want to make sure that that VM is stable or consistent is you don't want, for example, some information to be partially written and that process not to have completed.  It can lead to the information being -- or the backup being unstable and it may prevent you from restoring the backup.

So you want it stable so that you know that at the time you're taking the backup, the information is in a stable state and, therefore, when you can restore that information, you'll be able to do so without the system failing or the restore failing.

Next slide, please.

(Document displayed.)

So prior art software suspended VMs during backup, just as I explained.  And when you suspend the VMs, the problem is is that prevents users from accessing applications they have

been using.  And so that -- that's an inconvenience for the users if the information is suspended.  And that's what it states in the '086 patent:

"In many cases an application or applications may be in use when the backup is to occur.  The application may have one or more files open preventing access by the backup storage to such files."

And if a large amount of information needs to be backed up, then that can cause significant delays for the user.  That's the problem, one of the problems being addressed by the '086 patent.

Next slide, please.

(Document displayed.)

So all of these patents that I've talked about are Symantec's patents in this case.

I'm now going to take some time to give you background information on the '211 and '380 patents, which are Acronis' patents.  In some ways we're going to pick up a little bit where we left off with respect to the '086 patent.

As I was saying, continuing to modify data while a backup process runs may create inconsistencies that would prevent a successful restore.  One solution is to stop modifying the data during a backup by making it inaccessible to running applications.  And the '211 patent reflects this.

In the simplest case the file system can be suspended for some time and during that time, a snapshot is recorded. Of course, such an approach cannot be applied to servers where uninterruptible activity at the file system is necessary.

So you have the server that is constantly being accessed, for example, by multiple users. The problem is, is how do we back this up without suspending it, essentially locking some people out.

Next slide, please.

(Document displayed.)

The answer is an online backup. An online backup is made while applications continue to run and work with the data being backed up.

And the '380 patent states:

"Online backup is typical for servers with a high level of accessibility and, therefore, cannot be stopped to allow backup to be completed."

Next slide, please.

(Document displayed.)

And one of the methods of online backup that was known in the prior art was Copy On Write or COW. And what Copy On Write does is it protects against data inconsistencies by keeping separate copies of the original date and the modified data.

One known Copy On Write methodology monitors for any attempts to write to the portions of memory being backed up. That's very abstract and that's why after this slide, I'm going to show you another animation that we have prepared to illustrate the process.

But there are -- before we sort of go there, I do want to explain to you the advantages of it. It's that it saves memory and improves the speed of the system.

Please go to Slide 65. 65, please.

(Document displayed.)

So we're going to go through an animation here and I want to set up what the components of this animation are.

We have a computer processor, which my colleague discussed before performs calculations and controls the reads and writes to the storage device, in this case a hard drive.

And what we have illustrated here are blocks of data on that hard drive here. There are six blocks, and I'll be referring to them as -- the top line, one, two, three from left to right of the, then on the bottom line four, five, six, again from left to right.

We also have a cache. Now, what the cache is is a temporary data storage area on the storage -- on the storage device. It could be its own device. It could be on the storage device, but the point is it's a temporary data storage area that's going to be accessed in the Copy On Write process

that I'm going to tell you about.

And them we have the backup storage device which, as my colleague indicated, could be a hard drive, could be CD Rom, could be a thumb drive.

Okay.  So now that we have all these, please go to the next slide.

(Document displayed.)

We're showing the computer in action now.  It's reading from the storage device and it's writing to it.

Now, let's say we want to back up the data, but as we were saying before, we want to back up the data, but we want the system to keep operating while this backup is taking place. So we're going to employ this Copy On Write process.

Next slide, please.

(Document displayed.)

So the first thing we're going to do is identify the category to back up, and we're going to identify all of the information on the storage device or backup.

Next slide, please.

(Document displayed.)

And that's all we're showing here.  We have identified the six blocks on the storage device for backup.

Next slide, please.

(Document displayed.)

So let's begin the backup process.  And all this

process is is it's moving blocks of information from the storage device over to the backup storage device.  There is block one, block two, and block three.

But, remember, it's unlikely that this backup process is going to continue uninterrupted because we're still using the processor and the storage device at the same time that this backup is occurring.

So next slide, please.

(Document displayed.)

We're going to -- let's say, a write command comes in.  What we're going to do is the write command is going to come in, but we're going to pause it for a moment.

Next slide.

(Document displayed.)

We show the write command coming in and then we're going to pause that.

What we're going to do is we're going to assess where that -- what block that write command is directed to.  And we're going to take a copy of that block and put it in the cache.

Next slide, please.

(Document displayed.)

So in this case the write is directed to block five. We've taken block five and copied to it cache.

Why have we done is that?  We've done that to

preserve the backup in its stable state so that we don't have partial writes when we make the backup or interrupted writes leading to instability in the image and instability when we try to restore it.

Next slide, please.

(Document displayed.)

Now that we've copied that original block, we're going to execute the write, which just means we're actually going to write to that block as was originally intended by the micro-process and we're going do mark the block or flag it in some way to indicate that it's been modified since the backup process began.

That's what we're showing here.  The write is on pause.  The write occurs to the modified block, and then we flag that written block.  And then the backup continues.

Next slide, please.

(Document displayed.)

So you'll recall we backed up blocks one, two and three and now we're backing up block four.

Now we're going to get back to the block that we're written on that has been flagged as written.

Next slide, please.

(Document displayed.)

And what we're going to do rather than copy the block that has been modified, we're going to take the original block

that has been stored in cache and copy that to the backup storage device.

Next slide, please.

(Document displayed.)

So we see that's been written to, and then we move block five from the cache to the backup storage device.  And then we complete our backup.

Next slide, please.

(Document displayed.)

And we have block six that we need to copy over, and block six is copied.

And the result is that we have a copy of the -- a copy of the data on the storage device from the time we decide to back it up when it was in its stable state, but we have been able to do that while there have been reads and writes.

**THE COURT:**  But the new write did not get copied onto the backup storage device.  What was copied was in its state prior to being written upon.

**MR. WALL:**  That's exactly right.  That's exactly right.

So this Copy On Write process is something that was known in the prior art.

One thing to note about the cache is, of course, a cache is not limited.  There are constraints upon its size.

Next slide, please.

(Document displayed.)

So I'm about to give you an example of just what's known as cache overload.  Very simple, right?

If a cache is a temporary data storage area, it's of a fixed size.  If you exceed the size of that area, then no more information fits and that can result in errors or crashes.

So next slide, please.

(Document displayed.)

And so what we're showing is basically just this same Copy On Write except with more writes.

We now have two blocks that have been sent over to cache and now three.  And now we send the fourth over.  And because this cache has a three block capacity, just for purposes of illustration, you can't fit that fourth block in.

As a result, you're not going to be able to restore all of the blocks you need to restore into the backup storage 2005.

**THE COURT:**  You did -- this did require a suspension of the write function while the copy block was being written to the cache.

**MR. WALL:**  So what's happening is that the write is executed, but it's held for a moment so that the copy can occur and then -- so that the copy can occur and the -- and be copied to the cache and then the write executes.

So, yes, there is a pause in which the write command

is suspended.  So that's -- that's exactly right.

THE COURT:  But presumably it's a shorter pause by using this cache method than if you just suspended the whole thing and sent everything to the backup?

MR. WALL:  That's right.  It's the difference between just pausing the suspension for a moment as opposed to just stopping all writes from executing at the moment and preventing the user from accessing the application.

THE COURT:  You're only pausing that particular block?

MR. WALL:  A write to that particular block.

THE COURT:  Right, right.  Okay.

MR. WALL:  So next slide, please.

(Document displayed.)

What the '211 and '380 patents describe are modifications to the COW process to prevent cache overload.

Just as a final point, that COW process is well known.  What the '211 and '380 pants are addressing are preventing these caches that are used in that process from overloading.

And that's the end of our presentation.  Do you have any additional questions, your Honor?

THE COURT:  No, not yet.

MR. HALKOWSKI:  Can we have a few minutes?

(Discussion held off the record between

counsel and the clerk.)

**THE COURT:**  I assume this was deliberate.  You didn't discuss slide 44 because you had skipped from 43.  I assume that was a deliberate.

**MR. WALL:**  That's right, your Honor.

**THE COURT:**  Okay.  All right.  We can take --

**MR. HALKOWSKI:**  Five minutes?

**THE COURT:**  A five-minute break.  And so you don't have --

**MR. HALKOWSKI:**  A hard copy today.

**THE COURT:**  A hard copy, but you will have a slide presentation, is that right?

**MR. HALKOWSKI:**  So want to make sure we get a screen in front of you, so we'll work on that.

**THE COURT:**  Okay, good.  Fine.  We'll take a five-minute break.

(Whereupon there was a recess in the proceedings from 10:45 until 10:59 a.m.)

**THE COURT:**  Okay.

**MR. HALKOWSKI:**  Judge, with the help of your able assistant, we were able to get you at least a black and white copy.

**THE COURT:**  That's great.

**MR. HALKOWSKI:**  We'll get you a color copy of that when we get back to the office.

Mr. Katz is going to begin our presentation.

THE COURT:  All right.  Thank you, Mr. Katz.

MR. KATZ:  Your Honor, I'm glad to see you do have a screen.  We weren't sure when we walked in.

THE COURT:  I do have a screen.

MR. KATZ:  It's an honor to be in front of you once event.  I'm sure you don't remember me.  It was about a 15-minute hearing about eight years ago.

THE COURT:  I hope I treated you fairly.

MR. KATZ:  So I would like to apologize for any redundancy between any of the presentations.  We didn't know what Symantec was going to cover, but I think you'll find our presentations do complement each another very well, as it happens to turn out.

I would like to make one clarification before we begin, and it's just with reference to Symantec's Slide 25, referring to a parties agreed construction.

That is true.  It's an agreed construction for the '517 patent because that patent has a definition in it.  However, we do believe that the term "image" is broader than "blockwise image" as it might apply to other patents, but that is an agreed construction for the '517 patent specifically.

THE COURT:  Okay.  Thank you.

MR. KATZ:  Okay.  So we're going to actually begin kind of at the end where Symantec left off.  We're going to

talk about technology from the Acronis patents first and then well proceed to comment on some of the technological aspects of the Symantec patents.

THE COURT:  Okay.

MR. KATZ:  With that, Acronis as two patent-in-suit: The '211 and '380 patent.  Both are related, so we will be discussing them, the technology relating them together.

So as Symantec had already discussed, you have an issue that computers can get corrupted.  There can be failures and then you can lose valuable data.  And so that's why you do a backup.

And so the key here is that backups will allow you to restore a computer system and reload files to the state it was at some prior time.  Now, that doesn't guarantee that you're going to keep everything you've ever had.  Anything you've done since the last backup, unfortunately, you've lost.  But at least then you don't lose 10 years of your company's assets, you only lose maybe a few hours, depending on how often backups are done.

So in this example, we just show that you have a healthy computer disk on the left.  On the right there are three files -- or, excuse me, three blocks we show in two different files that are being written to at the time of a computer crash.  Because the blocks are being written to at the time of the computer crash, they become corrupted and so that

data is lost.

Okay.  Next slide, please.

(Document displayed.)

So as we've discussed, so backups takes snapshots of file systems.  So here we have a simple example showing that you've got a computer disk on the left and at 2:30 p.m. you take a snapshot of that computer system and all of the files and blocks we see on the left are copied to the backup server.

And we use a little motif of a camera because the concept of a camera snapshot is fairly accurate.  You want to take a picture.  Here is what it looks like at that instant in time.

Now, the '211 patent does describe the problem with doing backups.  So in here there is some text and it says:

"As discussed above, the data backup operation is time consuming.  Thus, in order to conform backup data with any specific state at a given moment, the data being copied must not change before the backup operation is completed.  Typically this task is not difficult if the data storage and the file system associated with the file storage are not connected to any active computer or is otherwise blocked from data modification."

All right.  And so here the point that's being made

in the patent is that backups are never instantaneous.  And if you could take an instantaneous backup, all would be well; but it takes time, especially with the very large computer systems.

And so what's the computer going to do while the backup is occurring?  And so you've heard counsel for Symantec discuss that you -- offline backups, which you can take -- you can stop using the computer and just allow the backup to happen, but more often than not companies want online backups, the ability to back up while people are still using the computer.  And that's where the problems come in, that there are a variety of patents aimed at providing solutions.

(Document displayed.)

So here on the next slide we have another quote and it says:

"If the file system is connected to an active computer and there are file system processes and user applications working with the data during the backup process (eg, an on-line backup) then the task becomes more complicated.  Online backup is typical for servers with a high level of accessibility and, therefore, cannot be stopped to allow the backup to be completed."

And I would say probably most companies, certainly large companies today do require, you know, online backups and

so this is, obviously, a big issue in this day and age.

So here we just illustrate the problem of trying to write to a disk while a snapshot is being taken.  And here the illustration is we're five seconds into this backup that we wished was instantaneous, but isn't.

As you can see, in the computer disk on the left it has two files.  Each file has eight blocks.  And on the right is the backup storage.  And you see not all the blocks from the second file have been copied to backup.

All right.  The backup is still occurring.  It hasn't completed.  So now what happens?  In this case what we see after five seconds of backup, the computer has written to two of the blocks that we show in red here.

Here there is no problem, and that's why we have also smily faces.  I wanted to find checkmarks, but I couldn't find them in PowerPoint so I had to use a smelly face.  Here we show the smiley face to show you've successfully backed up before the write occurs, so all is well.

But, of course, what happens if other blocks are written to, blocks that haven't been backed up yet?  And that's where the problems come in.

(Document displayed.)

Okay.  So in this next slides we see that at 10 seconds after the backup started at 2:30, a few more blocks have been copied to the backup server.  But in this case we

illustrate that a write to disk has happened with the last block of the second file.  As you see, the last block of the second file has not been backed up yet.  And because it's been written to, somebody has changed the data and that means that the data that existed before the write is now lost.  It has not been backed up.  And that's the problem that you have with the fact that backups are not instantaneous.

How do you handle these issues that you want to make sure you can preserve a complete snapshot in time when in an on-line process computers are constantly trying to write to the blocks in the files.

Okay.  So one solution, which is kind of a brute force, but unpleasant solution and, in fact, would mean you not really aren't having an on-line process is you say "no writes to the disk."

And I think we heard counsel for Symantec talk about this solution.  All right.  You just say:  Look, this backup is going to take some time and just halt all writes to avoid any problems.  Obviously, obviously, not a very satisfactory solution.

Another solution we heard about this is Copy On Write.  And so I've got some other illustrations which I think will complement Symantec's illustrations.  Hopefully, add some clarity to the process.

Again, as Symantec said, the Copy On Write procedure

was known -- you know, it's not what these patents are claiming as an invention.  This was a known procedure.

So how does Copy On Write work as described in the patents?  Well, what you do is you create these things called Inodes and some systems called Anodes.  And the key is it's a list of blocks.

And so you create a list of blocks and here you have a list that says:  Here are all the blocks in my file.  Now, you don't make a clone, which is like a backup, but not exactly as you'll see.  You don't copy those blocks, because you copy the blocks, you've now duplicated the amount of disk space you've taken up and it takes time.

Instead what they do is clone the Inode.  They say: Let's make a new list that's pointing to the exact same blocks. And so now you've got -- once you make the clone, you have two of these things called Inodes, which are lists of blocks pointing to the same blocks on the disk.

THE COURT:  It's just a list of blocks?

MR. KATZ:  And pointers to them.  Here is the block and here is where it is.

THE COURT:  Not the content?

MR. KATZ:  Not the content.  It points to the blocks with the content exactly.

So at this point the computer thinks it has current data and a snapshot of data.  What it really has are two lists

pointing to the exact same blocks.

So one of the benefits of Copy On Write is you don't have to copy all the blocks over.  They are pointing to the same blocks.

(Document displayed.)

Now, how does this help?  Well, now, let's see.  So now the computer wants to write to a block.  And the key is the computer does not modify an old block.  Instead what the computer does is it's going to create a new block on the right.  So it's going to copy that block into a new location.  It's going to add the written data.  And that's what we show in red.

So if we assume that's the first block that's being written to, we don't actually write to the first block.  You write to a copy of the first block.  And so we see a copy of the first block is being made in red, and you change the iNode to point to this new block.

And there are figures in the patent that show this, but I think these illustrations are a little easier to follow.  If you look at the first few figures of the patent, they say the same thing.

Okay.  So here you have the old block one and then you have a new block one.  So now look at what has now occurred.  You have the new iNode pointing to the old blocks two, three and four, and it points to the new block one.  You have the clone iNode, which is your saved copy of the data,

points to the old blocks.

So the beauty here is you made a very fast backup, but you didn't actually copy all the blocks. You just copied a list and a pointer to the blocks. And, yet, now you have the clone iNode point to what you would now called kind of a snapshot copy, and the current iNode points to the current copy and --

THE COURT: The new write was directed to the new block one somehow, rather than modifying the old block one?

MR. KATZ: Exactly. From the operating system perspective or from the application perspective, certainly, it thinks it's writing to the old block, but what happens is the Copy On Write process says: I'm not going to modify any blocks. I'm going to create new blocks instead of modifying blocks. And that's the key to the Copy On Write.

So from the perspective of the software on the computer, it thinks it's modified block one. It doesn't realize what happened is the Copy On Write made a new block one.

So in some sense from the perspective of the operating system, or at least the higher levels of the operating system, it thinks it has two versions. It thinks it's captured a snapshot of the old data and it has a current data, but, in fact, the only duplication is the written block.

And so you can see how in this case when only one

block has been modified, the computer effectively has a complete backup, but doesn't really.  The only block that's been duplicated is the block that's been written to.

Okay.  So here we show that the snapshot, which is, you know, kind of like a backup, but not because you haven't copied the data itself.  It's just the older Inode is pointing to the original blocks at the time snapshot was taken.  So that's where -- so if you're trying to look at the old snapshot, the computer is going to look through the clone iNode and pull out those blocks.  And the current state of the disk, as far as the operating system is concerned, is going to go through the current iNode, not the clone, which is going to look to the new block one instead of the old block one.

(Document displayed.)

So now we show one more level of complication where you have now two clones are created.  So you have the current Inode, which shows the current state of the machine with the new block.  You have the original clone, which was the original four blocks.  And now you can create a new clone Inode, which is kind of like a new snapshot, which in this case is now going to point to the current blocks.

(Document displayed.)

Basically what we now have is on the next right you would create a new block, that would be colored red, maybe it would be block two or three or maybe even block one might be

written.  And now we've got two snapshots.

And you can see that in the Copy On Write process you're constantly writing new blocks every time a block needs to be identified, and you can keep the old snapshot.

THE COURT:  Let's see.  Let me make sure I understand this.

The old clone Inode takes into account the now modified block one?

MR. KATZ:  No, it doesn't.  If you notice, the old clone Inode is pointing to the original four blocks.

THE COURT:  I guess the coloration of that, number one, is --

MR. KATZ:  I'm sorry.  That coloration is actually gray instead of red, and it was just to reflect that that's now an old block.

THE COURT:  Okay.

MR. KATZ:  But so, yeah, that's a little confusing.

THE COURT:  Okay, so that's old.  And then the new Iclone has already taken into account the modified.

MR. KATZ:  Exactly.  The new clone would look at the modified block.  It would never look at the older blocks pre-modification.

THE COURT:  And  which is the same as the current Inode is looking at at that point?

MR. KATZ:  Right.  Whenever you make a clone, it will

mimic the current state.  And then the clone looks different the minute you have a next write.  So the next write will create a new block, direct the current Inode to the new block, and then the new clone Inode will reflect the state as it exists right now on the slide.

THE COURT:  I take it that the old clone Inode somehow then directed those blocks to be copied?  I mean, because it -- that's the old -- that's the snapshot you want premodification?

MR. KATZ:  Right.  The key is that nothing for the -- for the old clones nothing is copied because you're creating new blocks when writes occur.

So the old clone Inode is always pointing to these old blocks that are not modified.  And so if you have a system crash, as long as you're not modifying a block, the block will survive a system crash.  The problems come in when you don't -- when you're doing a write to a block at a system crash, then it gets corrupted.

So the key here is the old clone Inode doesn't require any copying at all.  It is always looking to the old blocks, and that's what makes Copy On Write a very fast backup process.

THE COURT:  What's done with the old clone Inode?

MR. KATZ:  It will sit there for as long as you want to keep that old snapshot.  And then if at a certain time you

want to clean up the disk, you delete the old clone Inode and then you delete any blocks that only it is pointing to.

So, for example, let's say I didn't need that old snapshot. I delete the old clone Inode and I delete the original block one because no one else is pointing to it. As long as other of these Inodes are pointing to blocks, you, obviously, need to keep those blocks because they are part of newer snapshots.

THE COURT: There is no backing up at this point.

MR. KATZ: Exactly. This is a way of tricking the system to think you're doing a backup, but you're not actually copying blocks at all.

THE COURT: Hmm-hmm.

MR. KATZ: And that's the beauty of the system. That's why it's so fast and that's why it's so efficient.

THE COURT: You're preserving it at a certain state as you modify it?

MR. KATZ: Exactly.

THE COURT: But it doesn't protect against if you have a system crash and the whole thing goes -- everything is gone.

MR. KATZ: That's right. If you assume that your disk is going to get wiped out, you lost the data. And so even in a Copy On Write system, at some point you may want to back up the data in case you have a catastrophic disk failure.

But the nice thing about Copy On Write is as you're going along, you're allowed to create new data.  Keep snapshots of what it looked like at a previous state so that if you have just a system crash, not a disk failure, but a system crash --

**THE COURT:**  You go back to a prior date.

**MR. KATZ:**  (Continuing) -- you can go back to an old state.

But if you want to then back up this Copy On Write process, then you would have to somehow, you know, do a backup.

But as the patent describes the Copy On Write process, it is not actually copying the old data.  So it's assuming you're going to have, like, a power out and -- but not a catastrophic disk failure.

**THE COURT:**  Okay.

(Document displayed.)

**MR. KATZ:**  Okay.  So then what the patent talks about is, you know, how can we improve on these processes.

And so we're here showing Fig. 8 of the patent, which shows a few pieces that we have already discussed.

And so if we go to the next slide we kind of annotate Fig. 8.

(Document displayed.)

So you see you've got the backup storage, 330, which is, you know, like the backup storage we've, you know, talked about in previous slides.

And you've got the main storage.  The disk storage is actually that little strip in the middle where it says "Storage Media."

So what this is -- the slide is reflecting is that on this disk media you've got some portions of the disk that are backed up and other portions of the disk that are not.  And as you see, write requests come in.

So, remember, we have the red arrow in the previous slides.  And here you have the write request shown in Fig. 8 coming in wanting to write to the disk.  And now the question is:  How can you do this online backup process when you've got this write coming to the disk?  And this is what we're going to describe here.

(Document displayed.)

So what the technology being described here is, is that you first make a list of the blocks that need to be backed up.  And so step one you say, okay, well, which blocks do need to be backed up?  And then you're going to start copying them.  And so as long as no write requests are coming in, you would do a standard back up.

All right.  You're just going to copy block by block by block.  As long as no write comes in, you know, you're safe because the problem comes in when you try to write to a block, because then it can change and if there is a system crash, you've lost the data.

Okay.  So, again, you're copying these blocks and now a write request comes in.  What do you do?  So what the exemplary process is talking about here is that you're trying to write to a block that hasn't been backed up yet and so what do you do?  You suspend is write because you don't want to overwrite that data and you copy the existing data to this thing called a block data container.

Okay.  And so we saved the data before we let the write go through.  One issue is you don't stop the whole machine from operating, right?  This is a low level process.  You just stop that write from writing to this block.  And so you see here that we're saying:  Stop.  Don't write to it.  Let's first copy the block to the block data container and then we can let the write proceed.

So if we --

THE COURT:  It's done on a block by block basis?

MR. KATZ:  Yes.  This is a block by block issue.  What you have is a block data container and, of course, a block data container, as the name suggests, is -- contains blocks.

So now we've saved this block in the block data container and now we let the write request proceed and meanwhile the backup can continue copying over blocks that are not being written to at the time.  And for a block that has been written to, you don't take the block that's been written to because it's been changed.  Instead you take the block in

the block data container.

THE COURT:  The block data container is some kind of memory device?  Can it be a volatile cache type?

MR. KATZ:  I think as the patent describes, it can be pretty much anything.

THE COURT:  Any kind of memory?

MR. KATZ:  And I think that, you know, the idea here is that it's going to be faster to get to the block data container than to the backup.

THE COURT:  That was my question.  Why the intermediate?

MR. KATZ:  It's much faster because, remember, the backup storage has a lot of data on it.  It's organized.  It might even be under a file system, if it's a file-by-file backup.  It may be -- if it's sector-by-sector, then it's going to have a whole bunch of blocks within a particular organization.

You know, there are going to be restrictions on speed.  You can craft a block data container to be much faster.  You're only copying a few blocks.  So you have a lot more flexibility on how to get the date into the block data container.  If you had no speed increase and you could guarantee you could get that block written to the backup, then, you know, I suppose that would be a different technique.

THE COURT:  Speed is by virtue of the relative

simplicity of the block data container compared to the backup.

**MR. KATZ:**  And it doesn't have to keep track of all the other data.  And it could be even location, right?  The backup storage maybe a network device.  And so there will be an inherent slowness in getting to that storage while the block data container could be located much closer to the disk storage.

So there are a lot of different implementations, but I think the key -- your Honor hit the nail on the head -- is it's much faster to get the data into the block data container than into the backup storage and, therefore, the halting of the write request doesn't take nearly as much time than if you actually suspended the operation and said:  Wait until a traditional back up is accomplished.

Another potential issue, you know, is that if you're going to take the blocks out of order, you know, it's not necessarily clear depending on how your backup storage is organized if you could actually take the blocks out of order. So if you wanted to make sure to grab the block that's being written to, it may not be possible to get it into the backup storage in the place it belongs.  So that could be another issue that could come up.

(Document displayed.)

Our next slide shows that, you know, the backup continues.  As long as no writes are happening, it is more of a

traditional backup technique.

So that's our tutorial on the technology related to the Acronis patents.

Now I'll shift to the '655 patent, which is one of the Symantec patents.  And this is the one that your Honor may recall deals with the synthetic full backup, that process of merging incremental and full backups to create a full backup.

So the '655 patent is really -- it's about a backup catalog.  That's what this patent is focusing on.  So you are synthesizing, you know, a backup catalog in order to create a way of creating a synthetic backup.  The patent is about the way of this creation for this synthetic backup.

THE COURT:  What does this mean, "catalog"?

MR. KATZ:  The catalog is a listing.

MR. PEREZ-DAPLE:  Your Honor, this is actually a disputed term.  I was going to raise this.

THE COURT:  All right.

MR. PEREZ-DAPLE:  We're very cautious about going here at this stage.

THE COURT:  I'm not here to resolve anything, but maybe to give me a preview.  I will give you both a chance to say something so I have some sense of what we're talking about here.

MR. KATZ:  Let's go to the next slide and then we'll see.

(Document displayed.)

So the patent provides these examples.  So the patent shows an example of a full catalog and this figure comes right out of the patent.  And what it shows is that you have a file I.D.  So this -- this catalog, you know, the backup has N files, you know, one through five are shown and N is whatever number you have.

Then the file offset it says is the location to locate that file.

So you have a -- for a full backup you create this full catalog as shown here where you have a whole bunch of files and then the file offsets.

**THE COURT:**  An offset is location?

**MR. KATZ:**  Yeah, the offset is location.  You know, you can keep a backup in many places.

What the patent is describing is tape backup.  By no means are we suggesting that backups are limited to tape, but what the patent is describing here is a tape backup.  And so the offset is actually, it's distanced from the start of the tape.

**THE COURT:**  Oh.

**MR. KATZ:**  So it's like physically I'm now five inches into the tape.  I'm ten feet into the tape.

**THE COURT:**  That's why the term --

**MR. KATZ:**  Offset, yeah.  But it's really, you know,

more generically.  It's the location.  It's where is this file?

THE COURT:  And these are backup files?

MR. KATZ:  These are the backup files.  This is the catalog.  Just like any -- a store catalog, your Sears Roebuck catalog.  It's a listing of all the files that are on the backup system and the locations.

THE COURT:  Within the storage --

MR. KATZ:  Within the backup specifically, yes.

THE COURT:  Okay.

MR. KATZ:  So that's what the patent describes for the full catalog.

So let's go to the next image.

(Document displayed.)

The patent then describes the incremental catalog.  If you recall, Symantec then talked about the incremental backup where you don't back up everything.  You only back up files or blocks, depending on what type of backup you're doing, that get modified.

So in this case it's actually talking about a file-by-file backup.  Here, again, this figure from the patent.  This isn't one much our illustrations.  This patent illustrates that you assume that in between the full backup and the incremental backup, only four files have been changed; Files 2, 3, 31 and 40.

And what this is showing is that you're going to

create a new catalog for the incremental backup that lists those four files and shows where to find them.

In the patent they are suggesting you could put these on a different tape, a different backup tape.  And that's why instead of last to file offset, the first one was called A-11.  This one is called A-21.  But, you know, the specific location doesn't matter.

The key is:  You're listing just those files that have been modified.  You're backing up only those files that have been modified.  And you create a catalog that says where these files can be found.

(Document displayed.)

So you show the second incremental backup here.  So, again, this is sometime later.  In this example three files have been modified since the last incremental backup, 3, 12 and 70.  Again, you create a new catalog that just says:  Here are the files we just backed up and here's their location.

Okay.  So what does this mean?  And this is a -- from Fig. 7 of the patent, I believe.

(Document displayed.)

So to recreate the data, you need to combine all these catalogs to go find all of the pieces to put together your new backup.  So on the left we have the original full catalog.  In the middle we have one of the incremental catalogs.  And on the right we have a subsequent incremental

catalog.  I think Fig. 7 may have two or more, two additional catalogs, but we just took these three.

So you combine the catalogs.  You're going to find all the pieces and you can recreate the system.  It does involve accessing all these different catalogs.

THE COURT:  Different files may have been superseded by each incremental --

MR. KATZ:  That's right.

THE COURT:  File three here is going to be superseded twice.

MR. KATZ:  That's right.  File three is in each catalog because it was modified in between each instance.  And, of course, what this means is when you go to recreate the file, you don't restore a file three from the original backup because you know it's been modified.

THE COURT:  The last modification.

MR. KATZ:  Exactly.  Start with the last one, say we are going to take 3, 12 and 70.  Now what other files do we need?  Oh, let's go get 2, 31 and 40 and go to the back to the last backup and get the files you haven't already captured.

Okay.  So now the patent then has -- and this is figure seven so I may have a correction, was the other figures possibly from three?  We'll check on where the other figures were from, but this one is from Fig. 7, and this shows that you have a synthetic full backup catalog.

In here what they have is all the files that you have in your backup in a single catalog. And the patent shows a backup set I.D. to show you which backup set you're in. Is this incremental set one, two, three? So the patent does show that, you know, as one embodiment.

I don't think we're suggesting that you need the backup set I.D. to be a catalog, but we're showing what the patent shows.

And so here you have the list of files. You have their offsets and then you also know which backup set they came from.

**THE COURT:** And maybe this is all for illustration purposes, but I'm curious why file three would show the first -- so the old version and doesn't have -- A-31, for instance, you would think if you're trying to create the most -- maybe I have it backwards, but it seems like you would want the most recent -- with the modifications, to restore you would think file three file offset would be the final incremental change, which would be found in A-31.

**MR. KATZ:** Well, you would if we assumed that this reflected the same backup as I just discussed, and it doesn't.

Let me correct. I was wrong before. The other figures were from Fig. 3 of the patent. This one is a new example, Fig. 7 of the patent.

**THE COURT:** Okay.

**MR. KATZ:**  So the others were from Fig. 3.  And I apologize to the Court.  I should have labeled them and failed to do so.

**THE COURT:**  Okay.

(Document displayed.)

**MR. KATZ:**  So this is a new backup.  And if you see in this example, file three has not been modified since the first full backup because you see it's from backup set one. Here the example is file one in this circumstance has been recently modified and is from backup set three.  And so not consistent nomenclature, but this is a new example.

**THE COURT:**  Okay.

**MR. KATZ:**  Here we -- we have highlighted one of the rows and, again, show that you have you -- you know, file two has been modified and backed up in an incremental backup and so it's reflecting a location, in this case, on the second tape. But, again, it doesn't have to be on the second tape and it does show the backed up set is two.

In this thing call they call the synthetic full backup catalog in the patent, you don't have all those incremental catalogs lying about.  You actually create a complete catalog for every incremental backup.  So in this case you copy the previous catalog into this new catalog and add the new entries that have changed.

So in this circumstance as shown here, entries for

file two, three, and file N have come from the previous backup, and then file one has a new entry which shows -- because it's from backup set three.

And so in this case the new catalog you copy old entries, except for those entries where you've actually modified the files and for that you actually replace it with new entries.  So even though you're doing a synthetic backup, you know, you're only saving those files modified, you create a complete catalog each time.  And that's what's being shown here; that this catalog is not -- different catalogs.  This is a single catalog that has all the files from all the incremental backups that have occurred.

(Document displayed.)

So here we -- I will state that some more and I think this slide just says what I just said, so we don't do dwell on it.

The key is the catalog for backup set three copies the catalog for backup set two for all unmodified files and appends new rows indicating where the files have been modified. And so the result is a complete catalog, even though you have been doing synthetic -- excuse me, incremental backups.

Okay.  And now at some later time you can merge the incremental backups into a full backup, and that's called your synthetic full backup.  All right?  So then it will be easy to restore.  But the key here is to do that, you don't need to

merge all the catalogs because you've kept the synthetic full catalog the whole time.

So the process goes like this, your Honor: Incremental backup, incremental backup, incremental backup. At each incremental backup, you create this new synthetic full catalog. Then at the very end at some point you can merge all the incremental backups to make a full back up, but you already have the catalog put together.

THE COURT: Why is the newly updated catalog that you mentioned that occurs with each incremental backup already a full -- because it's current. It takes the cumulative effect of each incremental backup. So when you say: At some point then you get the... What is the "at some point"?

MR. KATZ: Oh, the key is this: At incremental backup number five, you have one catalog, as your Honor has just made --

THE COURT: Which takes into account four, five all the way through, what?

MR. KATZ: Actual backups themselves are five separate incremental backups. And so it would still take some time to restore from all the different backups, especially if you assume it's on five different tapes.

What the patent says is what you can do at some later time is combine all the content, the actual files, and then you can update your catalog to reflect the new locations, but

you -- you already have the complete catalog.

So you have a complete catalog with a whole bunch of incremental backups and at some point you can create a complete backup to go with your complete catalog.

THE COURT:  It's not just the updated catalog.  It's the backup itself that becomes sort of consolidated.

MR. KATZ:  Right, at some later time.  But the key is along the way the backup -- excuse me.  Strike that.

Along the way the catalog is maintained as a complete catalog even though the backups may be maintained as incremental backups.

Did I say that right?  Yeah.  Yeah.

THE COURT:  There is a distinction between the actual backups and the catalog of the backups?

MR. KATZ:  Exactly.  You have a -- because it's a -- the synthetic full backup catalog is one catalog even though it's pointing to many different incremental backups.

And so what the patent talks about is you -- having a single catalog has certain benefits that you don't need to recreate the catalog and it can speed the process along.

THE COURT:  At that point when they are actually merged into a full backup, is it no longer a synthetic catalog?

MR. KATZ:  It remains synthetic because it was not created from a full backup.  You're still synthesizing the full backup when you merge all the incremental backups together.

So the patent still refers to that as synthetic because it was not an old style full backup where you copied everything in one go.

THE COURT: So would the locations have changed or the back set -- the offset, would that have changed once you actually do this consolidation?

MR. KATZ: Yes. If you do the consolidation, which you don't have to do. If you do the consolidation, you have to update the offsets in your catalog, absolutely.

THE COURT: Okay.

MR. KATZ: At the very end of the patent they do talk about an alternative method where the file offsets do not point to the actual content on some incremental backup, but may point to some previously created synthetic catalog. I'm actually not quite clear on the benefit that, but I want to point out there is that alternative embodiment right at the end of the patent.

And I want to point out because it kind of originally confused me, so I thought I would just clarify our reading of it for the Court.

The key here is that even though it's pointing to a previous catalog, the key is there is still an entry for every file. This is not an incremental catalog. It's still a synthetic full catalog because there is an entry for every file, even if it's pointing to a previous catalog to get the offset information.

I hit a noodle on that one to understand it for awhile.  So I just point out that detail.  I don't know if it matters, but it struck me as interesting.

MR. WALL:  Your Honor, just for the record, I believe that's an altered copy from the figure from the patent, just to illustrate the alternative.

MR. KATZ:  Yes, yes.  Thank you.

Right.  The yellow is altered to -- they don't have an illustration of this alternative.

So the yellow boxes there was our way of showing, okay, instead of pointing to a previous synthetic -- excuse me, a previous incremental backup, it would point to a previous catalog.  That is true.  That is the yellow boxes we added to illustrate something the patent doesn't actually have a figure for.

THE COURT:  Okay.

MR. KATZ:  With that I'm going to turn it over to Mr. Eaton-Salners.

MR. EATON-SALNERS:  Good morning, your Honor.

THE COURT:  Good morning.

MR. EATON-SALNERS:  I'm going to talk about a couple different patents today.  The first is the '365 patent.

(Document displayed.)

And the general idea of the '365 patent, as we've already discussed today, is that you have an image of a

partition and then instead of storing that partition in some other location, you actually are going to store it within the partition itself.

Next slide.

(Document displayed.)

So a partition is a region on a storage device, for example, a hard disk drive, that's going to hold files or directories, information that you're going to be using in applications on your computer.

In addition to holding files in directories, the patent also talks about a partition holding a stream or block of raw data, which is not files or directories.  A partition could also be empty as well.  So you could have an empty partition.

There are two different basic approaches that the patent describes for backing up a partition.  You can either do a time-oriented backup, which is either the patent describes both file-by-file and subdirectory-by-subdirectory.  And there is also a logical unit-oriented approach, which could be block-by-block, cluster-by-cluster.  And actually this is a typo.  It should say sector-by-sector is the last one that the patent discusses.

THE COURT:  Sector-by-sector would fall into the second category?

MR. EATON-SALNERS:  Right.

So those types of backups, either file-oriented or logical unit-oriented, could be performed either to a different partition or they could be performed to the same partition.

And the difference there is fundamentally with the '365 patent is directed to -- it's directed to doing it in the same partition.

The patent specifically describes that when you're making an image in the same partition under the '365 method, it could either be a file-oriented or a logical unit-oriented approach.

I think there is a dispute between the parties as to whether an image is broader than the explicit definition given in the '517 patent.  So in the '517 patent the parties agreed in Column 4 starting at line 55 that:

"An image is a blockwise image of computer storage, not a file-by-file backup of computer storage."

THE COURT:  All right.  Say that again now.

MR. EATON-SALNERS:  Sure.  That's:

"An image is a block" --

This is for the '517 patent, a different patent.

An image is a blockwise image, so a very particular kind of image is used in the '517 patent.  Whereas, in the '365 patent, I think there is some dispute between the parties as to whether an image, you know, is broader and includes both

blockwise images, these logical unit-oriented images or the file-oriented, which the -- the patent describes both of the approaches.

So, for example, in the '365 patent at Column 6, I think which is quoted there at the bottom left of the slide:

"However, some embodiments allow users

to" --

THE COURT: Which slide are you on now?

MR. EATON-SALNERS: I'm on slide 40? No, back up. Sorry.

THE COURT: 39?

MR. EATON-SALNERS: Back up again. 38.

THE COURT: 38.

MR. EATON-SALNERS: So the citation there on the bottom left to Column 6 of the '365 patent, I don't have the quoted language.

THE COURT: Oh.

MR. EATON-SALNERS: But just to explain what the quoted language is, it's summarized on this slide, but not extracted.

The patent says:

"Some embodiments allow users to select

specific subdirectories and/or specific files

when creating or restoring an image."

So it's explaining that the '365 patent teaches -- in

addition to the block-based or logical unit-oriented image, it also talks about file and subdirectory images as well, just to clarify.

So what goes into a image?  The patent talks about two different types of information that can go into a image. An image can be used from user data, which is, for example, user files that are in the partition.

In addition, an image could -- instead of using those original files in the -- in the partition itself, you can make an image from a copy of the user data, and the copy of the user data comes from a previously created image.

So you could either base your image on the current data that's in the partition or data that's been stored in an image taken before.  And those are both explained in the patents of the quote.

Instead of reading user data from locations organized by the file system, the obtaining step may read:

"A copy of user data from what previously created image of the partition."

So it's the two different sources of information that can go into it --

**THE COURT:**  The third bullet point is just an illustration or explanation of the second bullet point?

**MR. EATON-SALNERS:**  Right.  That's the quoted language from the patent itself.

**THE COURT:** I just want to make sure I understand the relationship between the second and third bullet points there.

**MR. EATON-SALNERS:** So the third bullet point is showing both. Actually, both the first and second bullet points are included in that third bullet point.

So you can read locations -- read user data directly from locations or you could also read a copy of the user data from the previously created image. Those are both --

**THE COURT:** And user data would typically include files?

**MR. EATON-SALNERS:** Sure.

**THE COURT:** What else?

**MR. EATON-SALNERS:** It could include any type of files. It could include program files. Non-executed code.

It could be, you know, an email, or it could be a photograph. It could be any type of user data on the partition itself.

**THE COURT:** But not the software patent application -- not software itself? It's something entered by a user.

**MR. EATON-SALNERS:** Yeah. I think you could -- you could construe it a little more broadly than that.

A user file could be a program that the user installed as opposed to a part of the operating system or something like that. So a user could write what program

himself.  That would still be a user file.

So once the image is created, obviously, the opposite of the image creation is the restoration of the image.  There is a process described in the '365 patent for how to restore an image.

The first thing that happens is the program locates any images that are existing on the computer.  So you find the location of the image within the partition.

(Document displayed.)

Next.  The image is verified.  There is both consistency and integrity of the image is verified.

THE COURT:  What does that mean?

MR. EATON-SALNERS:  So if you look at the next slide, I will explain consistency and integrity.

(Document displayed.)

THE COURT:  Okay.

MR. EATON-SALNERS:  So verifying the consistency, you're detecting whether there has been any inconsistencies that happen to the data before or during the right process.

So we kind of talked before about how you need to put a file in a disk in an exclusive write state.  So you don't while you you're backing up the data introduce erroneous information.  So you don't have a snapshot of one particular time.

So if you have a portion of your backup from one time

and then a portion from different time, it's become inconsistent.  The image no longer has consistency.

And the second is:  Has your image maintained its integrity since it was created?  So, for example, there may be some error in the disk.  Maybe some byte got flipped.  You put a magnet too close to your disk.  So at some point the image lost its integrity.

And there are prior art, methods describing the patent for verifying the integrity of your disk as well.

And then finally after the program has located the image and verified the image, then it restores the image either to the same partition where it came from or it could be to a different partition as well.

(Document displayed.)

So the next patent to talk about is the '517 patent.  The basic idea behind the '517 patent is you're retargeting an image into new hardware.

So if you, you know, change your computer and you have a -- you know, a different sound card and a different hard drive, your old computer image may not work correctly on the new computer.

The key for the '517 patent is that that's done in a pre-boot environment.  As the title of the patent says, "Retargeting."

"A captured image to new hardware while

in a pre-boot environment."

**THE COURT:** What is a pre-boot environment?

**MR. EATON-SALNERS:** Let me explain the process of how a computer boots up. That's actually one of the terms in dispute as to what exactly pre-boot environment is. So I'll just kind of explain the background of the computer booting process for you.

**THE COURT:** Okay.

**MR. EATON-SALNERS:** When you turn on your machine, the first thing that happens is that the processor inside your machine gets an instruction to locate the bias. The bias is the basic input and output system. That's a small portion of memory on your motherboard in your computer and that tells you, informs the computer how at a very, very low level it can operate.

So after the BIOS gets started, it's going to run a post process, which a power up self test. You're going to test all the attached devices for reliability. Make sure that the computer is functioning properly. Maybe you've seen a, you know, quick screen when you turn your computer on, it's doing some checks of the various hard disks and so on. Maybe checking the RAM. That's what's going to happen in the post process.

(Document displayed.)

Next you're going to call a boot loader. A boot

loader can either call a pre-boot program.  So, for example, if you have something besides your operating system that's going to run at startup, because you have some special processor program that's going to run instead of the operating system or before the operating system, that can be called.

And then eventually either called directly or called from a pre-boot program or after a pre-boot program.  Your operating system is going to call -- for example, that would be Microsoft Windows.

And then once the operating system has finished booting, you're kind of in your normal operating state.  So, you know, you've got -- your desktop comes up.  You're icons come up.  All your programs are ready to be used.

THE COURT:  Explain to me what it means "boot loader on the master boot record."  What is that?

MR. EATON-SALNERS:  Sure.  So the master boot record is a portion of the disk that says what's going to be booted into, what's going to be loaded.

So are you going to boot into a particular operating system?  Sometimes people install multiple operating systems on the same computer.  She might have an opportunity to select between different operating systems.  You may have Windows installed or Linux installed.  So you could choose between those two different programs.

There may also be some programs that's running

because you've configured the program to run some special program rather than to booting directly into Windows, for example.  Those are decisions that can be made in the bootup process.

THE COURT:  And a boot loader?

MR. EATON-SALNERS:  The boot loader is the program on the master boot record that loads -- loads the operating system or loads the continuing program that's going to run.

So the master boot record is an area on the disk, and a boot loader is a program inside the master boot record that's run.

THE COURT:  The boot loader -- I thought you said it's a program.

MR. EATON-SALNERS:  It's a program that maybe selects an operating system, for example, or, you know, if it starts up, an operating system automatically.

THE COURT:  But you said it resides on the --

MR. EATON-SALNERS:  On the disk, right.

THE COURT:  But is it a software or hardware?

MR. EATON-SALNERS:  It's software.  You can overwrite your master boot record with a different boot loader, for example.  Your computer is probably configured to boot straight into Windows every time you turn it on.  Maybe you want to install Linux and have a different boot loader that will allow you to choose.  This time do you want to go into Windows or go

into Linux?  You can overwrite your boot loader program.  It's definitely software.

(Document displayed.)

And then last two slides, we've kind of already discussed this.  But the purpose behind the '517 patent is if you have a source computer and target computer that have different hardware, it may be necessary to update drivers or change an image that's being restored in order to have your image work on the new computer.

THE COURT:  And the term pre-boot environment, is everything up until the point where the bootup is complete?

MR. EATON-SALNERS:  Again, that's a term of dispute between the parties.  But I think it's up until the operating system is in an usable state.

We'll address that at the Markman hearing.

THE COURT:  Sure.  Okay.  Turn it back to my colleague, Mr. Katz.

MR. KATZ:  To resolve a question that your Honor had.

THE COURT:  Sure.

MR. KATZ:  You asked earlier, you know, this is not a backup.  It's not on a separate disk.  And, you know, I said that was correct, and that is correct.

This is -- you don't have a backup at this point.  The reason why you can now back this up very easily though -- I just wanted to clarify this point for you because I don't think

I addressed it adequately before -- is once you have a clone Inode here in the old Copy On Write technique, those blocks are never going to be written to.  So you can back up those blocks just by reading them.  And effectively you are doing an offline backup, right?

With Copy On Write the kind of the online system things are modified.  You know, those blocks will be -- you're going to create these new blocks.  Remember, you don't modify a block, you create a new one.

So, in fact, you can then back up a clone onto a different disk to avoid catastrophic disk failure.  And it's effectively an offline process in the sense that you're reading blocks that can -- that you know will never be written to.

Does that address your Honor's question?

**THE COURT:**  And that can be done -- since you know it won't be written to, that can be done while the system is still operating and the user is still writing?

**MR. KATZ:**  Exactly.

**THE COURT:**  You've got a shell around these blocks.  They can't be altered.

**MR. KATZ:**  That's right.  And the key is because you can never back up the current state, you're always backing up a previously made clone.

So you have identified a clone.  You made your clone Inode and then you can say:  Okay.  We have a clone, now we can

back up the clone.

THE COURT:  Okay.

MR. KATZ:  All right.  Okay.  Now, we want to move on to the '086 patent, and this is the virtual machine patent, which, you know, discusses capturing the state of a virtual machine, which is, again, I think, a term that both sides offer claim constructions for.

Actually, I take that back.  Maybe they say ordinary meaning.  In any case, it shows what does it mean to have a virtual machine and what does it mean to kind of back up a virtual machine?  That's really the issue here.

And I think Symantec did a pretty good job of already discussing a virtual machine which will aid the process along.  I will apologize for any redundancy, but maybe in some senses redundancy is helpful.

THE COURT:  It always is.

MR. KATZ:  So, again, from our perspective, the way I like to say it is that what is a virtual machine?  It's from the perspective of an application program.  Microsoft Word, an email server, you know, Microsoft Exchange running email.  It thinks it's operating on its own machine.  It sees a machine, but it's not really a physical machine.  What it sees is a software program pretending to be a machine.

And so the virtual machine can, for instance, you know, make the Microsoft Word program or the email program

think it's running on a particular computer with particular disks when, in fact, the actual physical computer is much different.  What it allows you to do is you can run, for instance, four or five different email servers each in their open virtual machine and, you know, they won't conflict with each other because each one thinks it's running on its own computer.  And this much larger physical computer is -- has created these shells around each program and is managing them, basically tricking the application program to think it's running on its own physical device.

THE COURT:  And each virtual machine thinks it's operating on its own operating system?

MR. KATZ:  That is exactly the idea.  A virtual machine will have a virtual operating system, virtual hardware from the perspective of the application program.

So, for example, you can have Microsoft Exchange think it's running on Windows -- you know, on Microsoft server seven or whatever.  In fact, it could be running on a Linux machine, which has a virtual machine which is faking out Microsoft.  Whether that's possible, I don't know because I don't think you would have access to Microsoft proprietary information, but in theory you could build a virtual machine --

Actually, for example, your Honor, Macintoshes allow you to run Microsoft software.  It's not exactly a virtual machine, but they do it by mimicking the Microsoft operating

system.  But the key is that it truly is virtual.  There is no actually physical machine there, but from the application program it thinks it's running an actual physical machine, an actual sole copy of an operating system even though a virtual machine software is actually running, creating these virtual operating systems.

THE COURT:  All right.

MR. KATZ:  Next slide.

(Document displayed.)

So virtual machines have a state.  What does that mean to have a state?

MR. PEREZ-DAPLE:  Your Honor, again, objection.  This is a term that is in dispute.  I don't know where he is going.

THE COURT:  The term "state"?

MR. PEREZ-DAPLE:  Yes.

MR. KATZ:  I think a phrase is in dispute, "capturing the state of a virtual machine."

MR. PEREZ-DAPLE:  The dispute has to do what is accomplished in a virtual state, which is, I think, where this is going.

THE COURT:  How deeply are you going to get into this question?

MR. KATZ:  Not very deeply, your Honor.

THE COURT:  Well, it may be helpful.  Like I say, I don't want to turn this into a pre-Markman hearing, but just so

I have context, I'll give you -- maybe after you finish, you can kind of give me your -- so at least I sort of understand as I get into it.

MR. PEREZ-DAPLE:  That's true.  I want the parties to at least frame the dispute.

THE COURT:  That would be helpful.

MR. PEREZ-DAPLE:  That's fine.

THE COURT:  Okay.

MR. KATZ:  And so basically what it -- a virtual machine has a state which means:  What's it doing, you know, at a particular moment in time?  What files are open?  What application programs are running.  You know, it's kind of a common sense understanding of the term.

And so because a virtual machine has a virtual operating system and it has a application program interacting with that operating system, the state is, you know, what's going at the time?  If you're running an email server, you know, which files are open?  Which are being accessed at the time?  What is the operating system doing at the time?  You know, it's essentially what is the machine doing at any given time, to put it very simply.

I think Symantec already touched on this earlier, which is:  How do you capture the state of the machine?  And Symantec discussed the idea of suspending.  And, of course, there's also the concept of backing up.  And I think for

purposes of understanding the technology here, the key is that the patent discuss is two different things.

One is, you can suspend a virtual machine; and the other is, you can back up the virtual machine for disaster recovery. And there -- and the patent describes them as different processes. In fact, what the patent describes at one point is that one way of creating a backup is you first suspend the machine and you make an image of its state and then you can back up the image.

So kind of -- actually, your Honor, similar to what I just discussed with Copy On Write where you made a clone first and then you could back up the clone. Here it's something akin to that; that you have a machine, you can -- the patent says you can back up that image to protect it in case you have some kind of catastrophic failure.

I think the key thing to keep in mind here, which is the difference between virtual machines and disks. When you're talking about a disk, right, it has information on it. So you're just backing up the information. You're backing up the blocks. You're backing up the files.

The difference between that and a virtual machine is that a virtual machine is more than just a bunch of files. It is a simulated machine. It's a simulated process. So when you back up a virtual machien, it has -- that's why it has what's called a state. It's not just files. The machine is doing

something at the time and you need to keep track of what it's doing.

So that's the different between a virtual machine backup, because a machine is a process, as opposed to just backing up a disk, which is just a set of information.

THE COURT:  That process is manifest or -- I mean, it is -- still resides in some set of files and things, I mean, that make up the process.

MR. KATZ:  The virtual machine is software running. And so at any given time that software, you know, is doing something.

So, for instance, one thing a virtual machine operating system may be doing is it has a series of files open versus files that are closed.  So that information has to be captured.  Where that information is recorded in a file, I don't know if you would technically call it a file.  But the state of a virtual machine is somehow embodied somewhere in the memory of the device.  It has to keep track of these things.

THE COURT:  All right.  At the end of the day it's still bits and bytes somewhere, in some form, something.

MR. KATZ:  Exactly.  Somewhere there is a list or -- I don't know.  Somewhere there is some indication, these are the files that are being -- that are open at the time.  These are the files that are closed.  These are the programs that are running.  So that information has to be recorded somewhere.

But I think the details of how that's recorded is kind of beyond the issues here.

**THE COURT:**  Okay.

**MR. KATZ:**  So finally there is a concept of what it means to suspend a virtual machine to somewhere.  And this is something that's in the claim and this particular -- what it means to suspend something to somewhere I don't think is in dispute, but Symantec can correct me if I'm wrong.

The idea is when you suspend a virtual machine and you want to capture its image, you have to put it somewhere.  All right.  The idea is that you suspended the machine.  Sometime later you want to restart it.  You want to restart it where it left off.  So even though it's -- half hour has gone by, an hour, a day, you want to be able to restart the machine as though it was never stopped in the first place.

So you have this collection of data called the image of the machine and you have to store that somewhere.  The patent has what I think to laypeople is a bit of a peculiar phrase where a machine is "suspendible to."  And I think both parties agree that what that means is:  Where is this data going to be put?  That's what means "suspendible to."  Strange phrase.

So we have just an illustration here where you have a bunch of possibilities.  You've got internal disks, external disks, cloud storage and network storage.  All those places

could hold this image.  The computer could say:  I'm going to suspend my virtual machine.  I'm going to create an image.  I'm going to put it any of those places.

And then there is also a backup server.  And what we've done in this example is put an X there.  And that's because this software will not copy the data there.

(Document displayed.)

See in this example -- you know, what you would say is that when you create the image of the virtual machine, in this example it could be put anywhere that you see:  Internal disk, external disk, the cloud, network storage.  Except it doesn't have access to the backup disks.

All right?  In this instance the software says: Look, you're not going to put it there because that's for a different purpose.  You're not allowed to.  It's that simple.

So in this example we're just illustrating that, that there is a place that you can't put the data.  There are other places you can.  And just being suspendible to some places where you can put the data.

That's it on the '086 patent.

Very few words on the '010 patent.  I think they talked about earlier bare metal restore.  Interestingly, there is a concept called bare metal restore which, as they described, is the idea of taking a computer and being able to restore it from, like, the bare metal.  It's just like a blank

slate.  You have a previous image.  You want to build it up onto a new computer.

They actually have a product called Bare Metal Restore, which does that.  It is their own trade name.  It is their own product.  I just don't want the Court to get confused with those two things.

And what the Symantec '010 patent went on about, is the user interface to map, as they describe, an old backup onto a new machine.

(Document displayed.)

And what we have here, shown here is Fig. 4 from the patent.  And I think they brought up a different figure, but they are very similar.  You can see that you have boxes indicating the old disks and you've got some boxes indicating the new disks.  And as you can see, the older disks, the older configurations are chopped up because there's, you know, different partitions and the new disks are shown with all free space.  So there's a lot of flexibility there.  And you can see how that's illustrated in Fig. 4.

If we go to the next slide?

(Document displayed.)

This is actually a figure from their user image for bare metal restore.  This is the embodiment of their patent.

**MR. PEREZ-DAPLE:**  Your Honor, he's pointing out something which I believe refers to prior art at this point.

THE COURT:  I'm sorry.  Could you say it again?

MR. PEREZ-DAPLE:  I believe that these bare metal restore programs -- and counsel can correct me if I'm wrong.  I may be mistaken on this -- I believe they have asserted that this is prior art and now he's using prior art to explain what's happening in the patent, what they have identified as prior art to explain what's in the patent.  Obviously, I don't think that's appropriate because he's essentially making an invalidity argument at the same time explaining is what the patent is.

THE COURT:  All right.  What's your response to that?

MR. KATZ:  I guess in the large part he's absolutely correct.  We are alleging this is prior art on the basis of on sale bar.

This is the embodiment of the patent.  I mean, the figure -- the last figure and this figure are uncannily similar.  There is no question about that.  I mean, this is the product of the company.

MR. WALL:  Your Honor -- go ahead.  I'm sorry.

MR. KATZ:  Our allegation is that we do believe there is an on sale bar issue.  We believe they put the product on sale in public use before -- more than one year before the filing date.  I don't see how that has any issue here.

MR. WALL:  Your Honor, two points.

One is we haven't conceded that these programs are

embodiments.  That's their assertion.

And, secondly, is that he's arguing an on sale bar issue.  That's 102-B.  It's invalidity and it's inappropriate.

**THE COURT:**  Right.  So let's make it clear.  I'm not going to address, obviously, the merits of any of this.  I don't allow -- I don't intend to hear, you know, sort of subliminal arguments, et cetera, et cetera in this regard.

My only question is:  In the context of this tutorial, will this help me understand what the technology is, without resulting in some kind of prejudice?  So I guess that's the question.

What's the harm here?

**MR. WALL:**  And my harm is to the extent he's trying to explain to you what's in the patent by looking at something that he considers prior art, he's trying to create an association between what's in the prior art with what the patent is talking about.

And if you're learning about what the patent is talking about based on what's in the prior art, presumably you might be somewhat -- that might lead to an association between the two and you say:  Oh, the patent described what's in the prior art.  That's the prejudice.

**THE COURT:**  Is that something that in this context of this tutorial you can disabuse me of so that I can get at least -- understand the essence of the technology without

being -- having this taint?

MR. WALL:  Your Honor, honestly, I'm just not prepared to -- this is the first time I've seen these slides. I had no idea that they would raise prior art in the context of the tutorial.  I thought we were going through the patents.  So I haven't taken a look at this at all.

THE COURT:  All right.

MR. KATZ:  Shall I respond?

THE COURT:  Yes.

MR. KATZ:  First of all, your Honor, I am the -- this is the first we've heard that they were even suggesting that they weren't going to admit that this is the embodiment of the patent.  I mean, there is no question about that.

But I'm surprised to hear them say it's a contested issue.  We had no idea they were contesting that the inventor's own product, which is this, is what is described in the patent when the figures are identical.  This is new.

Secondly, I must point out that counsel for Symantec has mentioned numerous times the words "prior art" in the course of their presentations.  So suggesting that they have stayed away from prior art in the context of the tutorial I don't think is quite accurate.

And, thirdly, I put this figure in because it's colorful and shows what that patent figure shows and thought it was just a very good illustration of an actual product that has

a similar graphical interface.

THE COURT:  These images are from what?

MR. KATZ:  This image is from the user image for Symantec's Bare Metal Restore 4.6, which is a product that was released right along the same time as their patent was filed and is a product that the named inventor worked on.

But, again, we weren't going to inject anything about invalidity.  The issue of on sale bar has to do with not technology as much as dates of public release, which, of course, we weren't going to inject here.

THE COURT:  I'll let you say one more thing.

MR. WALL:  The one more thing I was about to say is, of course, on sale bar also involves what the patents cover and whether this is a covered product or not.

THE COURT:  I think you flagged the issue and forewarned me sufficiently so that I can insulate myself from falling prey to some subliminal or implied argument here.

But I'm going to allow you to proceed and if -- you know, I know you're not perhaps totally prepared, but I'm sure you're prepared to say something and I'll allow you to say something.

MR. KATZ:  Sure.  And to the extent he can elaborate on their position on whether this is the same or different, we would like to hear it because we didn't know this was a disputed point.

THE COURT:  Okay.

(Document displayed.)

MR. KATZ:  Okay.  So here, again, this is a very nice image, again, with color showing a similar thing that you have, the before and after shots with the various colors.  And they talk about how you can use drag and drop to drag from one to the other.

Now, here --

THE COURT:  This shows you had sort of the before and after?

MR. KATZ:  Exactly.  The top is the before and the bottom is an after.

THE COURT:  Okay.

MR. KATZ:  Now, and now we just show a previous version.  Again, this is actually discussed in the -- the patent itself mentions the Bare Metal Restore product by Veritas, which is the company that Symantec acquired.

And here we're just going to -- contrasting the different technologies; that, you know, as far as the user interface goes, prior to the release of the new Bare Metal Restore the interface looked like this.  And so you had information about original size, restore size.  You saw the identification of the disks.

But I guess what's missing from this figure is what I'll call the color and glitz found in the next one.  Actually,

a comparison, old and new.  And so we just wanted to kind of show the different technologies.  They focused on mapping aspect.  We're focusing more on the user interface aspect.

So in that sense I think our presentations complement each other and we want to highlight those aspects for your Honor.

And with that, our presentation is concluded.

THE COURT:  All right.  Thank you.

You want to comment on a few things.  So go ahead.

MR. WALL:  I do, your Honor.  I think it will be brief.  Unfortunately, I'm going to have to jump around at bit.

THE COURT:  Sure.

MR. WALL:  The first point I would like to address is the catalog discussion from the '655 patent.

So I just point out that what I'm trying to do here is just frame the issue for your Honor rather than argue the point.  There appears to be agreement that a catalog identifies the location of backed up data objects.  I think that's what counsel said.  And the catalog enables the synthetic back up.

What the dispute seemed to be is structural.  That one of the things that counsel mentioned several times is that there was an entry for each file or that the catalog was eliciting per se and he analogized it, I think, to a Sears Roebuck catalog and you think of that as a listing.

The dispute between the parties is going to be what

the structure of that catalog is and whether it is constrained in the way that Acronis is suggesting it is. So I want to at least frame that issue and explain that there were disputes there.

Something else with respect to catalog, which is creating a new catalog that's also a disputed term. I believe the term is "creating a new catalog"? Let me just make sure I get this right for the record.

"Creating a catalog," from the '655 patent. That's the term, "creating a catalog." One of the things counsel mentioned with respect to catalogs was that you create a new catalog every time. In other words, you create a new catalog for the synthetic backup each time, each time you create a synthetic catalog.

That's an issue in dispute. They say that you need to create a completely new catalog and Symantec is making -- is contending that you don't necessarily have to create an entirely new catalog. For example, maybe you could modify an older catalog or carry over information from it.

**THE COURT:** That's with incremental backup, as I understood it, the assertion that a new catalog is created?

**MR. WALL:** That's right. Though I think the issue more pertains -- it may pertain to incremental backups. I'm pretty sure it pertains to synthetic -- catalogs created for synthetic full back-ups as well. Strike that.

I think your Honor is right.  The real focus is with incremental backups.

THE COURT:  All right.

MR. WALL:  I would like to move on to the '365 patent.  And I just wanted to highlight a dispute and counsel, I think, was -- alluded to this; that there is a dispute with respect to the term "image," whether an image must be sector-by-sector or cluster-by-cluster.  By which I mean whether an image is created that way in a sector-by-sector or cluster-by-cluster fashion, or whether it can be created in a file-by-file way.  And both sides, I think, explained how one really pertains to a physical aspect of storage and the other pertains to a logical division.

So there is a dispute as to that term with respect to the '365 patent.

And I would just like to point out on their Slide 36, that figures one and two are actually prior art and identified as such by those figures.  Just so there is no confusion, that's referring to the invention or something of that sort.

And --

THE COURT:  You say there is a dispute about -- on the '365, whether an image can be created i either one of the two.  What's the dispute?

MR. WALL:  So the dispute -- you may recall from our tutorial we were explaining that when you create a

sector-by-sector or cluster-by-cluster image, the advantage is that you capture information that's -- may not be in the file system.  For example, deleted files.

If you do a file-by-file backup, you're not going to capture that information in your image.  So it has significance that way.

THE COURT:  But what's the dispute between --

MR. WALL:  The dispute is that we believe that the image in the context of the '365 patent is limited to sector-by-sector or cluster-by-cluster.  Whereas, my understanding is that Acronis contends that it can also encompass what they call images that would be created on a file-by-file basis.  We would dispute that that's an image, but that's the dispute.

THE COURT:  Okay.  Thank you.

MR. WALL:  Then let's move on to the '086 patent. I'd just like to highlight this issue of state.  And the term, as counsel pointed out, is a state of a virtual machine.  And Slide 57 of Acronis' presentation, I think, it's the first bullet point -- I don't have it in front of me -- states -- it basically indicates that the state is everything it is doing at a given moment in time.

The dispute between the parties is whether a state encompasses everything or not.  Everything that the virtual machine is doing at the moment in time.  Whether you can have a

state of a virtual machine that encompasses part of what that machine is doing.

So that's another claim construction dispute.  I just want to make clear that that dispute existed.

And finally with respect to the '010 patent, first of all, as I said, unfortunately, I'm not really prepared to go into prior art issues today.  And we, obviously, dispute that the '010 patent is invalid.

But one thing I just like to point out regarding the presentation, and something that I guess we alluded to and we talked about in our presentation, is this feature of automatic mapping.  And simply because Acronis has come up and shown a particular interface and certain similarities in it in how something looks, there is more to the '010 patents than that. In particular, there is this automatic mapping feature, which as I was discussing at some length, refers to the determination on how particular information on one configuration is moved to a second one.

And I would caution your Honor just because there may be similarities in how figures in the patent and how a configuration is doesn't necessarily mean that all the features of the patent claims are embodied in the product they mentioned.

That's all I have.

**THE COURT:**  Thank you.

**MR. KATZ:**  I have two brief points.

**THE COURT:**  Yes.

**MR. KATZ:**  Just -- let me make two brief points.

Number one, we did not know there was a dispute over the word "state."  We think it's got an ordinary meaning.

The phrase in question, just for your Honor's information, is "capture the state of a first virtual machine."  And, in fact, this is the first time we heard the dispute framed exactly that way in terms of the word "state" and what a state is because their position was ordinary meaning and we simply are providing construction.

So, again, not quite sure actually what it would mean to have a state, a virtual machine be only some of the information about what it's doing, but that is what it is.

I make one other point, if I may, your Honor, and that is about the issue of the '655 patent and the creation of a catalogs.

And, again, I think Symantec suggested that we should have known to steer clear of a certain area because of a dispute.  I don't understand where they are coming from.  I'll just simply point out that, in fact, their own presentation is fairly consistent with what we said.

And I'll direct your Honor to Slide 44 of their presentation], which is a slide that they skipped over after reviewing our presentation.  And that slide says, and I quote:

"In the prior art each backup would have its own catalog."

And then they give pictures from the patent of the very catalogs we discussed that show the rows containing -- you know, row per file and the fact that in an incremental catalog you have one row per file.

THE COURT:  Say that last part again?

MR. KATZ:  In the slide that they skipped over, Slide 44, they also point to the same catalog figure we point to. And that's the figures at the bottom of the slides, where it lists each individual file.  You know, one file per row.  And you have the full backup.  Lists all the files.  And then the incremental backups only lists the files that have been changed so they have only one row per changed file.  And that's what we were describing.

So I'm not quite sure --

THE COURT:  I thought you were describing -- maybe I misunderstood.  I thought you were sayings once you have a full backup and you go through incremental change one, incremental change two, that there is some updating of the catalog at that point.

MR. KATZ:  Yes.  What I'm saying is this is -- I first described the prior art and showed the catalogs.  And then I went on to describe Fig. 7 of the patent, which talks about the creation of the single catalog.

But I heard them get up and say that we shouldn't have been discussing the structure of the catalog as individual, you know, rows in a table. And I'm pointing out their own slide describes the prior art in the exact same manner that we described.

THE COURT: All right. Well, this has been helpful. Good. As long as nobody says it's been helpful, it's been helpful to me.

(Laughter.)

THE COURT: This has been very helpful. I believe in transparency. No....

I thought your presentations were quite clear and it gives me a pretty good sense of the framework for all this.

What date is our claim construction hearing?

THE CLERK: The 28th at 9:30.

THE COURT: There is not going to be live testimony, as I understand it.

MR. PEREZ-DAPLE: That's correct, your Honor.

MR. WALL: That's correct.

MR. HALKOWSKI: That's correct.

THE COURT: And I guess we'll also have to decide how many and which of the claims we're going to address, and we're in the process of looking through that. So I guess we'll communicate with you exactly what the scope of hearing will be in advance.

MR. WALL:  Thank you, your Honor.

THE COURT:  Good.  Thank you.  Appreciate it.

(Proceedings adjourned.)

CERTIFICATE OF REPORTER


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Monday, November 19, 2012