Pages 1 – 193

United States District Court

Northern District of California

Before The Honorable Edward M. Chen

<table>
<tr><td>Symantec Corporation,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff-Counterclaim</td><td>)</td><td></td></tr>
<tr><td>Defendant,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>vs.</td><td>)</td><td>No. C11-5310 EMC</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Acronis, Incorporated, and</td><td>)</td><td></td></tr>
<tr><td>Acronis International GMBH,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendant-Counterclaimants.</td><td>)</td><td></td></tr>
<tr><td>_____</td><td>)</td><td></td></tr>
</table>

San Francisco, California
Tuesday, November 20, 2012

**Reporter's Transcript Of Proceedings**

**Appearances:**

For Plaintiff:          Quinn, Emanuel, Urquhart & Oliver
                        50 California Street, 22nd Floor
                        San Francisco, California  94111
                   **By:  Eric E. Wall, Esquire
                        Kate Cassidy, Esquire
                        Michael Horan, Esquire**

                        Quinn, Emanuel, Urquhart & Oliver
                        500 West Madison Street, Suite 2450
                        Chicago, Illinois  60661
                   **By:  Aaron Perez-Daple, Esquire
                        David A. Nelson, Esquire**

(Appearances continued on next page.)

*Reported By:       Sahar Bartlett, RPR, CSR No. 12963
                   Official Reporter, U.S. District Court
                   For the Northern District of California*

*Sahar Bartlett, C.S.R. No. 12963, RPR
Official Court Reporter, U.S. District Court
(415) 626-6060*

**Appearances (continued)**

For Defendant:          Fish & Richardson P.C.
                        225 Franklin Street
                        Boston, MA  02110
                   By:  **Frank Everett Scherkenbach, Esquire**
                        **Steven R. Katz, Esquire**

Also Present:           David Majors
                        Symantec In-House Counsel

                        Steven Doyle
                        Acronis Chief Legal Counsel


                        ---o0o---

**Tuesday**, **November** **20**, **2012**                                    **9:30 a.m.**

                    **P R O C E E D I N G S**

          **THE CLERK:**  Calling Case CR11-5310, Symantec versus Acronis.

          Counsel, please come to the podium and state your appearance.

          **MR. NELSON:**  Good morning, Your Honor.

          Dave Nelson on behalf of Symantec.

          With me I have Eric Wall, Kate Cassidy, Mike Horan. And back in the gallery is David Majors; he is in-house with Symantec.

          **THE COURT:**  All right, good morning.

          **MR. SCHERKENBACH:**  Good morning, Your Honor.

          Frank Scherkenbach of Fish & Richardson.

          Also with me is Steven Katz, of Fish & Richardson, representing Acronis.

          We have with us Steven Doyle, who is the chief legal counsel.

          **THE COURT:**  All right.  Good morning, everyone.

          What I would like to do is just simply go through -- and although I asked you to limit the number of terms, I'm prepared to address, I think, all the terms that have been submitted to the Court.

          There are enough relationships and things here that, although it exceeds the normal number here, I think I'm

prepared to go forward.

So I don't think I need to prioritize anything.  I think it's the easier thing to do.  The way I have my own notes organized is supply by patents and terms within each that are up for grabs here.  And so it may or may not accord with your order here.  So it would be easier for me if we do that.

So, for instance, I was just going to start with the '010 patent and the terms that are at issue there, such as graphical view of the first/second computer system configuration.  And so I have -- sort of have my terms lined up, unless you have a different idea.

MR. NELSON:  We had agreed -- it doesn't matter, Your Honor.

THE COURT:  I can switch pages, too.

MR. NELSON:  We are here for you.  And we are going to do this also.  We had arranged it so we were going to do the Symantec patents and then the Acronis patents, but if you want to go in numerical order --

THE COURT:  I was going to do the Symantec ones first.

MR. NELSON:  Oh, okay.  I think we are pretty much --

THE COURT:  But I don't know, within the Symantec patents, whether you had any special order within that.

MR. NELSON:  That isn't so critical for us.  I mean,

the presentations are -- we had to put them in some order, so they are, but we can -- it's a range so that we can go to that particular portion of those.

THE COURT:  Okay.

MR. NELSON:  There are certain terms that we had agreed to group together when we were arguing because they just kind can of naturally lend themselves to that, it's basically the same issue.  And the parties are in agreement on that.  So we can flag that to you.  Otherwise, we had agreed to just kind of go term by term so you could get one side and then the other, if that's all right with Your Honor.

THE COURT:  Yep.

MR. SCHERKENBACH:  We would like to start with '010. As you know, that's number one on our list and it's their patent, so that makes sense to us.

THE COURT:  And the term is the one I just mentioned, the graphical view question.

MR. NELSON:  Okay.

So my colleague, Mr. Wall, is going to be addressing this one, then, Your Honor.

THE COURT:  All right.

MR. WALL:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. WALL:  If we could please put up Slide 72?

(Technical difficulties with projector.)

**THE COURT:**  It's not hooked up yet?

**THE CLERK:**  It should be.

**MR. WALL:**  We're ready to go, Your Honor.

**THE COURT:**  Good.

**MR. WALL:**  So we're going to start with the '010 patent.

And if we go to the next slide?

That is a patent that is titled "Graphical User Interfaces for Mapping Computer Resources."  It was filed in February 2004.

And here there is only one term at issue, and it involves the interface.  But I would just like to sort of give you a little bit of context that we talked about at the tutorial.  I'm not going to belabor it, but I just want to give you context so you understand why you are construing the term.

Next slide, please.

So you may recall, we discussed at the tutorial that one of the problems in the prior art was that users who want to restore backed-up data that has a particular configuration needing to back that up to a new system that may have different hardware; for example, a different number of disk drive or disk drives have different space.

Next slide, please.

So the '010 addresses that issue by providing a graphical user interface that displays an old configuration and

a potential new configuration.  And so if we look at Slide 75, this is Figure 5 for from the patent -- 96 denotes the old configuration, and 98 denotes the new configuration.

And basically the interface allows the automatic mapping of resources from the first computer system configuration to the second computer system configuration.

And in the tutorial, we talked a little bit about mapping.  And as I noted to you, the term that pertains to mapping in this case has actually been stipulated to by the -- by the parties.  But --

Next slide, please.

-- there is one term in dispute here, and that is a graphical view of a first computer system configuration, and then a closely related term, graphical view of the second computer system configuration.  And we'll address those terms together.

Next slide, please.

So Symantec's construction is "a pictorial or text representation of a first or second computer system configuration."  Acronis' proposed construction is "a picture of a first, a second, or second computer system configuration."

So you see the dispute here boils down quite simply into this issue of the presence of text within the graphical view.  And I think the first and easiest thing to do is to turn to the intrinsic evidence to demonstrate why Symantec proposes

that text be included.

Next slide, please.

And what the next slide shows is two of the figures again from the patent.  And to describe it, let's just take Volume F from Figure 4, which is a volume we discussed.

So right -- what's illustrated here is a particular box.  You know, if you look at -- it's a 108E -- it's a particular box, and it's denoted by hash marking, and it's within a particular column.  But it's also labeled, and it's labeled Volume F, which denotes its volume.

**THE COURT:**  Where does it say volume?

**MR. WALL:**  So if you look at 10 -- this is Figure 4 --

**THE COURT:**  Yeah?

**MR. WALL:**  It's 108E.  And there's a box sort of up towards -- towards the top but not there, kind of at the center.

**THE COURT:**  Yeah?

**MR. WALL:**  It's labeled 108E.

And so is what that interface is showing is this box, but in it is Volume F, and inside that box is 1000 megabytes, which indicates the size of that partition.

So just showing this box obviously wouldn't tell you a lot.  It would tell you that there is -- you wouldn't know precisely what the label of this partition was, you wouldn't

know its size.

So the patent describes this interface where both the picture and the text in combination provide the user with information.  And they work together, right?  It's not just the text, it's the fact that Volume F is within that box.  So it's just pointing out that there is an interaction here between text and pictures.  And that's in Figure 4, Figure 5, Figure 6, and Figure 7 of the '010 patent.

I would now like to turn to the text of the specification.

Next slide, please.

And here is a passage, and I believe -- and this is what it states:

"As used herein, a graphical view of a configuration may refer to a representation of the configuration where at least a portion of the representation is provided pictorially on a display device using one or more graphical elements.  Each graphical element may be a pictorial representation; that is, at least a portion of its meaning is derived from its appearance on the screen."

And the next sentence says, "Graphical views and graphical elements may contain text as well."

So the graphical view consists of graphical elements, and those graphical elements may be pictorial or they may be text.

**THE COURT:**  Well, let me cut to the chase.

Why isn't it clear that what it means is a pictorial representation which can contain or include text?  But it has to have some.  And indeed, the specification says, "Each graphical element may be a pictorial representation that at least a portion of its meaning is derived from its appearance on the screen."  So it's got to have some element of, I don't know if you want to call it pictorialness, but it can be supplemented and it can include text.

So the two competing proposed constructions here, yours says a pictorial or text, which suggests, if you read it literally, it can have no pictorial, can be completely text, which I don't think that is the case.  On the other hand, Acronis' just says a picture of and mentions nothing about text.  So doesn't the truth lie somewhere in between?  I mean, the specification history --

**MR. WALL:**  I think so, but let me at least -- I think what I would say is that I think that the patent is disclosing both pictures and text.  But what we've tried to do, at least in our construction, is not just say text, we have a textural representation.  I just want to -- if I could just take a minute to explain why I think that would address the issue?

I think what we're trying to exclude here is just a paragraph, for example, explaining, you know, this is a -- this

is -- Volume F is a 1000-megabyte partition on disk one, that is what we are trying to exclude.  And I don't think that our construction contains that, and let me explain why.

And could you please go to Slide 82.

And this alludes to what I was talking about before, is that what we say is a textural representation, so that textural representation, as I noted before, could be -- so in this case, it's not derived just by the fact that it says Volume F, it's also derived from its particular placement on the screen and its location within that box.  So what I would say is by using "textural representation," that phrase, you are excluding mere text.

And I just would like to also point out --

If we go on to the next slide, Slide 83?

-- that, you know, you can have a textural element that serves not even as a word at all, but just as a representation of something.

And the intrinsic evidence I would like to point you to is the '954 patent.  Now, this patent was cited during the file history.  And the case law states that these patents that are cited in the file history should be treated as intrinsic evidence.

So what I've shown on Slide 83 is a particular portion of the specification of that '954 patent along with a figure from that '954 patent.  And what we have is, in Column

10, and these are some portion of lines 21 through 33, it's referring to this Figure 8 and states:

"A graphical indicator is illustrated as Reference Numeral 112 in the form of a textural X representing that logical device three is defunct, whereby the data in the failed physical disk cannot be recovered for the logical device since there is no correction through raid level zero."

**(Court reporter clarification sought.)**

**MR. WALL:** And Figure 8, you see that it's basically just a textural X in this column, and there is a -- in a particular column, in a particular row.  And the X indicates that there is a failed physical disk there.

And so I guess what my point is, is you could absolutely conceive of a pictorial representation made up, for example, of text elements, like these lines here in Figure 8 could be hyphens or dashes.  The question is, how is the text used?  And so what I would say is that if -- these graphical view claim terms should be construed in such a way that they permit the use of text, but they exclude the use of written language -- near written language to explain what is being shown.

**THE COURT:** Well, so what you are saying is that the term "text representation" is not just text, it is a graphical use of text.

But, you know, the whole purpose of this is to have

the jury understand that.  And now with your proposal we would have to then define what text representation is and go further.

Why isn't it simpler to say, basically, we are talking about a pictorial representation that can include text?  There is still a pictorial aspect of it.  I mean, even this thing, there is a column, a chart, a graphical aspect to it, even though at the end what is being represented as the failed portion of the disk, or whatever, is an X.

**MR. WALL:**  What I'd say, Your Honor, is I think that gets towards -- towards the right place.  I'd frankly like to think about that with my colleagues.  I think that goes to the right place.  Our main concern with Acronis' construction is the absence of a textural element.  And we just don't want to be in a place where a jury is looking at this claim construction and it thinks, you know, the presence of text in a particular interface excludes it, that interface, from being included.

**THE COURT:**  All right.

Well -- well, let me hear from the other side.  You've heard my view that your proposed construction says nothing about text, and that would be misleading.

**MR. SCHERKENBACH:**  Your Honor, I actually think we're entirely aligned with your view on this.  Our construction standing alone doesn't mention text.  In our briefing we tried to clarify that and said, in fact, at one

point of course it can.  So and of course it can, it has to have a graphical element, and it can include text.

So we could modify ours to add at the end "which may include text."  That would be fine with us.  If the Court wanted to say "a pictorial representation of a computer system configuration which may include text," that's also fine with us.

The issue here, and I think got danced around a little bit in the briefing, is whether text alone qualifies, and I think the answer to that, clearly, is no.  And I understand Your Honor to frankly already be at that spot, and so I don't really need to argue about it a lot.

That's really the issue:  Theirs, as written, would allow text only, that's obviously not --

**THE COURT:**  They say "text representation," which, frankly, I didn't catch because it's pretty subtle.

**MR. SCHERKENBACH:**  Right.

**THE COURT:**  It doesn't say "text."

**MR. SCHERKENBACH:**  I didn't really, either.  But the gist -- reading between the lines of their briefing, and this is driven by the way our product works, which is textural, right, our interface is textural, and so they want a construction that would cover only text or something they could call a textural representation but really nothing that anyone could call graphical.  And that's really I think where they

resorted to this '954 patent.

I just wanted to make a couple, just for Your Honor's maybe comfort at this point --

If you could turn to our Slide 7?

Just to get a sense for how this patent uses the various terms that are relevant to this construction --

**THE COURT:** Slide 7?

**MR. SCHERKENBACH:** Slide 7.  Our Slide 7.  It reproduces some of the text that counsel had on one of his slides.

**THE COURT:** Okay.

**MR. SCHERKENBACH:** This is sort of the most important bit of intrinsic evidence.  It comes from the patent at Column 6, lines 38 to 45.

Now, if you just read it -- and this is an example.  There are many other places in the spec that use the language in the same way.

It's talking about a graphical view of a configuration, okay?  And a portion of it is provided pictorially using one or more graphical elements.  So the graphical view is a bigger pictorial representation comprised of graphical elements.

"Each graphical element is a pictorial representation," reading along, and then at the bottom it says:

"Graphical views and graphical elements may contain

text as well."  Okay?  And that makes perfect sense, it's sort of a hierarchy view comprised of elements which can include text.

The important point here is, text alone is never described as a graphical element of any kind.  And so I think that is sort of the answer to this '954 patent that they tried to rely on, as I understand it, to get a broad enough construction where text alone would be called some graphical in some sense.

**THE COURT:**  Okay.

**MR. SCHERKENBACH:**  So that's really, unless you have questions, Your Honor --

**THE COURT:**  No.  I think I have a good sense of what that situation is and where I'm going to go on this one, so let's move on to the next one.

**MR. SCHERKENBACH:**  All right, great.  Thank you.

**THE COURT:**  Now, I had, and I don't know for what reason, but I had the '365 next.  I don't know if you are prepared to address that or you want to skip to another one?

**MR. NELSON:**  That's fine, Your Honor, I just have to find it here in my notes.

**THE COURT:**  If that's harder for you, I can go to one of the other ones.

**MR. NELSON:**  Oh, no, no, I was getting the '086 queued up, I thought we were going to go in numerical order.

**THE COURT:** Oh. Okay.

And the first term that I have in my notes is "obtaining a copy of user data" in Claim 34, is that correct, one of your first ones?

**MR. NELSON:** I can do that one, Your Honor.

**THE COURT:** Okay.

**MR. NELSON:** Let me just find where that is in the presentation and we'll get there.

Well, first, let me go to Slide 28.

Just want to make sure I kind of draw us back to the --

**THE COURT:** Yeah.

**MR. NELSON:** -- tutorial you had.

**THE COURT:** Yeah, that's helpful to me.

**MR. NELSON:** I apologize I wasn't here. I was actually in trial in Virginia.

**THE COURT:** It was helpful.

**MR. NELSON:** Yeah, well, perhaps it was good that I wasn't here, then.

**(Laughter.)**

**MR. NELSON:** So the '365, what this deals with is storing a computer disk image within an image partition. And so the idea behind this, if you look back into the patent, you recall that, you know, one of the things that you can do is, let's say you got a factory image. You know how sometimes when

you get a computer they will ship you the disk that says, well, here is what we installed on the computer; it was sent to you, so you if have some problem, you get a virus and it gets corrupted or something, you can go ahead and at least restore that.  Well, people don't always have the disks, and those kinds of things.  So one of the things that you can do is create -- take that same image, that disk image, and store it within the user partition.

Typically in the specification, the way that is described is, it will be in some format that the normal file system doesn't use all the time so you don't overwrite it, those kinds of things.

But it will show up when the user looks at their system as, you know, part of that -- that partition so you don't run into a situation where the user says, hey, I bought a ten gig -- remember, this patent was filed many years ago -- ten gigabyte disk, and I look at it, and it's only five for whatever reason.  So there are some issues like that.  And that's, generally speaking, what it is that we are dealing with with this particular patent.

Now, it wouldn't have to be limited to that factory image.  It could be, you know, the user wants to back up certain files for critical applications, maybe their Outlook, to make sure that they have those.  You know, there are a number of things that are described in the specification that

are potentials for this, but that is basically what we're talking about in this patent.

So with that, let me turn to the term that you want to do first.

You guys -- so it's 41.

**THE COURT:**  Is that 41 in your book as well?

**MR. NELSON:**  Correct, in the slides.

So this shows up in Claim 34, for example, "obtaining a copy of user data."  And to cut to the chase here --

If I go to the next slide, 44?

-- really, what's going on here is with Acronis' construction they are saying that this copy of user data has to be a specific thing; in other words, it can't come from your normal working partition where you're working on the data and things every day.  They're saying that this, when it refers to a copy of user data, it has to come from within that previously stored image.  That's really the crux of the dispute between parties.  And if you look at the specification, that's just simply wrong.

They refer --

If we go to Slide 43?

So what they do, this is a section, you recall, from the briefing perhaps.  In Column 17 it talks about a method that you could use in order to obtain user data to create this

image that you are going to store within the partition.  And so what Acronis does is refers to this particular section.  And if we drop down, it's not what I have highlighted, but you'll see the sentence that reads "The obtaining step;" it says:

"The obtaining step 702 may read user data directly from the partition using standard file system file-oriented calls or, preferably, lower-level sector cluster-oriented routines," okay?

So they look at that, and they say, well, that's not a copy of user data because it doesn't use the term "copy," that's using the reader data directly.  So when a claim talks about obtaining a copy of user data, it can't be talking about that.

Now, they go down a little bit further, and you'll see the sentence in that section that starts "Instead"; it says:

"Instead of reading user data from locations organized by the file system, the obtaining steps 702 may read a copy of user data from a previously created image 420 of the partition."

So that really becomes -- and that's the crux of the argument.  They say, look, when you read it from the "working partition," I'll call it, you know, the working set of data, that doesn't refer to that as a copy; when you read it from the image, it refers to that as a copy.

Well, besides being a little hyper-technical --

**THE COURT:**  That's the nature of this business, isn't it?

**(Laughter.)**

**MR. NELSON:**  It is to a certain degree, that's fair, Your Honor.  But let's look at how step 702 is actually introduced.  And this is the part that I have highlighted.

"During the obtaining step 702" -- so this is describing the functionality, it's the theme sentence, I would guess, of this paragraph -- "an implementing program obtains a copy of user data which is stored in the partition 300," okay?

So it refers to both of those as obtaining a copy of user data.  In fact, the partition 300, in both of those sentences that I read that Acronis refers to, it's referring to that same partition.

So the theme sentence of the paragraph in the very section of the specification that they rely upon introduces that as obtaining a copy of user data.  So to suggest that the patent distinguishes between the two, when those are both ways that it describes for obtaining a copy of user data, is simply wrong.

And furthermore, if you just think about it colloquially, you know, it's something that we refer to all the time:  If you go ahead and you have your system, your computer system, and you make a backup, then you would -- we would

generally say, well, I have two copies of the data, right? That's the purpose of making the data.

We wouldn't say -- if you went to somebody and said, oh, I only have one copy of my data, somebody would say, well, wait a minute, you made a backup, and now you have two.  Oh, no, no, I have one copy and I have one original; that's not the way the patent talks about things.  That's not the way the patent talks about things. so, honestly, that is the dispute.

We think that the language, itself, this is a situation where you don't really add much to it by construing it.  It is pretty straightforward.  I think a jury knows what its means to obtain a copy of user data.  So it's probably not one where you need to substitute words for what is there in the patent.  But certainly, the crux of the dispute, reading in a limitation that says in this sense you have to get it from the image is just simply incorrect, Your Honor.

**THE COURT:**  And I take it you wouldn't object to a construction which provides that that obtaining a copy of user data means reading user data directly from the partition or from a previously created -- covers both bases?

**MR. NELSON:**  That would be fine, Your Honor.  If you are more comfortable with that and you think that that deals with the dispute, we don't have a problem with that.  We were just suggesting that perhaps one where you don't to have do new words.  But again, as long as we get that idea and the fact

that there isn't a limitation that --

**THE COURT:**  This is an example where perhaps less than precise drafting is perhaps saved by the specification because, obviously, it would have been easier if the term "copy" wasn't used in the first instance or some other terminology were used --

**MR. NELSON:**  Well, yeah, except for, as I said, with the colloquial notion, it's just kind of the way we refer to things.

I mean, you're right, you could just say obtaining user data, but the specification, when we look at this section, it uses exactly the same terminology and says to one of ordinary skill in the art, there is two basic ways in our example to do it, one or the other.

**THE COURT:**  Right.

**MR. NELSON:**  And Acronis is just focused on the second one.

**THE COURT:**  Okay.

Let me hear the response.  The specification, that is actually how I read it as well.  That seems to be pretty persuasive, but I would like to hear --

**MR. KATZ:**  Sure, Your Honor.  I don't know if it's possible to switch to our system?

**(Projector adjusted.)**

**MR. KATZ:**  There we go.

**THE COURT:**  What slide are you on?

**MR. SCHERKENBACH:**  Forty, I think.

**MR. KATZ:**  Slide 40, Your Honor.

**THE COURT:**  Forty.

**MR. KATZ:**  I think we would just like to start with the claims, themselves.  When you are doing claim construction, it's always important to start with the claims.

And as Your Honor just pointed out, the claims are drafted in a certain manner.  And Acronis is just kind of seeking to give meaning to the claim choices made by Symantec.

And so here, for example, in Claim 1, they did specify that you have something called user data stored in a partition, and then they mention that there is also an image which contains a copy.  So there we have a very ordinary understanding in the back -- you have user data, and then you have a copy of user data, which is the image.

Now, if we turn to 34, the key here is it doesn't say making a copy of date.  It doesn't say, you know, having an image creating a copy of data.  It says you obtain a copy.  So it could have said, which I think Your Honor just was kind of pointing out, they could have said that you obtain user data.  All right.  So what does a copy mean, and should it be given effect?

And our position is you do need to give this effect.  They chose to say in this particular claim that you obtain not

the user data, but you obtain a copy.  You are obtaining something that's existing, and what exists?  A copy.  So we would say it would be improper to construe a copy of user data to mean the user data or a copy of user data, which is really what Your Honor was just describing.

And if we go to the previous slide?

So again, the text that Symantec pointed you to where it did use the phrase "a copy" was, as Mr. Nelson pointed out, pointing to the Partition 300.  So that's an ambiguous statement, Your Honor, because our Partition 300 includes both the user data and the copy of the user data.  All right.  So a reference to the entire partition does not resolve the issue.  So we believe that the first topic sentence is ambiguous, at best, as to what it's referring to.

On the contrary, later in the paragraph, which is the part we highlight here, it is crystal clear what it's referring to, and specifically that the obtaining step may do one of two things, may read user data directly from the partition or, instead of reading the user data, you may read a copy of the user data from a previously created image.

So I think it's clear that in this paragraph we have a general first sentence that Symantec focuses on, which is ambiguous as to what it's talking about, because it's talking about the entire partition, and then you have later in the same paragraph two specific statements drawing a specific

distinction, a distinction, by the way, that's borne out by the claims between user data and a copy of user data, which is something stored in the --

THE COURT:  Isn't the significant term the obtaining step 702?  Isn't that what this is about?

MR. KATZ:  The description in the patent is about obtaining step 702, that is correct.

THE COURT:  And that is referring at least to the express terms of the claim, to the obtaining a copy of user data.

MR. KATZ:  Oh, I see.

Actually, Your Honor, that would be incorrect.

THE COURT:  No?

MR. KATZ:  And here's the issue.

THE COURT:  Okay.

MR. KATZ:  Remember, the specification is often written before the claims.  So the specification is referring to obtaining step 702 in the figures, which is not exclusively obtaining a copy when they drafted the claims.

So you can't say that the obtaining step 702 is exactly the obtaining step in the claims, all right?  In the claim, they are limiting it to obtaining a copy of user data. And so they took something that they could have said obtain user data, the spec supports that, but instead they said obtain a copy of user data.  And so the key is, no, obtaining step 702

is not co-extensive with the drafting of --

**THE COURT:**  Where in the patent?  Where do I find the 702 -- Figure 7?

**MR. KATZ:**  If the numbering convention is --

**THE COURT:**  Yeah, looks like Figure 7, right?

**MR. KATZ:**  Okay, so there in Figure 7, it is -- there it's talking about obtaining a copy of at least some user data, which is consistent with the highlighted paragraph down below, where it's referring to a copy, all right?

So what you have here is, 702 is broadly stated as being a generic obtaining step, but the patent text is saying there is two types, you can either obtain user data or you can obtain a copy --

**THE COURT:**  But I understood you to draw a distinction between the specification, which refers to the obtaining step 702, which if you stay within the bounds of the specification, it clearly encompasses both reading user data as well as reading a copy of user data within the spec, itself.

I mean, your argument is that, well, that -- that obtaining step 702, as laid out in the specification, is different and broader than, more expansive than that more specific obtaining in the claim language, Claim 34.

**MR. KATZ:**  That's right.

**THE COURT:**  But when I look at the actual Figure 7, it sure looks the same.  It says, "obtaining copy of at least

some user data 702."  How is that different from the, quote, "obtaining a copy of user data" found in Claim 34?

**MR. KATZ:**  Right.  And I think the key there, Your Honor, is you've got three different things to look at:  You have the text of the specification, you have a figure, and you have the claim.

So I would say Your Honor is definitely reading it correctly when it says the figure uses the word "copy," as does the claim, but the text draws a distinction.  And so, again, you are not co-extensive when the text says, okay, well, actually, we are going to have two things even if the figure might only show one.

So the key here, Your Honor, is that the text has a distinction between obtaining user data and a copy of user data; that that distinction is carried out into the claims.  And the fact that the figure is focusing on the copy is -- would not resolve that issue.  You know, the key is that the text, itself, says you have two different things.

Well, except now we are sort of like construing the specification.  And in construing the specification, I'm looking at the reference to 702, and the question is, is the obtaining step 702 referred to in the specification really referring to the same thing and therefore is useful in enlightening the claim language in Claim 34, or is it referring to something else?

All I'm saying is, when I look in trying to construe the specification language, sure looks like the same thing to me.

**MR. KATZ:**  Right.  And I think that the answer I have to that, Your Honor, is that in the specification it does draw a distinction by saying you have an obtaining step 702, may read user data directly.  So that's one option.

**THE COURT:**  Yep.

**MS. BROWN:**  And then the text then says or the same step could do something else.  So it's two step 702s, right, you have two alternates that the text is providing detail about.

And I don't think it takes any construction here, Your Honor, I mean, it's quite explicit that when it's talking about reading a copy of the user data, they tell you explicitly where it's coming from, right, the copy of user data is from a previously created image 420.

So I think the key here is that you do have this generic obtaining step 702, which is there is some inconsistencies in the spec:  You have the figure, has the word "copy," you have a generic statement saying it comes from Partition 300; none of those is going to answer the specific question here, which is where the copy comes from.

If you look at that text we highlight, there is a clear distinction between just user data and the copy of user

data, which in no ambiguous terms is stated as coming from the previously created image. And that is what we are looking to have the active claim construction get clarified because we think the text here is quite explicit as to what that means.

THE COURT: All right.

I'll give you a short comment on that, and then I want to move on to the next.

MR. NELSON: Okay, thank you, Your Honor.

Here's the problem with that: Your Honor's exactly right, you can see, the problem is they cut out the first paragraph, I mean, the first part of the paragraph. And if you -- even if you go up further, so Your Honor is right to focus on Figure 7.

If we go up to right around column -- or, excuse me, line 5 of the patent, you see where it says "methods generally"?

THE COURT: Where are we?

MR. NELSON: I don't have it in a slide. It would be the '365 patent, Column 17 begins at lines 5, or at line 5.

THE COURT: Right.

MR. NELSON: You see here, this is where it starts to describe Figure 7, which is where Your Honor was focusing. And then the first time it talks about step 702, which is what Your Honor was focusing on in Figure 7, it says.

"During an obtaining step 702, an implementing

program obtains a copy of user data which is stored in the Partition 300." So it introduces it that way, exactly the same way it's described in the figure in the specification, and then it goes on and talks about two ways to do that, right, read it directly.

So the only way Acronis gets to where they are is to ignore the figure, ignore the rest of the specification, and say, well, and when you described one of them, you didn't use the word "copy"; therefore, if I ignore else everything else, that's way read I read it. And that's just not the way you read a spec, you got to read it all together. And it uses exactly the same terminology in the figure to introduce the step as it does in the claim language. So I think that that really disposes of the issue, Your Honor.

**THE COURT:** All right, let's move on to the next.

The next term is "in partition image which is stored in the partition."

**MR. NELSON:** Okay, so this starts at page 31 of our dec, Your Honor.

And if we could put that up -- okay.

So here the real distinction between the two is whether we give meaning to the definitional statements concerning the invention in the specification where it says when we're talking about an image here, we are referring to a sector-by-sector or cluster-by-cluster copy of the data, which

is a lower-level treatment.  And Acronis wants to -- I mean, they specifically have -- the definitions are pretty much the same until you get to that last part and they say, the copy is not limited to a sector-by-sector or cluster-by-cluster copy. So essentially what they want to do is read in a file-by-file, you know, treatment of a file-by-file backup.  That's really what, at least the way I read it, the dispute is between the parties, Your Honor.

So if we go to the next slide, 32, we can see that there is a definitional statement here.  We've cited this in the brief.  This comes from a statement regarding the invention in Column 6 of the '365 patent.  And it says:

"Unlike the conventional image partition in Figure 2, the novel image partition includes one or more images of the data from the imaged partition.  The images are created using sector-by-sector or cluster-by-cluster imaging tools and techniques."

So from our perspective that's a definitional statement.  We're distinguishing things from the prior art. And there are some other things that I'll get to.  If you actually read the background section, there are many discussions that we've cited in our briefs -- and I'll save time and not go through each and every one of those -- that are distinguishing the file-by-file approach and certain problems with the file-by-file approach.  One, for example, is if a file

has been deleted, you have no backup of it, they tend to be slower, they are more difficult to deal with.

Now, what Acronis focuses on, then --

If you go to the next slide?

And this goes back to that same paragraph we were looking at in the last term, so I think this is going to be a featured section of the specification for us, Your Honor.

They read this, and they say:

"The obtaining step 702 may read user data directly from the partition using standard file system file-oriented calls."  So they stop right there and say, okay, that means that you are -- anytime you use file system file-oriented calls, you must be doing a file-by-file backup.  But they don't have any connection in the specification.  In fact, this part says, "or preferably lower-level sector cluster-oriented routine."  So that would be included in that statement.

But they have no -- no connection that says, well, no declaration -- or no statement from the specification, no declaration from an expert, nothing to say that if you're using standard file system file-oriented calls that you are necessarily doing a file-by-file backup.  In fact, there are statements in the specification to the contrary.

So if we go to the next slide?

See, here this goes to the language -- their arguing goes to the language in the claim at issue that talks about

restoring individual files, right?  So they're saying if you need to restore individual files from an image that you must do a file-by-file backup.  Again, there is no support for that.  In the specification, it says, in fact, to the contrary.

This is again from a description of the invention.  It's from Column 5 continuing to Column 6.  And it actually says, "one or more files from the image can be individually restored without restoring the entire image.  Other features and advantages of the present invention will become more fully apparent through the following description."

So this is in that same section where it defines the novel sector-by-sector, cluster-by-cluster imaging approach and distinguishes it from the drawbacks of the file-by-file backup approach.  And it says at the conclusion of that, that you can still restore individual files from that particular image without restoring the whole thing.

So the basic premise that Acronis uses to fulcrum their argument is simply wrong, that in order to do a file-by-file -- an individual file restore, you must do a file-by-file backup.  That simply is not the case.

**THE COURT:**  So you can restore files using a cluster or sector approach, cluster-by-cluster or sector-by-sector?

**MR. NELSON:**  Correct.  And the specification says that in a number of places, including where I just read.  And I'll get to a couple more with this.

So if we go to Slide 35, you'll see this is another one, this is from the background section.  And this is distinguishing, as I talked about from the earlier file-oriented approach, this is roughly Column 3, lines 51, through Column 4, line 6, just to give you a little bit of background on what I just talked about that draws a distinction between the previous file-by-file, you know, the file-oriented backup approach and the drawbacks with that.

And it concludes with this sector-by-sector image, preserve documents, optimization, producing exact image of the disk with the exception that some images do not contain data from unallocated sectors.

So it concludes by saying that's the approach that we want to take, because the prior approach has all these particular drawbacks.

So now let's go to Slide 36.

So this is from the background of the invention section again, where much of this discussion is.  So you'll see here it talks about the images of the present invention.  This is right below the section that I started with, where we talk about the novel approach here are created using sector-by-sector or cluster-by-cluster imaging tools and techniques.

Now, it says, "some embodiments allow the user to select specific subdirectories or files when creating or

restoring an image."  So Acronis seizes on this language again, like that other language that I said in 17, it says, well, then, in certain embodiments I must do a file-by-file approach in order to be able to restore those, but that's not what the specification says.  I just turned you to some language earlier from the specification that says you can still restore individual files when you are doing a sector-by-sector or cluster-by-cluster low-level approach.

And here in Column 3, this is again distinguishing some prior-art approaches.  One approach is generally file-oriented, while the other approach deals with files but operates primarily on clusters, sectors, runs, or similar logical allocation units which are smaller than files, so, again, drawing the distinction between the two.

The distinction between the two is not that if you do an image you can't restore individual files.  The distinction between the two is that if you are doing a file-by-file approach, then you say, give me file one, give me file 2, give me file 3, as opposed to a sector-by-sector or cluster-by-cluster approach, which deals, as you see here, with smaller allocation units, so that I can go right to -- make a physical copy of the disk.

But as the specification talks about in other places, you can get the information from the file system in order to do -- because that's what a file system does, Your

Honor, it maps the physical sectors and clusters back to the individual files.  So there is no reason, when you do a sector-by-sector or cluster-by-cluster approach, that you can't also get that information to be able to do the individual file restore.  And the specification discusses that.

So the problem with Acronis' approach here is simply that it -- it takes, you know, a statement that says, well, in certain embodiments I can restore individual files and makes the logical leap that says, therefore, you must in those embodiments do a file-by-file backup approach, but the specification, throughout the background and in the description of the invention -- and I, you know, cited you a number of passages, and there are a number of additional passages in those sections -- draws the distinction between the novel imaging approach and the prior art file-by-file backup approach and further says that you can still, when you do the novel imaging approach, restore individual files, you are just dealing with lower-level logical allocation units.

So the problem with Acronis' construction is, it ignores the explicit statements in the spec that says, hey, we don't want to do the file-by-file approach, we're doing this novel imaging approach, the sector-by-sector and cluster-by-cluster.  It ignores that and then says because you can store individual files, those must be done with the file-by-file approach.

But it doesn't provide any evidence of that, right? It's asking you to accept that as a -- I don't know, judicial notice, a well-understood principle, but it doesn't -- it never says that anywhere in the specification that that's the case. And, in fact, it makes statements to the contrary.

**THE COURT:**  All right.  Let me hear the opposing view.

**MR. KATZ:**  I don't think that's mine --

**(Holding up opposing counsel's notes.)**

**MR. KATZ:**  -- unless it has good notes, and then I'll take it.

**(Laughter.)**

**MR. KATZ:**  Symantec definitely is not presenting what Acronis' approach or view is.  And, in fact, what they described bears little relationship to the proper legal framework for claim construction.

So the key here is that the claim language says nothing about how the image is created.  The claim language, and, indeed, the patent, is focused on where the image is going to be stored.  That's what this whole patent is about.  The presumed novelty of this patent was that an image, which normally would be stored outside the partition, Symantec claims for the first time is going to be stored in the partition.  And the entire patent is focused on exactly that, it's, hey, look, what we are going to do is store the image in the partition.

So if we turn the page, let's actually look at Claim 50, which is one of the claims that uses this phrase.

**THE COURT:**  Where are you?

**MR. SCHERKENBACH:**  Our Slide 42.

So let's look, I mean this claim is a pretty simple claim to follow, right?  You've got:

"A computer program storage medium having a configuration that represents data and instructions and will cause at least a portion of a computer system to perform method steps," okay?  So far, all it's saying is it's going to be an apparatus version of a method claim.  It's going to have instruction that are going to do something.

So what are the steps?  "For utilizing a partition within a computer system, the method steps comprising steps of locating an image of the partition and to store it in the partition and restoring selected user data from the image to the partition."  That's it, that's what the claim is about.

And so if we give a pictorial representation of that claim, as opposed to the textural representation, and I show that on Slide 42, and you see that you have this imaged partition, here labeled as 610 and 300, and the key to this patent is that you are going to take this image of the partition and actually store it in the very same partition. And that's what this is about.  And so we don't understand where Symantec gets this cluster-by-cluster, sector-by-sector

limitation.  It's just not there.

If the -- Symantec believed that the inventive aspect of this patent was that it wasn't going to do a file-by-file approach but only a sector-by-sector approach, it would have added that to the claims, it would have said, wherein the image is created by a sector-by-sector mechanism.

So fundamentally, Acronis' point is, the claim says nothing about how the image is created.  And there is a classic -- what's Symantec is doing is classic reading an embodiment into the specification.

It is true that the specification discloses sector-by-sector and cluster-by-cluster imaging.  It also discloses file-by-file imaging.  And, you know, you don't read in the fact that what -- the details of the embodiment that are left out of the claim, all right?

They purposely were looking for a broad claim here that didn't have this distinction from prior art.  And that is what should be given effect.  So fundamentally, you just don't add sector-by-sector, file-by-file.  And the focus is in partition.

So if we turn to the next slide?

To summarize:  You can have an image of any type. There is no limitation on the type of image.  The patent describes two:  You have the file oriented and what they call the unit oriented, which is the sector-by-sector,

cluster-by-cluster.  And when a patentee does not add a limitation from the spec of the claims, you don't read it in in the process of claim construction.

Especially when you read this patent, you know, 99 percent of this patent is all about where you store the image, when you might access the image, the benefits of storing images in the same partition.  Although it does mention, oh, and you can create an image using this particular approach, that's not the focus of the patent at all.  The patent is really focused on where you put the image.

So if we go to the next slide, 44, and Symantec pointed to this as well:  They first glossed over the clause we have right here, and then they did come back to it.  But I think this demonstrates that what Symantec's saying can't actually be accurate, because what it says is the image --

"Images 302 are created using sector-by-sector or cluster-by-cluster imaging tools and techniques, which may be those already known or those hereafter developed."

And then it says:

"However" -- "however," meaning now we're going to say something else -- "some embodiments allow users to select specific subdirectories and/or specific files when creating and restoring an image."

And so, first of all, this paragraph is not definitional, this paragraph is a description of one of the

embodiments in the patent.  And, Your Honor, it may even be the preferred embodiment of the patent, but you don't read in all the details from the preferred embodiment or any embodiment into the claims when the claims have no hook, all right?  The federal Circuit says you have to have a hook for that.

And here, far from definitional, it's describing how they are particularly doing it in this circumstance.  And then they say it can be sector-by-sector or cluster-by-cluster; however, some embodiments do it differently.  And so there is no basis to even suggest that that's the only thing described.

Okay, and now if we turn to the next slide, and this is Slide 45, this isn't the situation where Acronis is saying, you know what, Your Honor, there is something called file oriented; it's not mentioned in the patent, but, you know, it should be understood that it's covered.  It is mentioned in the patent.

And so the patent describes, you know, two different ways you can do this in the prior art.  Remember, they didn't invent sector-by-sector, either.  They acknowledge that is in the prior art as well, so these aren't distinctions from the prior art.

The prior art disclosed two things:  First, it disclosed file-by-file, and it also disclosed sector-by-sector. And here, in Column 3, at lines 20 to 42, you see a description of the file-oriented approach.  Now, does the patent say that

there are some drawbacks of that approach?  Yes, it does.  But, again, just because an approach may be considered less optimal for some purposes doesn't mean you then exclude it from the claims when there is no basis to do so.

And so, you know, the claims are broad in that respect.  The claims don't limit it to sector-by-sector, and so it would be improper to read it in just based on general types of claim construction.

So if we turn to the next slide, 46?

Again, the focus here is where the image is stored and not the particular type of image that is being created.  And so, for example, you know, the language in Claim 34 is "in partition image."  And here in Claim -- excuse me, at Column 12 starting at line 2 -- actually, that can't be 2 because it wouldn't carry over -- or maybe it's Column 12, lines 2 to 5.

It states:

"An image 420 is an in-partition image at least because it contains user data which came at some point in time from the Partition 300 that currently contains the image."

And our point is, it's very straightforward.  I mean, the term is almost self-explanatory.  It would be helpful to explain to the jury that this in partition image is stored in the same partition, just so there is no, you know, dispute about that.  I think we all agree that would be a helpful addition.  But again, here is something in the spec clearly

saying what an in partition image is.  And there is no basis to keep that to only a certain type of image.

And so now if we go to the next slide, 47, we just have both claims there side by side.  And you can see the claims are quite clear that the focus is not on what type of image is used, it's where it's stored.  So you have -- you are creating in Claim 34 an in partition image.  And it specifically says that you are going to have the image in the same partition.  Again, this is pretty straightforward stuff.

And Claim 50, which we looked at again, specifically says you are locating the image which is stored in the partition.

**THE COURT:**  All right, thank you.  It's all very helpful.  Let's move on to the next.

**MR. NELSON:**  Just one thing can I address briefly there, Your Honor?

**THE COURT:**  All right, briefly.

**MR. NELSON:**  So here is the problem with that whole discussion you just had there, is he never told you what as image was.  I mean, that's part of it, he wants to say, well, it's just an image.

An image, according to the patent, which is exactly what I walked through, doesn't include the file-by-file backup approach.  That's what the background of this action -- or that's what the background of the patent states.  So if you

look at Column 3, for example, beginning at line 35, and you can even go up to line 20, because that's what Counsel cited to you, Figure 1A, and it talks about a file-oriented backup approach, it talks about the problems.

And then it gets to Figure 2, it shows:

"An imaging approach which also restores files," so you can restore files from the image, it says that, as I pointed to earlier, "that deals primarily in clusters or in other file allocation unit," which is typically smaller than a file, "unlike the file-oriented backup shown in Figure 1, the imaging backup approach shown in Figure 2" --

**THE COURT:**  Yeah.

**MR. NELSON:**  And this continues, and I read some of this for Your Honor, but you'll see, if we skip down to line 59 there, it talks about the imaging approach can back up all data, including data and deleted files, when that data has not been overwritten, file system structures, operating system files, device drivers, information about network cards, and other installed hardware."

So it's true that part of the inventive aspect of the patent is where you store these various images, but an image is defined in the patent to be a cluster-by-cluster or sector-by-sector approach, which is where I started out with Your Honor.  And it's distinguished in the background of the patent because of drawbacks with the file-by-file approach from

the file-by-file approach.

So for Acronis to say over and over and over again that the patent just uses the term "image" broadly and doesn't talk about the type of image, that's simply wrong.  It says that an image doesn't include the file-by-file approach and talks about why that is.  So to suggest that 99 percent of the patent deals with location is incorrect.  The patent talks about and sets up what an image is, which is part of the term that we are trying to construe.  So to ignore that is exactly what Acronis wants you to do.

**THE COURT:**  Well, what's your response to the more basic problem, is that if something -- if such an inventive aspect is so critical, there is no limiting language in the claim, itself?

**MR. NELSON:**  The term "image," Your Honor.

**THE COURT:**  Well --

**MR. NELSON:**  That's what the term "image" is, and the patent says that.

**THE COURT:**  Where does the patent say that that is the only definition of "image"?

**MR. NELSON:**  Well, the part that I just read you. It distinguishes a file-by-file approach, which is what they are trying to include.

**THE COURT:**  No, because that's an imaging approach. It doesn't say this is only the image that can be encompassed.

**MR. NELSON:**  Well, but it's defining what an image is, right?

**THE COURT:**  And you expect that -- something that important to be found in the terms of the claim rather than leaving it to the specification?  And even then, it doesn't clearly say an image means X.  It just says an imaging approach, et cetera, et cetera, it's a better approach --

**MR. NELSON:**  Well, right, but it does have -- it goes on and talks about, in Column 6, when it's describing the invention, "the novel image partition includes one or more images," and says that they are created using sector-by-sector and cluster-by-cluster images.  So it does use, as we started out --

**THE COURT:**  What about the "however" that counsel pointed out?  It says "however," which means something contradictory or different, some embodiments allow users to select specific subdirectories and/or specific files in creating and restoring an image.

**MR. NELSON:**  Well, that's the part I just read which says that the imaging approach can back up all data, including data in deleted files which has not been overwritten --

**THE COURT:**  It seems to me there is some ambiguity there.  And if something is so critical, some inventive aspect is so critical that you want to read it into the claim limitations to now interpret various provisions of the

specification, seems like fairly thin ice.

**MR. NELSON:** Well, I understand what you are saying, Your Honor, except for the fact that you don't need to further define the term when that's what the term "image" means and that's how the specification uses the term "image."

Acronis hasn't pointed you to one -- if you look through here, when they talk about file-by-file approach, they never use the term "image" to modify that. In fact, they contrast the two. So it is talking about that, and it's well understood in the art that that's what "image" means.

So to suggest, then, that, oh, well, it can include a file-by-file approach, we are actually putting the cart before the horse here, Your Honor. It doesn't need to make that limitation because that's what that term "image" means. It doesn't mean -- it doesn't need to say in the claim, I mean an image and not a file-by-file backup approach because that's what "image" means, and that's what it confirms through the specification. It's using --

**THE COURT:** Were it not for your interpretation of the specification, the term "image," ordinarily in the art, I assume, is not just confined to a cluster-by-cluster, sector-by-sector.

**MR. NELSON:** Typically, that is the case, Your Honor.

**THE COURT:** Typically? What about always?

**MR. NELSON:**  Well, I can never say that -- always, because I don't know how everybody's ever used the term, Your Honor.  So I'm not going to represent to the Court that that is -- every single time that that term's been used, that that's the case, but that is how it's described here in the patent, that that's the definition of "image" that is being used, which is the commonly understood one.

You won't see any reference in here, and Acronis hasn't pointed you to any, which equates the file-by-file approach, which it talks about and distinguishes as an inferior method --

**THE COURT:**  Let me ask you:  Column 5, a brief summary of the invention --

**MR. NELSON:**  Um-hmm.

**THE COURT:**  It says:

"In partition images or images of a partition stored within a partition.  In partition image may be stored as one or more files within the file system or an image container.  If the image file would be larger than the maximum file size, the image may be divided into multiple files making up all or part of the container" -- "may be divided" -- I'm just, you know, frankly, the first time I've looked at it with that eye, but I don't see where it's obvious from at least that beginning introduction of the summary that the image is only referring to cluster-by-cluster or sector-by-sector and not file --

**MR. NELSON:** Well, when it's talking about files here, it's talking about the container that holds the image within the file -- or, excuse me, within the partition.

So that's why they say -- and it does talk about this later with FAT -- that's the file system that's used with versions of Window -- File Allocation Table, that's what it stands for. But you have maximum file sizes, so your image may be too big, so you may have to break it up into multiple containers. So that's what it's talking about there.

The -- where I would take you back to, Your Honor, is just where it talks about images in the background and distinguishes that from the file-by-file approach. So when you do that and then later pointed to the language where it talks about the novel approach, uses the sector-by-sector and cluster-by-cluster.

So they have emphasized that, but there isn't anything that Acronis is pointing to in the patent that equates those two things; in other words, says that the file-by-file approach that I've distinguished from imaging approach is nonetheless an imaging approach.

**THE COURT:** All right, let's go on to the next. We have a time issue here.

**MR. NELSON:** Yeah, understood, Your Honor.

**MR. KATZ:** Your Honor, not to belabor the point, but at least give you the citation?

*THE COURT:*  Yeah.

*MR. KATZ:*  I'm not going to read it into the record, we can point to it.  It's Column 3, line 10 to 20.  It talks about backup images, generally.  They equate the two terms.  And it talks about that there are two approaches:  One is file-by-file; the other is sector-by-sector.

*THE COURT:*  This is Column 3, lines 10 through 20?

*MR. KATZ:*  That's correct.

*THE COURT:*  Okay.

All right, let's go on.

This next term is "locating an image of the partition which is stored in the partition."

*MR. NELSON:*  Right.  So this is --

We'll go to Slide 38 of ours.

So this appears in Claim 50.  The basic dispute that we have here --

If we go to the next slide?

-- is that Acronis want to say this has to be done by an implementing program.  So, certainly, there are implementing programs that are generally referred to -- I mean, they are referred to generically as, you know, things that have certain functions in the specification, it doesn't appear anywhere in the claim language.  So what Acronis is trying to do is read in a specific limitation from the claim to say, well, you must use an implementing program in order to do the

locating.

Now, other than trying to read in, then -- I assume all of the functions that are anywhere attributed to an implementing program in the specification, I assume that's what they're trying to do.  They don't highlight that in the briefing, but what other purpose would you have?  Because implementing program is described throughout the specification in different embodiments to have different functionalities, so I'm not sure how we would even know which particular functionality they are pointing to if it's less than all with an implementing program.

But furthermore, the one thing they say in the brief --

If we go to the next slide?

-- is they seem to be trying to eliminate any user involvement in the process at all to say, well, this claim --

If we go back?

**THE COURT:**  Which slide are you on?

**MR. NELSON:**  I'm on Slide 40 right now, but we can go back to Slide 38 just briefly.

So they say in Claim 50 that it's a computer storage medium claim, and so it's data instructions which will perform a particular method.  Therefore, they say in the briefing, well, there can be no user interaction at all because this has to be automated.  Well, that's simply not the case.  And it's

not the way that this is described in the specification.  And if I go to Slide 40, I can give a good example of why that's the case.

Here in column 14, if multiple images are found, the user can choose the image desired.  Or, the image to operate on can be automatically chosen by the creation date, name, or other defining feature.

So the patent in the specification talks about a situation where a user -- because remember, you can -- the background of the patent talks about -- or, excuse me, not the background, the specification talks about multiple images being stored because you may have a certain set of files or maybe you have certain dates you want to go back to before you loaded an application, or something like that.

So part of the process is, the user can choose.  You know, let's say you have image 1, 2, 3 that you are trying to restore, the specification describes a situation where the user can choose an image 2, for example, and the implementing program will go ahead and pick image 2.  So it doesn't -- that's a function that's described in the implementing program in the specification, which is the limitation that Acronis wants to read into the claim even though it's not there in the claim language, but they want to exclude one of the explicit functions that's described to be performed, which is to implement the user's choice in the process.

I mean, obviously, anytime, Your Honor, you interact with a program and it gives you a choice, there is going to be instructions that are going to carry that out, because I think we can all agree that a computer can't do anything that it's not instructed to do.

So what they are really trying to do is to say there can be no user input in the process at all, at least that's what they say in the briefing.  And that is simply incorrect.  And, in fact, it's a function that's explicitly described in the implementing program.

So, one, I don't know where they get the limitation -- they want to read in the limitation of the implementing program doing all this when it doesn't appear anywhere in the claims.  It is described in the specification, certainly, but that would be a classic example of reading in a limitation.

But then, further, the only purpose, explicit purpose, that they describe for doing that in the briefing is to exclude a situation where the user has any input in the process, and that is a function that is described where the implementing program would play a role in that process.

So, you know, we are reading the limitation in when it's not there, but we're reading in only certain of the functions of that limitation and not other functions without any description of which ones are in and which ones are out.

**THE COURT:** Okay.

**MR. KATZ:** Your Honor, I guess the big question here is, you know, as Mr. Nelson is saying, is where in the claim, where in the claim does it require this actually be done by a computer? And the answer is, it's right in the claim.

So we turn the page to Slide 34.

**THE COURT:** Whose Slide 34?

**MR. KATZ:** Our Slide 34, Your Honor.

**THE COURT:** Okay.

**MR. KATZ:** Claim 50 says it's a computer program storage medium that has a program on it to perform method steps and that the -- it comprises two steps. So it is a computer program that has -- it's -- excuse me, it's a medium with a program to perform the following method steps, a locating step and a restoring step.

And so they want to say that, oh, you know what, a user can do the locating and then the computer can just do the restoring. And what we say is, no, that's why we need this term construed, because we want it to be made crystal clear that this claim says the instructions that the program stored on this medium must perform the locating step. And that's why we say it's got to be done by an implementing program.

As far as what Mr. Nelson pointed to --

So you can go back to now Slide 40 of Symantec's presentation.

Your Honor, I don't know, do you have that in front of you?

THE COURT: Yep, um-hmm.

MR. KATZ: What he's pointing to is where a user chooses. And the operative word there is "choose." And so the computer has to do the locating, right? The computer instructions that are accused of infringement have to go and locate the various images.

The fact that if it finds more than one a user will choose the one to restore is a separate issue. And the choosing step is not in the claim. So we're not saying the implementing program has to do the choosing. The claim doesn't require choosing. The claim says the implementing program, the program stored on this medium, has to do two things, locating and restoring. And so that's our position, that you need to, based on what the claim says, the instructions that are accused of infringing have to be the locating step --

THE COURT: So explain to me what the significance, or lack of significance, is with the if multiple images are found, the user can choose the image desired, et cetera, et cetera. Why doesn't that imply that the user involvement can somehow direct the program?

MR. KATZ: Okay. Actually, if you parse this through, Your Honor, what you have here is an image locater 620, okay? Now, that's software, that's the implementing

program.  And that's going to locate the one or more images. And it may find them over here, it may find them oven there, it's got to go and seek out and find the images and say, okay, hey, I found three images, I found four images.

Then what this says is, if you find multiple images, and the key is the locating step is now complete, the computer has done the locating, now the user -- of course, it's a user interface, the user can choose what he wants to retore, but that is different from the locating step.  And so there is a fundamental difference between like the user -- let me give you an example, Your Honor.

You know, you have a restoration program, and it says enter the location of the image, and the user has to type in some URL or some complicated path:  The computer is not doing the locating, the user is stating where he wants the image.

That is different than just any -- some user involvement where the computer locates four images, it comes up with a user interface screen that says, I found the following four images, here are the dates that they were created, which one would you like to restore?  So this is not just a Symantec issue, locating is the nuts and bolts of what this computer program must do according to the claim.

And I don't believe Acronis ever said a user cannot be involved in the program.  I think, you know, obviously,

there is user involvement in almost every computer program. What we are saying is that the locating step as claimed is done by the instructions which are on the computer medium.

**THE COURT:**  Does that preclude the user from listing the particular images it wants and then computer -- the implementing program then locates -- I guess that's the question, what does "locate" mean?  Is that after -- is there room for a user to say which images?

**MR. KATZ:**  I mean, Your Honor, in your hypothetical, right, a user may say, I want an image that was created in the past week.

**THE COURT:**  Yeah.

**MR. KATZ:**  And the computer will come up with a list of all the images that it locates, I think that would fine.  We are not saying a user isn't involved with the machine.  What we're saying is, finding the images on the hard disks, on the network, wherever the images are stored, that is an explicit step in Claim 50.

And so they didn't have a claim that just says, you know, instructions to restore an image, right?  It's a two-step claim, and the first step is locating.  And it specifically says that that must be the computer program stored on the medium does the locating.

**THE COURT:**  All right.

So from your perspective, then, even if the user

says, I want such-and-such a kind of image or file, or whatever it is, as long as the locating or the finding is done by the program, not by some manual process or some user?

**MR. KATZ:**  Exactly, Your Honor.

**THE COURT:**  So what's the difference?  Do you dispute that?

**MR. NELSON:**  I don't know what he's talking about, is the problem, Your Honor.  I suspect Your Honor's example is exactly what they are trying to exclude and they just hope that that language you give will allow them to do that.

So first, still, where do we get this implementing program?  Why is it there?  It's not anywhere in the claim, so, you know, that construction doesn't make any sense to add that. And you still run into exactly the same problem that I started with, which is now when we look back to the specification, what are we supposed to do when we get to summary judgment time or trial time?  Are we supposed to look to all of the functions that are described, potentially the implementing program, and read all of those into the claim?

You know, that part I don't understand what it is that they are is suggesting, because there are many different embodiments of the implementing program that are there in the specification.  But in terms of Counsel's reading in Claim 50, he didn't read the second step of it.  It's -- the Claim 50, it talks about -- I'm just finding it here in the patent because I

don't have the slide -- and restoring selected user data from the image of the partition.

So there is explicitly in the claim a selection step, and that is -- you know, that's part of what Your Honor's talking about.  So if the user, for example, would say, go find this for me and restore that, or if the program says, here is the ones I have, which ones do you want, you know, various things like that, all those things would be included.

So I'm not even sure what they're talking about when they say, well, some manual process to go find it.  I mean, a user can't go look at that disk.  That's not human-readable information.  So there is always going to be a computer, some set of computer instructions involved in the process to, you know, look at the catalog, look at the information.

**THE COURT:**  All right.

I'm wondering, given what I just heard, whether there is really a difference.  If you all agree that the user can specify the image that the user seeks to store or restore, but then once that has been selected, the implementing program automatically then finds it rather than it's done manually, which you don't seem to take dispute with.

**MR. NELSON:**  Well, I don't know how that process could be done manually, that's why I don't --

**THE COURT:**  So you say it can't be done, they say it shouldn't be done, you are all agreeing it won't be done that

way, it would only be done through an implementing program, the actual process of locating the file within the partition.

MR. NELSON: Well, but here is the problem, Your Honor, implementing program, that's -- I think what we're doing is we're having a little bit of look over here at this shiny object, and I'm going to sneak in the implementing program language.

Because the implementing program is a term that is used in the specification and has provided many, many, many functionalities. What you are talking about and what they have pointed to in the claim is just program instructions, which is already there in the claim. Certainly, there have to be program instructions to locate, that's what the claim says, but it doesn't have to be the implementing program of the specification along with all of the various functions that are described there. That's the problem that I have with that particular construction.

I mean, it's nice to hear them say that they are not trying to exclude the user, either saying go find this one or selecting those, because that's contrary to what they said in the brief. They said that --

THE COURT: Well, all right, but now that they said it, I'm wondering whether it makes sense for you to sit down and figure out whether there is some language that accommodates --

MR. NELSON:  There may very well be something we can talk about that will satisfy those concerns.

THE COURT:  Okay.  Well, I'd like you to try.

MR. NELSON:  Okay.

THE COURT:  Now that we have, I think, an understanding that there is -- that there can be user involvement in identifying the images, et cetera, et cetera, but the actual automated process of finding that is one that does not involve -- which you say can't be done, anyway, so maybe there is not that much --

MR. NELSON:  We'll, you know, after the hearing here, we'll talk.  And I'm assuming when we get to the end that won't be the only one where that happens.

THE COURT:  Okay.

MR. NELSON:  So based upon that, I figure Your Honor will give us some kind of time frame so that we can put some parameters on this.

THE COURT:  That would be ideal.

MR. NELSON:  Yes.

THE COURT:  The reporter needs to take a break about every 90 minutes.  Even though we have only gone through three terms, we probably should take a break at this point.

MR. NELSON:  Okay.  Thank you, Your Honor.

THE COURT:  Take a ten-minute break.

THE CLERK:  Court's in recess.

(Recess taken at 11:05 a.m.)

(Proceedings resumed at 11:15 a.m.)

THE COURT:  Okay.  I think the last term on the '365 is the verifying the consistency and integrity of the image. And as I understand it -- well, I'll let you -- I mean, I see that there is a pretty big difference here in terms of your approaches.

MR. KATZ:  Your Honor?

THE COURT:  Yeah?

MR. KATZ:  So at the break we were discussing ways to try to streamline the process.

THE COURT:  Yes.

MR. KATZ:  We have some other ideas, but we have one now.

THE COURT:  Okay.

MR. KATZ:  I think the issue here is very simple. Maybe they'll have some comments.

Our view is, consistency and integrity mean two different things.  Slide 49 of our dec highlights the text we are relying on.  Symantec is going to point to different text that they claim says that they are the same thing.  And I would submit that based on that, that's all the argument I have unless you have a question for me, but that's our position. And we think that we can probably submit that on the papers.

THE COURT:  Well, let me just ask you:  There is an

issue about, yeah, the difference between the two, and I guess I'm not sure I understand what the difference is.

**MR. KATZ:**  Okay -- oh, I think it's Slide 49 makes it clear, but let me just point out that consistency, in Acronis' view, specifically means that the data is all from one period of time.  So remember, Your Honor, from the tutorial, once you start writing to data, then it's like, okay, well, now you -- you can take a new snapshot, but if the data is mixed from different periods of time, that's not -- it's inconsistent data.

Integrity is the data is not erred, that no fault has occurred causing data to be corrupted.  So again, our view is that those two specific differences should be given meaning.  Symantec's view is, it's kind of just of one phrase used more generically.

**THE COURT:**  So error checking techniques, such as check sums, only address integrity and not consistency?

**MR. KATZ:**  Well, the key here is this, Your Honor:  In general, error checking techniques are for integrity.  There is the sentence where they talk about both and then throw on that you can use error checking techniques.  Our position is that that is an ambiguous phrase, not quite technically accurate.  You know, consistency is really making sure that it's from one period of time.

Now, can you use some kind of technique to validate

time stamps since the time stamps have changed?  Sure, but, you know, Symantec's view is they will point to the paragraph where error checking techniques appear to be referring to both.  We say that other parts of the spec make it clear they are two different things.

THE COURT:  Okay.

MR. NELSON:  Thanks, Your Honor.

So, yeah, the problem, the specification, and, in fact, in the summary invention section at the bottom of Column 5 and the top of Column 6 does actually say -- this is beginning about line 62.

THE COURT:  Um-hmm.

MR. NELSON:  The consistency and integrity of the image, itself, is also verified when used such as after it was created or updated and before or after it has been used to restore data.  This can be performed by way of check codes such as check sums or CRC codes embedded in the image's files and the image container.

So the -- right there in the summary of the invention section it says that you can do that to do both of these functionalities.

The passage that Acronis pointed to before says, well, here is something you can do when you are copying the data; in other words, don't write to it while you are copying it in order to try to make sure there aren't inconsistencies.

Those are two different things:  Verifying whether there are inconsistencies is something that happens after the fact on the data.  And that can be done, both verifying inconsistencies and the -- the other step, verifying the integrity, excuse me, integrity and consistency.  It says that those are done together and can be used, these CRCs or check sums, and those kinds of things.

So what Acronis is trying to do is, here is a way when you are copying the data to prevent inconsistencies.  And that is where their language of verifying the data and the image was not modified during the imaging process comes in.  That is simply in the specification and the passage that I referred to and that Counsel just referred you to, a statement of, here is a way that you can prevent inconsistencies in the data when you are doing the initial copying or, you know, taking the image.

So they are trying to read that limitation in.  You don't go ahead and do a verification after the fact that says were you changing data while you were writing to it.  And that's the limitation that they were trying to read in that is problematic.

Then as to the second definition, the integrity, we don't really have a problem.  That -- as we said, the specification says that those are examples of things -- again, they just examples, they are not a limitation in the

specification.

You know, if we go up to our Slide 46, you know, towards the bottom in Column 15, you will actually see additional examples of things that can be used to verify the integrity and consistency of the data.  So it shouldn't be limited to check sums and CRCs, those are examples.

*THE COURT:*  Well, let me ask:  You want to just go with the plain and ordinary meaning, but what's the jury going to -- what are they going to do with those terms "consistency" and "integrity"?

*MR. NELSON:*  Well, I mean, frankly, I think that those are terms that we generally use.  And they are used in this patent in that fashion.  So it really -- at that point in time, I don't really think it's a claim construction issue.

What we are doing here is not really construing the claim, we are reading in specific examples which, frankly, Your Honor, is the second part of the analysis.  Remember, Markman says let's go ahead and construe the scope of the claim and then it's up to the fact finder to apply that to the particular facts.

So, one, that's part of the reason why providing specific examples in a claim construction is disfavored, because that usurps the second part of the process, which is actually saying these are things that are factually covered by the claim.

But I'm not sure that this construction, if we tell the jury --

If I can go back to the construction?

-- "verifying the contents of the image by utilizing the error checking techniques such as check sums, cyclic redundancy checks, or other means knowns to the art, whether that's, frankly, helpful to them.

Really, what we are talking about is an expert that says, here is the way the data is verified, here is the way the consistency -- the integrity and consistency is verified.

**THE COURT:**  You think it adds nothing to say that what this is about is checking for errors?  I mean, that will be evident.

**MR. NELSON:**  I mean, I think it is.

Frankly, I don't have a problem with that construction, because that's really what's going on here is you are checking for errors before you do the restore, because otherwise, I've restored something that is just going to give me errors, which is kind of a bad idea.

**THE COURT:**  Okay.

**MR. KATZ:**  So, Your Honor, I think we would propose a compromise position that verifying the consistency definition would be kept because it's verifying data that was not modified and that verifying the integrity would be construed, verifying the contents of the images have not become corrupted.

**THE COURT:**  Well, why don't you put that on your list of things to talk about.

I mean, I understand your point, but, you know, it's not obvious, I think -- someone -- what consistency and integrity means.  I mean, maybe this will come out at trial, but --

**MR. NELSON:**  Yeah.  I mean, I think on that we would be fine to say with respect to both of them as verifying the data is not corrupted.  The problem -- Counsel got up and they said, well, we'll drop the stuff from the second one, but we want to keep the first one.  The first one's the problem, Your Honor.

That doesn't really get us anywhere, because they are trying to read in a step that doesn't have anything to do with verifying the consistency of the image.  It's a way that you can ensure a lack of inconsistencies will make a copy, but it has nothing to do with verification.  So that is where I think we are going to run into a problem with this issue.

What they propose for the second, if they are willing to do that for the whole term, then we can take that off the table.

**THE COURT:**  Yeah, well, I think it's something you might discuss.  And using e.g.s, or examples, may be one way of approaching that.  But why don't you see what you can do with that.

So let's -- I do agree we need to move on here.

**MR. NELSON:**  Okay.

**THE COURT:**  Before I do, going back, I don't want to beat a dead horse here, but the creating an in partition image question, the sector-by-sector, cluster-by-cluster, I'm wondering if you can't reach a resolution on that -- sounds like that is a key issue -- whether it may be useful to have some -- because now it's clear to me you are pinning a lot on the claim term "image" as the quote, "hook."

And I am not sure how much -- whether it may be helpful to have some additional briefing on that, such as I ask, you know, whether the term in the art, definitional term, is clear, that it has one implication if it generally is -- or, you know, some of the other things we talked about.

**MR. NELSON:**  Yeah, I think that would be fine.  And I understand exactly what you're saying, Your Honor.  You know, some limited briefing on that issue may be within the same time frame that we get the compromises to Your Honor.

**THE COURT:**  Yeah.  So why don't you put that on your list.  Short and concise, I don't need a whole rehash.

**MR. NELSON:**  Understood.

**THE COURT:**  But maybe supplemental thoughts on that would be helpful.

Okay.  So now we are on the '186 -- I mean, the '086, at least that's my order here.  And the first term is "a

state of the virtual" -- "of the first virtual machine."  There is this issue about, one, the word -- the use of the word "snapshot" and whether all of the information -- how much is required in terms of the definition of the state of the first virtual machine.  Is it just the -- at least one file using at least one application executing, or does it have to be all of the information necessary to -- to restore.

**MR. NELSON:**  And that's --

**THE COURT:**  At least that's what I understand part of the debate is.

**MR. NELSON:**  I think you've hit -- those two issues are really the whole thing.

I think what they propose is to do it on briefing, but it sounds like Your Honor would like some clarification, perhaps, in response to those questions.  I'm happy to do it either way.

**THE COURT:**  Okay.

**MR. NELSON:**  You're in charge.

**THE COURT:**  Yeah, but procedural comment?

**MR. KATZ:**  Simply that they are on for plain and ordinary meaning, we have a construction.  We think that the briefing is fairly clear on this.

If Your Honor has no questions, we would suggest moving on to another term.

**THE COURT:**  Well, I do have -- maybe this is almost

kind of a basic question, but why isn't it -- in order to accomplish what the invention teaches here, why doesn't the entire state of the first virtual machine -- don't you to have a -- sort of a complete state to be captured or copied to be backed up to have some utility?  What's the utility of if you only backed up one file used by at least one application?

**MR. NELSON:**  So the answer to that, Your Honor, and, I mean, that is a good question, because that is basically what they are arguing.  Of course, they don't quite get there, because they recognize that you can -- you know, the specification specifically says you can copy, in other words, back up, just, you know, some portion of the state, so you would never get to the point where you had the entirety of the state of the machine.  But let me answer the utility point directly.

So I think I used an example earlier that is appropriate here:  If you are going to back up your machine, generally, let's just take it outside the context of virtual machines, because, you know, that's a layer of complication that I don't think we need here.

If I have a particular, let's say Outlook on my machine, I want to back up all your Outlook.  Your E-mails and stuff are going to be in what is called a PST folder, and so in order to back up Outlook, you really only need to back up that PST folder, that is all you need to have.  And that would be

useful for you because you would have all those; if your e-mail program crashed or something like that, you could restore fully to that.

It's similar in this context.  And that is why it talks about applications, maybe back up an application because a virtual machine can be running multiple applications, and you may be only concerned with backing up the particular state of one of those applications or only part of one of those applications.  Because what you need to do, in order to make the invention useful, is back up that which you want to restore.

And so there can be many situations in a system where you don't need to back up the entire state of even the particular virtual machine because it may be easier for you -- let's say you have, you know, an image of the system that's sitting there already, where I have all of the applications and the things that are not going to change and all I care about are certain data files with respect to that, so that's all I would want to back up in this realtime function.  I would still have utility in the invention.

And that is why the claims specify things that way, because otherwise, Your Honor, if it's not written that way, it becomes so easy to design around it, because what you would say is, well, here is one file that I don't care about, so I won't back it up.  And then they make an argument that says you

haven't backed up the entire state; therefore, I don't infringe.  And that's why you write claims that way.

I don't disagree that oftentimes you may want to back up multiple files, but that's what the claim allows.  It's just written so that you can't get around it easily by saying, well, I will just leave out this one file or this one aspect of the state that I don't really care about.

Does that answer Your Honor's question?

**THE COURT:**  Yes, I think I does.

All right.  Let's move on to the next term, "suspending."  Seems like that's an obvious term, but I'm not sure -- your concern is that Acronis wants to add a lot of qualifications to this that are not necessary?

**MR. NELSON:**  Yeah, I think that's right, Your Honor.

So they have the additional, "to pause the execution and capture its state so that execution can be resumed later."

Well, there's other aspects, and we just talked about that, other elements that talk about capturing the state. So this is not only adding limitations to this term that aren't there but that are unnecessary in light of other language in the claim, itself.

So that is a problem that we have with Acronis' construction, which is why we just construed the term "suspending" here, which is "temporarily preventing from executing."

And we've cited a number of things in the specification that are consistent with that, and I don't think I need to go through all of those unless Your Honor has specific questions.  But we do have this file wrapper issue: Remember, there is distinguishing the JVM.  JVM is JAVA virtual machine, at least that's my reading of it, Your Honor.  And there was a situation in the prior art where there were backups, you know, checkpoints made, points in time, and what you could do is, you could just use that to run on a different virtual machine.  And they said, no, that isn't suspending, that is just your machine goes down and you are just taking a backup and, you know, putting it on, essentially, a different machine and running it.  That's not what we are.

So -- and remember, with this '086 patent, too, and this is why it uses the language "suspendible," there are two ways you can back up the machine:  You can either suspend it, in other words, temporarily prevent the execution and capture whatever state it is that you want to back up and back up the state, or the patent talks, and these are the claims that we are focused on here with dependent Claims 11 and 22, you can actually do the state capture and the backup while the machine continues to execute; in other words, you don't need to suspend the execution.

This is why the claim uses the term "suspendible," Your Honor, because it couldn't use the term "suspended"

because Claim 1 doesn't require the virtual machine to be suspended.  Claim 1 provides either -- Claim 11 specifically says, I'm backing it up when it's not suspended while it's executing.

So I think between those two issues you really do have the crux of the dispute between the parties on these "suspending" and "suspendible" terms.

I don't know if you have --

**THE COURT:**  Say that again.

**MR. NELSON:**  Okay, as to which, the "suspendible"?

**THE COURT:**  Yeah.

**MR. NELSON:**  Okay.

So let me pull up -- see if I can find --

Okay, yeah, Slide 62.

So you have here, focusing on that element 2, little (ii), "copy at least a portion of the state to a destination separate from a storage device to which the first virtual machine is suspendible wherein suspending the first virtual machine is performed responsive to a suspend command."

So there are two issues there:  The wherein clause is the first point that I talked about, is that that's something where you can temporarily suspend the execution, not something where the system crashes and you just go restore something on a new system.

The other aspect is the "suspendible," right?  What

Acronis reads that is, well, that's simply the capability of being suspended, which is true to a degree except for it's specific here, remember? Because if we look at Claim 11, which is -- the 11 and 22 are asserted in this case and what we are focused on -- is this idea -- and look at the very last clause of Claim 11, "such that the first virtual machine can continue executing during little (ii) referring back to Claim 1. So that's the idea.

Remember, I said the specification describes two ways to capture the state and back up the virtual machine: One is to issue a suspend command to temporarily prevent the execution and capture what state you want and back up that state; the other is to allow it to continue executing and do the state capture there. It talks about separate files to do some kind of copy and write.

And there are various ways to do it, but the Claim 1 has to use the language "suspendible." It can't use the language "suspended" because it allows for either. And that's the idea, is that it would be suspendible to some particular location. You have the system set up -- it's designed that way. But that's why it uses the term "suspendible," is because Claim 1 allows for either method that I've described. Claim 11 specifically adds a limitation and requires that it is not suspended.

So does that answer Your Honor's question?

THE COURT:  Well, I understand that part of it, so let me hear why suspending is anything more than, as suggested, temporarily preventing from executing.

MR. KATZ:  Sure.

Can we turn on the slide projector?

I think the easiest way to get there is actually first talk about "suspendible" and to do it in that order.

Fundamentally, I do want Your Honor to realize that we fundamentally disagree with their characterization of the patent.  We think that what you just heard is actually technically wrong.

What this patent actually talks about is a virtual machine where state is captured when a suspend command is issued.  That is not a backup.  That is -- remember, a virtual machine is an operating environment.  We are not talking about a static file on a disk, right?  It's operating, application programs are running, they are in the middle of doing something, files are open.

The only way to restore, to resume a virtual machine after suspending, is to capture the state so that you can then set the virtual machine up where it left off.  It's kind of like, Your Honor, if you are watching a movie and you have a little scroll bar at the bottom of the Netflix or on a computer, if you pause it and it doesn't capture the state of the movie that you are an hour and a half into, when you come

back, everything is gone.  So that's what the issue is here.

So what the patent actually talks about are not two ways of doing a backup.  What the patent says is, you have a virtual machine:  If you are going to suspend it, that action when you get a suspend command is, you pause the machine and you capture its state.  Required to do both, because otherwise you could never resume the machine.  And then you don't have a suspend, you effectively have a virtual man crash, such as in the prior art.

THE COURT:  So you take issue with the second method of backup that he says this patent covers?

MR. KATZ:  Right.  What the patent is talking about with the backup is, what you do is this:  First, you suspend the machine, which captures its state, now you have the state of the machine.  That's not a backup, there is only one copy of the state.

What it then says, for disaster recovery purposes, is you can back up that state, all right?  So you suspend and capture the state, number one, not a backup.  You can make a backup of that captured state, now you have two copies of the captured state, the state you captured on the suspend and the backup.

So let's actually -- and if you look at the claim, that, in fact, is the structure of Claim 1.  Claim 1 has a little (i), which is, the first thing you do is you capture the

state of the virtual machine.

Then claim -- then little sub two -- or (ii) says that you then can copy at least a portion of the state to a destination, you know, to some destination. We'll get to that. So the key is, that's the backing up, right? You've captured the state, not a backup. You now copy at least a portion of that state to some particular location, and now that is the backup, that copy.

And now, earlier there was the question of why would it say only a portion? Why would it make sense to back up only a portion? Well, I have two responses, Your Honor. Number one is, what it's talking about is backing up a portion to a specific location. So the other portions can be backed up to a different location, right? You are not saying you only back up a portion.

Number two is, the patent does say this could be an incremental backup. And it says you can back up only a portion of the state, meaning the modified portion, if you've already done one backup already.

And so what the portion language here is really getting at, I believe, is that it's allowing for an incremental backup. But it presumes you've already done, you know, at least one full backup. Because, as Your Honor pointed out, if you don't back up everything, you know, what good is it?

So now I want to talk about "suspendible," because I

think what we have just heard is interesting --

**THE COURT:**  Can you address Claim 11, his interpretation of Claim 11?

**MR. KATZ:**  Claim 11 actually says you don't suspend the machine during sub little -- (ii), whatever you call that thing, two little (ii).  Well, that's very true, the suspend happens when you capture the state in the first paragraph with the one (i).

The paragraph with the two little (ii) is the backup which can occur after you've resumed the virtual machine. Because when you are backing up, you are copying a state that has already been captured from the first suspend.

**THE COURT:**  So that's the key, that is referring to post-suspension.

**MR. KATZ:**  Post-suspension.

And I've got some slides, which we may get to them, but maybe in the interest of time, I'll just refer Your Honor to them.

Slide 58 of our presentation gives three examples where it's very clear that what you are doing on a suspend is you are capturing the state.  Because that's fundamentally what it means to suspend the virtual machine, you can either stop it or crash it.  But if you are going to suspend it, implying you can restart at a later time, you must capture the state.

And so on Slide 58 in Column 2, lines 62 to 67, it

even says:

"In another embodiment, the computer system may capture the state by suspending each virtual machine to an image."

The phrase "suspend to an image" means capturing the state.  You don't pause something to anywhere.  The "to an image" is the creation of the captured state.

And so the language "suspend to" something only makes sense if you understand what it means to suspend, is you are going to capture the state and then store it somewhere.  And that's, actually, the "suspending to" language, again, Your Honor, is in the claim, itself.  And we'll get to that in just a second.

So again, in Column 4, line 36 to 42, it does say that in response to resume command the kernel may read the image of the suspended machine.  Again, if you didn't create the image at the suspend, you couldn't do that.

And finally, in Column 11, lines 31 to 42, it says that:

"The image data request is a request for the current state of the virtual machine" -- and here is the critical language -- "as would be provided if the virtual machine were suspended."

Now, it goes on to say, in this example you are going to do it without suspending the machine, but the text

makes it very clear that when you suspend the machine, you save the state, that that's what it actually means to suspend.

And specifically for these claims, there is the phrase "to which the machine is suspendible," right?

**THE COURT:**  Well, explain to me this Column 11 again, this last slide.

**MR. KATZ:**  Oh.  What this is talking about is capturing state without actually suspending the machine, right?

**THE COURT:**  Right.

**MR. KATZ:**  Giving an alternative embodiment, which isn't, you know, necessarily relevant here because we are talking about suspending.  But if you notice the clause, it says you can request the current state of the virtual machine, and that -- just this clause is what I'm referring to, "as would be provided if the virtual machine were suspended."

**THE COURT:**  Without actually suspending the virtual machine.

**MR. KATZ:**  Right.  So it's saying we've already discussed that when you suspend a virtual machine, you save the state.  Now, we are also saying you can also capture the state in other circumstances.  But this clause is making it clear that if you suspend the virtual machine, you do save the state. That's what it's saying.  It's saying you can either do a request for the state either by suspending, in which case the state is saved, or you can do it even if you don't suspend.

**THE COURT:**  Well, you know, it says "the embodiment of Figure 6, the backup program may be configured to back up virtual machines without suspending the virtual machines."

**MR. KATZ:**  Right.

**THE COURT:**  So --

**MR. KATZ:**  No, there is no doubt this paragraph is about an alternate where you don't suspend.

**THE COURT:**  Right.

**MR. KATZ:**  But what I'm saying is, the clause that I'll referencing at the bottom of that paragraph makes it clear that a state is provided when you do a suspend.  They are saying like when you suspend, you can capture a state.  So it's making a reference to the fact that during a suspension, you can capture a state.

But again, if that paragraph troubles you, Your Honor, we can disregard it.  The key is, it's actually referring back to the stuff earlier discussed, such as in Column 2, where it says you can capture a state by suspending a machine.

**THE COURT:**  Why -- why isn't this identification of one embodiment an indication that Symantec's interpretation that this -- this patent covers both ways to back up, including one that there is no, you know, you can continue to execute at the same time without actual suspension?

**MR. KATZ:**  Okay, it could be the case, Your Honor,

where you can actually capture the state without suspending. That's -- that's a different issue, all right? That could be another embodiment disclosed in the patent.

What I was pointing out was that what this patent is describing for suspension is not about a backup. What the patent says uniformly: If you suspend, you capture the state. There are other ways to capture the state, but if you suspend, you --

THE COURT: If you suspend, then it must encompass capturing both the pause and the execution as well as capturing that state.

MR. KATZ: Right, that's what we're saying. Sure, the patent says, by the way, there are other ways to capture the state. But what Symantec is trying to say is the suspend does not require the capturing of the state. We are saying it has to because otherwise the invention wouldn't work, but also because the claim, itself, specifically talks about a storage device to which the first virtual machine is suspendible.

And we talked about this at the tutorial, and it's very convoluted language, but what this is saying is, you have a storage device to which the first virtual machine is suspendible, meaning to which you will put the state.

If you are not capturing the state, that sentence doesn't make any sense. If you are just pausing a machine, you don't send data anywhere. And so we think that the fact that

even the claim references that you are going to have a storage device to which you are going to send something, the something we are talking about is exactly capturing the state.

THE COURT:  All right.

MR. KATZ:  If we can briefly just rewind to back to the slide, where it was before or even earlier.

Okay, just -- one more.

Okay, so again, if I can just cover this very quickly?

THE COURT:  Which slide are you on?

MR. KATZ:  Fifty-three, Your Honor.

And we discussed this at the tutorial.  In fact, this is a piece of the tutorial slide:  When you suspend a machine, you capture the state and you put it somewhere, and that is called the location to which you suspend the machine.

And so the claim says you are going to identify a destination separate from the storage device to which the virtual machine is suspendible.

Now, it could have said, to which it's "suspended," but it didn't.  It said, to which it's "suspendible."  And so in this example, because it could send that state to any of these devices except the backup server, obviously, those are locations to which the machine is suspendible.  And so in this case, the only option to have a destination separate from those is the backup server.

So, for example, you couldn't send it to the external disk or the internal disk because those are places where the machine is suspendible.

You know, I didn't understand Symantec's argument that it had to say "suspendible" and not "suspended."  It doesn't.  This is a textural claim.  They could have picked their own language, and they chose "suspendible."

Go to the next slide.

"Suspendible," if you look it up in the dictionary, says "capable of."  And so "suspendible" means capable of suspending.  And so the issue here is, if the machine can capture the state and send it to locations A, B, and C, that is where the machine is suspendible to.  In the language of the patent, that's what it means.  You identify the locations where you could put this state information.  And what the patent is saying is, you know what, what we want to make sure of is when we make the backup copy that we put that somewhere else.

So if this machine might save the state to disks A, B, and C, it's going to say, we want to pick a backup location where we know that is not going to happen, and so we have to pick a location --

THE COURT:  Right.

MR. KATZ:  And what Symantec is trying to say is, no, if you suspend to disk A, then you can put the backup anywhere else.

And we say, no, the claim is suspendible, meaning where might you suspend the disk -- excuse me, where might you suspend the virtual machine to.

So if we go to the next slide?

You know, so here we have a example where the state is being sent to the Internet cloud storage, okay?  So you suspend the machine, you ship its state to the Internet cloud storage.

Symantec's view is, well, that means you could send a backup to anywhere else.

And we say, no, the claim is very clear, it has to be separate from where the machine is -- we discussed this -- to which the virtual machine is suspendible.

In this case, even though in this one instance you chose to save it in the Internet cloud storage, you could still save it to internal disk, you could still save it to the external desk, you could still save it to the local network disk.  And you don't want the backup to go anywhere where you might save a state, so you need to pick a destination separate from those.

And we think that flows just from the plain and ordinary meaning of "suspendible."  And notwithstanding what the -- Symantec's attorney was saying about, well, there is no other choice, there is always a choice.  That's the word they used, and the plain ordinary meaning of this term is that you

identify where you could send this state information.

THE COURT:  Well, if you can't send it to any storage device to which the virtual machine is suspendible, I guess what's the point of that?  All I'm trying to understand is, what's the point of that?

MR. KATZ:  Oh, why would this have significance?

THE COURT:  Yeah.

MR. KATZ:  Okay.  And the reason is, if we look at the slide -- again, this goes back to the comment I started with, Your Honor:  There is a difference between a backup and capturing the state of a virtual machine, right?  When you suspend a virtual machine, you capture the state.  That's one copy, okay?

So for disaster recovery reasons, you want to also have a backup.  And so what this says is, you can have multiple virtual machines, you can have multiple states, you want to look at where it's suspendible to.  And for the maximum protection, you want to pick a destination that is separate from that.

And so in this example, the backup server would be specifically designated in the computer, and you cannot save virtual machine state here.  And that is why it's now protected.  Now you can hold backups, and now you know you have disaster recovery.

Without that sort of requirement, then the computer

would have to keep track and say, okay, well, state one is stored in one location, state two is stored in another location.  Now we can make sure maybe the backup for state two can be stored in the same place as state one.  It's very confusing.

We are not saying there are no other potential ways of doing this.  We are saying this claim and this patent is very specific that its solution, and they write their own claims, they are their own lexicographers, the solution in this patent is, you identify where the virtual machine is suspendible to, and you've got to pick a different location.

THE COURT:  And again, the definition of "suspendible to" is what?

MR. KATZ:  That is -- well, first of all, "suspendible" means capable of being suspended.

THE COURT:  Yeah.

MR. KATZ:  "Suspendible to" are locations where you can save the state -- locations where you are capable of saving the state upon a suspension, all right?

So what it means to be where it is suspendible to is when you suspend, where can you save the state to, what are the options?

THE COURT:  How is that determined?

MR. KATZ:  Well, the computer would have some sort of identification and citing on where or when virtual machines

are suspended, where it's going to ship the state to.

But for this invention to work, you would not want to designate one of those locations to be, for example, the backup server, as in this example on the screen, because what you don't want to have happen is have the machine save a state to a location where you are also having backups.  You want to the keep those two totally separate.

So you have a group of locations where you can save a state to, and you have a group of locations, or maybe one location, where you can save backups.  And that is, we believe, the only rational reading of this claim, given the choice of the words the inventor chose.

**THE COURT:**  Okay.

**MR. NELSON:**  All right.  I need -- I have to clear up someone serious errors in the representation of the patent, Your Honor.

So Counsel, his whole argument was based upon the fact that whenever this patent talks about capturing the state, they are suspending the virtual machine.  That's false.

**MR. KATZ:**  Your Honor --

**MR. NELSON:**  Right here --

**MR. KATZ:**  That's not what I said.  I said the opposite of what he said.

**MR. NELSON:**  It is what he said.

**THE COURT:**  Okay, why don't you say what you think

you said.

**MR. KATZ:**  I said, Your Honor, and I think the record will be very clear, you can capture the state in ways other than suspending; however, when you suspend, you capture the state.

**THE COURT:**  Okay, that's what I understood.

**MR. NELSON:**  Okay.

So here in Column 3, right, it says -- this is beginning about line 17:  "The checkpoints" -- and this is one of the things they are talking about that they use as backups -- "may be created by capturing state while the virtual machines continue to execute or by suspending the virtual machines and copying the suspended image."  So you can do either, there are two embodiments in the patent.

Now let's go to Claim 1.  In Claim 1, what Counsel said is, well, this is one where you always are suspending the virtual machine in order to capture the state.  Look at little (i).  Little (i) doesn't use the suspending or suspend command, or anything.  It specifically doesn't do that.  So little (i) which we talked about, captures a first virtual -- and it says "a state of a first virtual machine," not the state.

And I've already explained why it says "a state of the first virtual machine," but you won't see anywhere in this element where it talks about suspending.  It doesn't have to. Claim 1 doesn't have to suspend in order to capture the virtual

machine state.

So Counsel is saying that it was written specifically to cover only the situation where the state is captured when the machine is suspended is demonstrably wrong by looking at the structure of the claim can.  "Suspend" doesn't come in until you have little (ii), right?

**THE COURT:**  Yeah.

**MR. NELSON:**  Little (ii) says, "copy at least a portion of the state to a destination separate," and we've read that.

Now, if we go to Claim 11 here --

**THE COURT:**  What about Claim 2?  I mean, you say Claim 1 doesn't require suspension.

**MR. NELSON:**  Claim 1 does not require suspension, absolutely not.

**THE COURT:**  So what's the meaning of (ii), which is "wherein suspend" --

**MR. NELSON:**  Right, responsive to.  So, in other words, if you suspend, it's performed responsive to a suspend command.  That's what it says.  That's what the wherein clause says.  So that's why it uses the term "suspendible," to which the first virtual machine is suspendible.

And those are the two embodiments, Your Honor.  You started to read from Column 11.  You know, Column 11 through 12 of the patents talks specifically about an embodiment where the

machine or the -- a virtual machine state is captured where it's not suspended.  So there are two different embodiments.

No question in the patent and in this claim, when it is suspended, you use the suspend command to do that.  There is no disagreement with respect to this.

But then Claim 11 talks about, and this goes to the end, such that the first virtual machine can continue executing during the two, right?  So Claim 1, as I said, covers both situations, both embodiments:  The earlier one where you use the suspend command to suspend the virtual machine, capture some state of that virtual machine, and then copy that over.

You have here then -- or it covers, Claim 1 covers the situation where you don't -- you capture the machine state while it continues to execute, and no suspend command is actually executed.

Claim 11 is specific to only the situation, so it adds the limitation that says, this is only when the virtual machine continues to execute, right?  So both of those states have to be covered by Claim -- or both of those situations have to be covered by Claim 1, right, which is the way the embodiments are described in the patent.

Again, if you go ahead and execute a suspend command, you will suspend the virtual machine.  That is what is described in the specification.  That is what is in the claim. But you don't have to, that's why little (ii) uses the

terminology "suspendible," because it could be, it could not be, depending upon which embodiment you us want to use.

THE COURT:  All right.  So I understand your point that suspension is not necessary required to capture.

MR. NELSON:  Correct.

THE COURT:  But his point is, if you do suspend, that implies suspension and capture.

MR. NELSON:  You capture some state, that's correct, that's what we started with.  You don't have to capture the entire state, it depends on whatever it is that you want to resume.

THE COURT:  All right.  So that goes back to -- but you would agree that if you use the suspension option, there is a capture component to that?

MR. NELSON:  There would be if you are going to do it, but the rest of the claim talks about that, right?

So that's the problem with that construction, is the rest of the claim talks about capturing the state, that state can be captured without suspending.

THE COURT:  Yeah.

MR. NELSON:  So if you write in there a situation where, well, suspend is issue the suspend command and capture the state, what I'm saying is that that's true, that that would happen if you issued a suspend a command, but the claim doesn't require that.  It does require capturing some state, but that

could be while it continues to execute.

**THE COURT:**  So what's your objection, then, to Acronis' claim construction of just the word "suspending," as that term appears, that if you do suspend wherein if, it does imply pausing execution and capturing its state?

**MR. NELSON:**  Well, it's unnecessarily, it is completely unnecessary.

It's true in the embodiments that are described in the specification, when you do pause, you will also capture state, but they are two separate steps.  And the claim itself uses the capturing and keeps that separate from the suspending, it already claims that.

So there is -- it can always be true in a patent, Your Honor, in embodiments that when you do X, you almost also do Y, but that doesn't mean when X appears in the claim that you need to construe the claim to also require Y.  That's my objection to the construction.

So I don't disagree with the way Acronis describes the embodiment of the patent, but I don't think it's necessary for the definition of suspend, particularly when you have a claim that continues to allow execution and doesn't require the issuance of a suspend command.

So, and if you look at our constructions, they provide that, there is no ambiguity to those constructions. Suspending is the temporarily preventing the execution, right?

That's what suspending is.  Capturing the state is capturing the state.

Now, in the embodiment, if you want to when you suspend, it says also go ahead and capture the state.  That may be true, but it isn't a requirement of suspending, because the claim talks about those as two different things.

**THE COURT:**  Because it already appears in the little (i).

**MR. NELSON:**  Correct.  That is correct.

And, now, as to the suspendible --

**THE COURT:**  Yeah.

**MR. NELSON:**  -- issue, I've explained, I think, and I'm not sure -- unless Your Honor has questions, I don't need to go back through on what our position is on why the term "suspendible" is there, but the objection to Acronis' definition, I had much less objection to the way Counsel described it.

Your Honor asked, well, how do I figure out what it's suspendible to?  Well, it's suspendible to something, because in reality, whatever system there is going to be configured, right?

**THE COURT:**  Yeah.

**MR. NELSON:**  And there's going to be some -- but that is not what their construction is.  Their construction is written to say, well, anything -- any storage device which in

theory I could configure the system to be suspendible to, that would be excluded from the definition, right?

That's the problem I have with it, because what they're trying to do is take something that's clear, in other words, yes, it says keep it to -- or store it to a storage device or copy it to a storage device separate from where it's suspendible, but when it's configured, it's going to be suspendible to a particular storage place, not to any one, which in theory it might be, because, frankly, then that would exclude all forms of nonvolatile storage.  They could always configure something.

**THE COURT:**  You don't have an objection if it's clarified that as configured or as programmed as opposed to any theoretically available device to which --

**MR. NELSON:**  Yeah, because that's what the claim says.  I mean, that limitation, "copy at least a portion of the state to a destination separate from a storage device to which the first virtual machine is suspendible," you know, I understand that, Your Honor.

So I'm not trying to construe the limitation out of the claim, but I do think that we need to give it some meaning and context, not, well, in theory I can design it to be, because that's not what the claim is getting to and that's not what the specification describes.

**THE COURT:**  All right.

Well, let me ask you:  Do we have any less of a difference than we thought --

**MR. KATZ:**  It does seem like it took a long time to get there, but I do believe that they are pretty much agreeing to our constructions.

I will just point out, just to be -- just for the record --

**THE COURT:**  Well, with the clarification that it's not just any device to which the machine is suspendible on a theoretical level but one which is particularly -- to which it is directed or configured.

**MR. KATZ:**  Not -- I would say it can't be directed, Your Honor, it has to be configured.  Because the difference, as they're saying, you look to see at a suspension where it actually went.  And it's irrelevant where the file was actually put.  If it's configured to allow it to go to ten locations but it only obviously goes to one, those other nine are not --

**THE COURT:**  Right, it's sort of predetermined; there is a configuration that --

**MR. KATZ:**  I would assume.

**THE COURT:**  -- dictates and identifies devices.

**MR. KATZ:**  Yes, Your Honor.

**MR. NELSON:**  Well, I don't know what he's saying.  I think what's he's trying to do to see if he can program in a noninfringement argument to say, well, I'll just say in theory

there could be ten others, even though that particular one is not going to go there.

I mean, it has to be tied to a particular instance of where it's going. You can't have a situation where you say, well, in theory, I'll have one that one out of 50 times it might be sent to the backup server, and therefore, it doesn't meet the claim limitation, right? There's going to be some situation where if you program and you configure the device, that instance it's going to go to a particular place.

**THE COURT:** But the idea is that once it's configured, then we -- it's identified and it's finite, et cetera, et cetera.

**MR. NELSON:** So -- no, understood, but what I heard him saying there is, well, I might have a situation where randomly I assign it to the backup server once in a while, and therefore, in theory it might go there, and therefore, it doesn't qualify, that kind of situation.

You can't have a construction that would exclude that kind of thing because that -- what that would allow you to do is to say, I infringe most of the time and there is one instance where I don't infringe, so that wipes out all the infringement.

**MR. KATZ:** Your Honor, actually, I think, again, he's trying to word his claim so that it will not cover what the claim says.

If, in fact, what this thing he is calling a backup server is configured to accept states, that's right, there is no infringement, Your Honor, that's our position. Our position is, the claim is very clear.

If, in fact, this thing he wants to call a backup server is a location which is available to be configured to accept state, that's a noninfringing solution.

The whole point of this patent is you are going to pick a location other than the locations you configure it to accept state.

THE COURT: Configured, that's at the key.

MR. KATZ: Configured. And especially the reason it's the key, Your Honor, is because of something Mr. Nelson said, which I wholeheartedly agree with, which is Claim 1 doesn't even require a suspend to have occurred. Now, he seemed to imply that I said it was. If I did, I misspoke.

THE COURT: No, I understand your point now.

MR. KATZ: Okay. Thank you.

THE COURT: Well, again, I would like to put that on your list to see. I will tell you that, you know, it seems like it makes sense with respect to defining destination separate from storage device to which the first virtual machine is suspendible, to have that encompass those destinations that are configured.

MR. NELSON: Understood, Your Honor. But, see, you

have to take every situation in an instance in time. It may be configured, right, in one situation. That's why I am talking about you can't get out of infringement by having one instance where you don't infringe and you infringe all the other times.

So I put it in -- in configuring, I can do it by putting in a random number generator and just say, okay, one out of every 50 times I'm going to store it to the backup server. Well, that means the other 49 times it's not configured to do that, and those would be infringement. That's exactly what I heard him saying, and that's the problem with what they are trying to do.

Now, I think that's less of a claim construction issue, Your Honor, and probably more of an infringement issue. But that's what I just heard him say. And that isn't -- that's neither the law, nor does it make any sense in the context of the claim.

But, again, you want us to go back on that one and see if we can come up with a compromise language --

THE COURT: Yep.

MR. NELSON: -- at least to narrow the issues for Your Honor.

THE COURT: All right, good. Thank you.

'517, right? I don't know if we need to spend a lot of time on this, "while in a preboot environment."

MR. NELSON: I honestly don't think so, Your Honor.

For ours, it's really a definitional issue.  You know, in the specification of the patent, if you go to our Slide 53 we have the language there.  And it really is in the brief.

Fifty-three is the language.  And then the construction, if we go to Slide 55, this is really where the crux of the issue is.  This is from Column 5.  And the excerpt we have here is from lines 7 through 21.  It defines, it's got parentheses -- or, excuse me, quotation marks, not parentheses, right around the term "preboot environment" --

**THE COURT:**  Yeah.

**MR. NELSON:**  -- which is an indication of definitional:

"Preboot environment is an environment on a computer during execution of a preboot program."

Okay, so that's fine, but we went ahead and substituted in the very next definition of "preboot program" because we think that would be helpful for jury.  Perhaps Your Honor wants to define those two things separately and just use the definition, which we would be fine with as well:

"Permit only limited operation of the computer used to perform operations such as diagnostic or boot image downloads."

So you have a situation -- the definition we have proposed just comes from those two definitions, or the

construction, I should say, that we provide. It comes from those two explicit definitional statements in the specification of the patent.

If Your Honor would prefer to break out "preboot environment" and "preboot programs," since one refers to the other, we don't have an objection to that if you think it would be more clear, but we need to use the definitions that are provided in the specification.

**THE COURT:** All right.

**MR. KATZ:** Your Honor, I'll try to be very brief, and maybe I'll get more points for brevity here.

Our view is that that is not quite the definition in the traditional sense. It does say that a preboot environment is an environment on a computer during execution of a preboot program. You know, I think that if a preboot program is running, certainly that's a preboot environment, but if a preboot program isn't running, and what exactly does that mean?

So they are kind of taking a phrase, taking another phrase, and bootstrapping them together. As he acknowledged, you know, he was kind of piecing them both together.

Our view is, this is very cumbersome. What if you don't have a preboot program? Is he really saying the absence of a preboot program, for example, means you are not in a preboot environment even if the operating system is in operation?

**THE COURT:** All right. If we avoid all of that, what's wrong with just their proposed construction, while -- while a preboot program is running that permits only limited operations of the computer and limited device support?

**MR. KATZ:** Well, it's the "while a preboot program is running." We just think it's -- essentially, we don't think this actually needs construction now, upon the briefing. That's why we say a computer, before it is booted, that, yes, it is true that a preboot environment is an environment that exists if a preboot program is running. Well, what if one isn't running? You can still be in the preboot environment.

A "preboot environment" is a very generic term. It means what it says. And it can extend beyond exactly the contours of the running of the preboot program.

So they say it's definitional, we say, no, if you take it in context --

**THE COURT:** It doesn't to have be running.

**MR. KATZ:** That's right, that's our position.

**MR. NELSON:** Your Honor, the issue with just going with the "if the computer is booted" is the fact that it's inconsistent with the specification of the patent, because obviously, in a preboot environment you have booted into the preboot program, right? So it would be extremely confusing to the jury.

We know that that's included in the preboot

environment because you put quotations marks around it, that's a strong presumption that you are providing a definition.  And the problem with their definition is, it ignores all that and, in fact, would exclude that which is specifically defined to be included because the computer has booted into the preboot program.  That's its operation.

You can do limited functionality, that's what it says.  And it defines that as a preboot environment, which is, you know, the whole purpose of the invention, at least in certain embodiments, where you go ahead and copy the image over, it's not yet deployed, right, because it's only been copied, do an inventory using this preboot program of what the hardware is and then decide what modifications you need to make.

So the notion that it would be before the computer is booted, it -- it excludes, frankly, all the embodiments of the claim and would just be extremely confusing to the jury, because I think a layperson would think, well, that means before I turn the power out.

THE COURT:  Well, and this specification, which talks about environment during execution of a preboot program, which sounds like something's happening, running, or something else.

MR. NELSON:  Sure.

THE COURT:  I don't see what the objection would be

to take the language off this specification.

MR. NELSON:  Agreed, Your Honor.

THE COURT:  All right.

"Image not presently deployed on new hardware computer."

MR. NELSON:  I don't -- unless Your Honor has questions, I don't think we really -- I mean, that goes to the point I just said, is that all it's getting to is that simply copying it isn't deployed yet because I may have to make modifications before I make that the operative image.  That's all we are talking about, and that's what our definition was getting at.

Unless Your Honor has questions, I don't think I need to --

THE COURT:  Well, I'll hear any other comments.

MR. KATZ:  No.  I think our briefing covers it, Your Honor.

THE COURT:  Okay.  All right.

'655, maybe this is a bigger deal.  Catalog.

Does it have to be a list?  Must there be a separate entry for each data object?

MR. NELSON:  That really is the answer, Your Honor. And we have provided examples, a number of examples, in the briefing, where you have catalogs that are not in the form of lists, such as a lookup table that will provide certain things.

So there are certainly implementations of the catalog that are described in the specification that are not in the form of a list, that those are certainly embodiments.  In fact, the operative language that's -- let me -- oh, it's at the beginning, I'm sorry, page 5 of our presentation.

**THE COURT:**  Page 5?

**MR. NELSON:**  That's where this begins.  But let's get to Slide 7.

This is where I understood Acronis to be taking a large part of their support.  This actually comes from the background section of the patent where it's discussing prior art, so I don't think it's particularly instructive to what the catalog is.

Now, we don't dispute that a catalog can have one entry per file, there is no question about that, but it's not limited to such an entry.  As I said, you can have lookup tables.

And furthermore, it wasn't clear to me from Acronis' definitions -- there are other terms that we'll get to where they seem to be implying that the claim, if we go back to, for example, Slide 5, see where the claim has a "wherein" clause right at the end of that last element?  It says:

"Wherein the catalog contains information indicating that backup copies of the first and second data objects are contained in the first and second backups respectively."

So the "wherein" clause in the claim says what information is in the catalog.

I couldn't tell exactly from the briefing, and maybe Acronis' counsel will correct me and clear this issue up, whether Acronis was arguing that I need also include information about where within the backup copy to find all those.  And the answer is, the claim doesn't require that.

This could be an example where you have it in the lookup table or you have some other point or some other place where you include that additional data.  All the claim requires is that the catalog tells you which backup a particular file is, and it may be done collectively.  You could have a situation where the backup was done on X date and all the files that are within that backup are in this backup set.

So that's -- if they are not arguing that it also has to necessarily include the location within the backup, then we don't have an issue there.  But I couldn't tell from their proposed constructions whether that was the case.

THE COURT:  All right.

Well, that's -- that goes to the phrase "information indicating that the first and second copies are contained in the first and second backups, respectively."  That's where the location issue comes in.

MR. NELSON:  Correct, correct.  It makes its way in the catalog only because that phrase in the claim modifies the

information that's in the catalog.

THE COURT: What about, getting back to listing the specification, I guess back at Column 3, it does have that language when backup server 18 creates a full backup set, backup server also creates a catalog 36(1), listing the files copied to tape; is that --

MR. NELSON: Yeah, that was what I just referred to.

THE COURT: Yeah, and what was highlighted in your Slide 7.

MR. NELSON: Right. And that's true, it does talk about that and there are embodiments.

This particular section, if you actually look at the patent, that's in the background section of the patent. It's not until Column 5 that you actually get to the summary of the invention, and then the bottom of Column 5. And then continuing on, you get to the detailed description of the embodiments. So that particular language is not even describing, you know, what the actual invention is here.

But that said, Your Honor, we don't dispute that there are -- there are embodiments described beginning in Column 5 where you do have the catalog in the form of a list, they are just not limited to such.

THE COURT: Where in Column 5? What lines should I look at?

MR. NELSON: Well, I was talking about where the --

the detailed description begins, beginning about lines -- so in the summary of the invention, for example, at Column 13, you'll see here that the synthesized catalogs are created to more officially create the synthetic full backups, but you don't see any mention here in the summary of the invention the particular form of the catalog, right?

So that certainly is the purpose of that, they are used to more efficiently create the synthetic full backups. But the particular form of the list is not something that was emphasized there in the summary of the invention section.

**THE COURT:**  And one wouldn't find anything about lists if you go through the detailed description?

**MR. NELSON:**  There are certain references where the catalog would be a list, although many times, I think even where Acronis refers to, we can just continue down on that same -- same slide.

If we could just go to Slide 10?  It's highlighted.

Even there, where it talked about there will be n entries corresponding to N data objects --

**THE COURT:**  Yeah?

**MR. NELSON:**  That limitation, I think, doesn't -- there is no reason to include that limitation in the claim.

And as we have cited in the briefing, there are -- there are implementations where it's implemented as a lookup table, for example, which would not fall under the category of

a list.

So again, what this is, it's a situation where they are trying to read in particular limitations from embodiments of the claim that don't find their way -- or, excuse me, from embodiments in the specification that don't find their way into the claim.

So I'm not -- and I haven't seen anything in the briefing, at least from Acronis, as to why it's critical to the invention that the catalog be in the form a list.  I mean, maybe they'll tell us here, but I haven't seen that in the briefing, so I'm not sure where that even -- that limitation even comes from.

Okay.  What about the limitation that there has to be separate entry for each data object?

**MR. NELSON:**  Again, with respect to the lookup table embodiment, you would not necessarily have that situation.  And you could envision implementations where you don't have a separate entry.

For example, you might have a situation where rather than having the file and the backup ID, you know, there are some where you have the file, you have a file ID, a backup ID where it says what set it's in, you could organize the catalog by just the backup.

So, in other words, I could have a backup that's done on XA Backup 1 and then have all the files that are

included in that backup.  So you wouldn't have a list of n entries corresponding to each file, you would have a list of N entries corresponding to a particular backup.

So there are many other ways within the invention that you could organize the catalog and achieve the purposes without it requiring that it be a list of one entry per file.

THE COURT:  You made reference to a lookup table.

MR. NELSON:  Yes.

THE COURT:  Is that discussed in the specifications?

MR. NELSON:  It is.  And I'm looking for the citation right now.

MR. SCHERKENBACH:  Column 7, line 36, Your Honor.

MR. NELSON:  Thank you.

MR. SCHERKENBACH:  Correction, Your Honor, Slide 9.

MR. NELSON:  From -- yeah, 27 to 30, we have that whole paragraph highlighted.

THE COURT:  Where is that highlight?  In 9?

MR. NELSON:  Correct.  The paragraph that we're referring to is in Column 7, beginning at lines 27 through line 40.  In particular, at the end you have in one embodiment a lookup table can be used to map the backup set Z to tape Y.

And that's what I was talking about, Your Honor. You know, you have a situation where the way the lookup table is, is you have backup set Z.  So, in other words, that is a backup that was performed on X day and that can tell you what

files are within that backup set, which would give you the information you need but wouldn't be n entries.

You wouldn't have one entry per file in that format. You would have one entry in the catalog per backup set which is organized that way.

You understand what I'm saying there?

THE COURT:   Well, maybe.   Can you -- so what would be in a backup set?   What would be in a backup set Z?

MR. NELSON:   The backup set that's described in the patent is that you take a backup at a particular point in time, it could be a full backup, it could be an incremental backup, and it's the group of things that were included in that particular backup.

THE COURT:   Um-hmm.

MR. NELSON:   So that's what you are trying to do. Remember the synthetic full backup:   You have a full backup at one point in time, and then you have all these incrementals, the incrementals being the things that have changed since the last time you did a backup, whether it be full or incremental.

And rather than having to go and restore each one of those individually sequentially, you can have something that tells you which backup set contains the most recent version of the file.

But you can see how you could do that in the context of this embodiment, where you have the backup set that lists

all the files in there, so you don't have to go in and have a situation where it's one entry per file and then you repeat those are all in backup set 1, for example.

**THE COURT:**  Start as a base of the backup set.

**MR. NELSON:**  Correct.  That's the embodiment that's described there in Column 7, Your Honor.

**THE COURT:**  All right.

**MR. SCHERKENBACH:**  Your Honor, I think it would be useful on this one to actually -- to reset a little bit and talk about what this patent is about.  I'm going to get to the lookup table issue because we interpret that very differently than they do.

**THE COURT:**  Thank you.

**MR. SCHERKENBACH:**  But if you could be in our -- well, Slide 9 of our set is really where we begin.

But let me just start with this sort of summary, and that is, the whole point of this patent is to maintain a single full synthesized backup catalog at every stage in the process as opposed to having multiple incremental catalogs, which was that prior art, okay?  And I'm going to step through all of this, but in both cases you can end up restoring your data at the end of the day.

In the one case you have to look at multiple incremental catalogs to find the latest versions of each of your data files and where they're stored.  You sort of have to

bolt them together.  There are pros and cons to that approach.  That's the prior art; the patent improved on that.  And it improved on that in particular by saying every time you do an incremental backup of a file, you recreate a complete catalog and you back up, then, from that catalog, okay?  That's really sort of fundamental to the claim construction issues in this -- in this patent.

Let me start first with the notion of list versus their formulation of data structure, okay, and why does a catalog have to be a list.  The answer is because the word "catalog," that word has meaning, okay?  We're not trying to read in something into that word.

That means something to somebody of skill in the art.  They seem to want to substitute data structure, which, frankly, can mean anything.  It can be a catalog.  It could be a file.  It could be a directory.  Who knows what a data structure is to a computer scientist?  I'm not sure there is a broader computer science term than "data structure."  I mean, that has the effect of reading catalog out of the claim.

Now, why do we say catalog has to be a list?  Because this patent really couldn't be clearer:  Every single time they describe a catalog, it's a list, including this twist with the lookup table which I'm going to come to.

But let me start -- let's just step through it on our Slide 11.

I mention in the prior art, which, by the way, Figures 1 through 4 in this patent -- it's a little unclear until you get to the very end, Figures 1 through 4 are the prior art approach, okay?  And then it's when you get to the succeeding figures that you get into what the actual invention is, beginning with Figure 5.  All right?

But in both, as I already mentioned, in both situations there were catalogs.  There were catalogs in the prior art, and the patent has a new kind of catalog, and they are all lists.  Everywhere you look in the patent at a catalog, it's a list.

So, for example, on our Slide 11, yes, this is about the prior art, and we put this in our briefing, but the point here is, when the specification talks about catalogs in the prior art, they are all lists.

In particular, let's go down -- this is Column 3 in the second paragraph there:  When the backup server 18 creates the full backup set 1, the backup server 18 also creates catalog" -- it's 36 paren (1), closed paren, "listing the files copied to tape 32 paren (1)," closed paren.  "As shown in Figure 3, catalog 36(1) includes n entries corresponding to the N files."

That is literally just one example of many.  And, in fact, with all due respect, other than their lookup table argument, they can't find any other examples in the spec where

a catalog isn't explicitly described as a list.  And in particular, though I'll come to this later, it's a list where you have one entry for each file, or each data object.

So I was reading there from Column 3 -- let me just get the specific cite for you -- oh, here it is.  I'm sorry, 21.  I was looking in the wrong paragraph.

So the specific part I read to you, Your Honor, was Column 3, beginning at line 21.

**THE COURT:**  Yeah.

**MR. SCHERKENBACH:**  Okay.  All right, so you're with me.

And then if you look -- so that's the textural description of the prior art catalogs in one spot.  And there are other examples.  I'm not going to go through them all.

Our Slide 12 then shows you there are representations in the figures of these prior art catalogs.  And so what do those show, and it's more of the same.  Figure 3 is one of the figures describing what's in the prior art, and in every case, you've got four catalogs there.  You've got an initial full backup catalog, 36(1).  You've got two incremental backup catalogs, 36(2) and 36(M).  Those are incremental.  You know that because they only have a subset of the files, not all the files.

And then on the right-hand side, you've got catalog 40, that's the synthetic full backup catalog that is created

anew, if you will, from those three prior catalogs.

And you'll see, obviously, in every case, it is a list and there is -- well, let me just stop there because we're talking about lists.  It's a list, no doubt it's a list, okay?

Then if you go on to the way the specification describes the invention, itself, that consistent description is the same.  So our Slide 13, right up front in the summary of the invention, the synthesized -- and we've highlighted a portion of it here -- "the synthesized backup set catalog comprises n entries corresponding to N data objects respectively."

**THE COURT:**  In one embodiment.

**MR. SCHERKENBACH:**  Yeah, let's talk about that.

So, first of all, clearly that's a list.  In one embodiment, yes, Your Honor, the one they claimed.  It is one, but that is the one they claimed.

Now, we could accept a definition of "catalog" per se that doesn't have the notion of a separate entry for each data object.  And this is a modification from what we have in our papers on further reflection, because I think at the end of the day, we end up in the same place.

We could have a catalog definition that has the notion of list and of identifying locations of backed-up data objects in the data volume.  And it's other -- it's the other piece of the claim that requires this separate entry for each

data object.

And that other piece of the claim is the last piece of the claim.  In fact, I think counsel read it to you.  So we're only talking about Claim 7 here, the last -- it's the creating a catalog step, which is where I actually had intended to cover this, but I can just direct Your Honor to it.

Where you get to the creating a catalog step, it requires -- it says, "creating a catalog after modification of the second data object but before modification of the first data object wherein" -- and here's the key part -- "wherein the catalog contains information indicating that backup copies of the first and second data objects are contained in the first and second backups," okay?

So even though you've only changed one of the two files, you create a new catalog that has entries for both.  And that's why -- so they have claimed the embodiment which they disclose or describe in great detail, they have claimed the embodiment where you've got as many entries in that catalog as you have data objects.  The claim says first and second.  It could say first, second, third, fourth, and fifth; it doesn't matter.  That's the source of that requirement.

**THE COURT:**  Well, let me go back to the list question, if --

**MR. SCHERKENBACH:**  Yes.

**THE COURT:**  You've kind of covered several different

things; what about the lookup example?

MR. SCHERKENBACH: I was just getting -- that's Slide 14, that's the next slide in order there.

And the -- there is a single reference to "lookup table," as far as we know, in the entire patent, and here it is, okay? And this comes from one paragraph in the spec, but let's look at how it starts, okay, at the top.

"As noted, each synthesized catalog contains n entries corresponding to the N files respectively of Volume V. It's a list with as many entries as there are data files."

And then if you keep reading this particular example, there is a variation where instead of -- let's just keep reading because I think it's important: Each entry within the exemplary synthesized catalog shown within Figure 7 includes three items, all right? So we've got a list with as many entries as data files, and for each entry there are three items.

Now, here is where it gets quite a bit more detailed, but the punchline is, as part of the process of mapping from those three items to the actual location of a data file, you can use a lookup table. That's all this says. In other words, the catalog entry, itself, doesn't have to contain every single piece of detail necessary to find file. You can have -- in the catalog, itself, you can have a mapping to a lookup table that says go look somewhere else.

There is nothing here that says or even suggests that you can therefore have a catalog that doesn't have any lists at all or that you can somehow have a catalog that would consist of a lookup table, which is a completely foreign concept within the context of this patent.

So you have to be very careful about taking this notion of using a lookup table for a very specific and limited purpose and sort of morphing that into some embodiment that's just really not disclosed in this patent.

**THE COURT:** What about this notion that there need not be an entry for every file or data point that you use, for instance, a backup set Z that doesn't have -- you don't need every entry leading up to that point?

**MR. SCHERKENBACH:** So that -- the answer is, it's true you don't need every entry in the sense that you can create a full backup from using multiple catalogs. And, indeed, you have to use multiple catalogs if you don't have one that has an entry for every file. That's the prior art. That actually -- that was the point of sort of starting at the beginning here. They disclose that in the patent, and they say you can do it that way, where you end up with two or more catalogs which collectively have all the entries you need. But that's not our invention; our invention is this single catalog.

**THE COURT:** Right.

**MR. SCHERKENBACH:** Which has -- in fact, again,

that's the next slide, Slide 15, where you've got a full synthetic backup that can be done using only a single catalog.

This is Figure 7 of the patent.  And I think we might have done a side-by-side here later on of Figure and Figure 3 --

Yeah, can we go to Slide 21, Steve?  Great.

Since I'm sort of dealing with these together, I hope it's not confusing, but this is really the rub, all right, Slide 21.

In the prior art, you had incremental catalogs: 36(2), and 36(M) there on Slide 21 which you had to combine with the original catalog in order to be able to do a backup, a full synthetic backup.  That was the way it worked.

And as the specification describes, there are pros and cons to that.  You know, incremental backup has some advantages except when you want to restore.  It's easier to backup less than the full thing every time.  If that's all you need to do, great.  But then if you want to restore everything, if you have multiple catalogs, you've got to piece them together and you've got the overhead of the system dealing with multiple catalogs to go find the latest version of every file in order to do a full backup.

And this is described explicitly in the patent, actually, in several in several spots.

THE COURT:  Well, I understand that.

**MR. SCHERKENBACH:**  Okay.

**THE COURT:**  But what about the point that, as I understood it, that the invention, given the way that the catalog, the full catalog, is synthesized, that you don't need all of the -- an entry for every file because it's already been sort of somewhat accumulated, as I understand it, in the backup set Z, for instance?

**MR. SCHERKENBACH:**  No, no, you do need an entry in the catalog for every file, which is what Figure 7 shows. Again, it's on this Slide 21, for example.  That's the whole point, is that you have an entry for every file in a single catalog that tells the system where to go get the latest version of that file, right?

It doesn't to have be -- you know, they don't to have to be stored in the same place.  They certainly weren't backed up at the same time, they were all over the place --

**THE COURT:**  Right.

**MR. SCHERKENBACH:**  -- frankly.  And that's beauty of the invention, is by going to one catalog and traversing one catalog, which has an entry for every file, that can be very efficiently done, much more efficiently done than in the prior art.

And so that's why they have claimed -- they have claimed their embodiment here of having -- of maintaining a catalog, creating and then maintaining a catalog -- this is the

last element of Claim 7 -- where even though you have -- let's go through that again because this is where the rubber meets the road.

You are creating a catalog after modification of the second data object but before modification of the first data object, okay?  So you haven't done anything to number one, you have only changed number two, but you are creating a catalog that contains information indicating that backup copies of the first and the second data objects are contained in the first and second backups, respectively.

That is the -- that is the critical distinction from the prior art.  The prior art, you wouldn't have done that.  In the prior art, you would have said, I've got an earlier catalog that has information about data object number 1, and now when I change data object number 2, I only need to do a catalog to deal with number 2.  And then if ultimately I want to create a full backup, well, then I add the two together, I sort of bolt them together.

This claim is claiming -- I mean, it's one embodiment.  It's the only embodiment they disclose.  I know there is two spots in the specs where it says in one embodiment, but it's the only embodiment where you create and you maintain a single catalog with entries for every file as shown in Figure 7 and described in, you know, in great detail in this patent.

So you don't have to do, at the end of the day, the punchline here on our Slide 23, you don't to have do this piecing together process, which is the way the prior art did it.

**THE COURT:**  But you're saying notwithstanding this, you still have to have an entry for every file.

**MR. SCHERKENBACH:**  In fact, not only notwithstanding it, the way you achieve it, the way you are able to avoid the scenario on Slide 23, where you have to combine three pieces in order to do a restore, the way you achieve that, according to this invention, is to have a single catalog with an entry for each data object.  That's the whole point.

And again, because you are probably going to hear it when counsel gets up, there is this -- there is language -- as I say, in two spots it says "in one embodiment," but this is the only embodiment disclosed, number one.  And number two, it's what they claimed.  Whether or not it were the only embodiment, that's what the claim requires.

**THE COURT:**  All right.  Why don't I get a response.

**MR. NELSON:**  Okay.  So briefly, Your Honor, what this is all based on is their reading that there is only one embodiment.  Now, you know from the cases that we cited in the brief that wouldn't get you there, anyway, as a matter of claim construction.

We cited two very recent Federal Circuit cases,

*Thorner versus Sony*, in the briefs, 669 F.3d 1362, and *Aventis versus Hesperia* (phonetic), also a 2012 case, 657 F.3d 1324.

So, you know, even if what he said were correct, that there is only one embodiment described, that doesn't get you to the point of where you read that limitation into the claim.  And that is all you heard over and over again.

**THE COURT:**  That's the only embodiment you claim.

**MR. NELSON:**  Right, but that's wrong.  So let me explain why.  He bases it all on this "wherein" clause, and let's look at it:

"Wherein the catalog contains information indicating that backup copies of the first and second data objects are contained in the first and second backups respectively."

It doesn't say wherein the catalog contains an entry for each file indicating that backup copies of the first and second data objects are contained in the first and second backups.  That's the way counsel read it, but that's not what it says.

So if you need to have information, there is no question about that.  But I gave you an example.  And I think counsel even acknowledged it was an example with the lookup table.  There, the information was organized by backup settings, right?  And the backup set ID told you which files were in that particular backup set.

You could have those all in a single catalog, there

is no question about it.  That's described.  It tells you which files are in the backup set, and you go through and you determine where to restore the most recent version of the file from that one catalog.  So that is an implementation that is described in the patent specification that their -- "they" being Acronis -- that their construction would exclude that.

So the notion that that's the only thing that's claimed, it uses the term "information," yes, and you need information to indicate where can you find the various copies of the files, there is no question about that, right?  Of course, it says where in the backup sets.  It doesn't say specifically where in the backup set, meaning, you know, where on the tape within that backup set.

There can be other information that you go to, and I think counsel acknowledged that the catalog doesn't need to contain every single detail of information, just where you can go to get that information to do the restore.

The --

**THE COURT:**  So the backup set -- I mean, you are saying that it's organized by backup set, but doesn't the backup set then contain an entry for every file?

**MR. NELSON:**  It wouldn't be unless -- think about it, I mean, you can have a situation -- if you organized it by backup set, you would have multiple entries for that backup set.  So, in other words, if I looked at an Excel spreadsheet,

I could list all the files that were in that particular backup set and that would work, but there wouldn't be an entry for every single file because of the way my catalog is organized, is by the backup set ID.

They are trying to exclude that type of embodiment; in other words, they are trying to say you can only have a catalog that is organized by file, period, and that's not what the specification describes, nor is it consistent with the invention.

So we're not suggesting that you don't need to be able to have information about where within the backup sets to go find the files, but the only way to do that is not, as Acronis suggests, have your catalog organized with one entry per file.

And they could have claimed that. You know, this notion that that's what they claimed, it uses a broader term "contains information indicating the backup copies of the first and second data objects are contained in the first and second backups respectively."

So it doesn't say where an entry -- there is an entry for each file saying that that file is located in this particular backup set. So they used broader language to encompass these various potential embodiments of the catalog.

So what they're trying to do is limit it to a very specific embodiment, meaning I have in everything they showed

you, have your file ID over on the left.  So they have one for each of them, and I have other information in the other columns to the right of that.

But that isn't the only way you could organize it. As I said, you could have one entry for backup ID that lists all the particular files, for example, that are in that backup. And that's described in Column 7, as I said.  So they're -- Acronis' definition would exclude that type of implementation.

**THE COURT:**  Tell me, briefly, Column 7 --

**MR. NELSON:**  Yeah.

**THE COURT:**  -- which -- oh, that's the one you quoted before.

**MR. NELSON:**  Correct.

But, I mean, I think beyond that, Your Honor, you got to be tempted, there is always a temptation in every situation in a patent to say, well, I have to limit it to this specific embodiment that's described, but that isn't true.  You got to construe the claim language.  And the -- otherwise, we would always just go to the specification and write in whatever limitations are in the specification.

And that's why the cases we cited to Your Honor caution against the idea, even if there were only one embodiment.  But here there are not, there are multiple embodiments.

**THE COURT:**  Where would I find other multiple

embodiments in -- in the specifications?

**MR. NELSON:**  Well, that's -- I mean, there are various ones that talk about what information would actually be excluded -- I mean included.  So each entry -- this is from Column 7, within the exemplary synthesized catalog shown in Figure 7 includes three items:  File ID, volume file offset, and a backup set ID, right?

Well, he showed you one in the prior art where it didn't include all that information, for example, and said that, well, this is an example, there is just a file offset and a file ID.

So there are -- and here, it also talks about further down that you could have file X identified by file -- more particularly file X identified by the file ID of an entry as stored on a tape Y as part of the backup set Z identified by the backup set ID.

In one embodiment, a lookup table can be used to map the backup set ID to tape Y.  So the physical address of file X on tape Y can be calculated by adding the offset AQN of the entry to a starting address of tape Y.

Well, if you look to one of the embodiments I described, certainly, it's not in Figure 3.  And even as to Figure 7, you don't have all of that various information in there because you have -- you don't have the volume, for example, that's there.

So there are different information -- there are different embodiments described in the sense of the information that would be included in the catalog, so you would have to have a construction, certainly, that included those embodiments unless there is a reason to exclude those.

But, fundamentally, it goes back to the point that they are trying to have a definition of catalog that's limited to a particular way to organize the catalog; in other words, only a catalog that's organized by file.  And the patent doesn't say that.  I mean, I cited to you an example where it's organized by backup set ID, and that's what it says.

So you can't limit one -- you can't limit the definition to one that's organized in any one specific way when the claim doesn't otherwise require it.  And the specification certainly doesn't require it, either.

**THE COURT:**  All right.

Let me just -- let me just get the response to your point again, that very point, and then we are going to take a break.

**MR. SCHERKENBACH:**  Your Honor, thank you.

This my Slide 14, if I can direct you to that again?  On this lookup table issue, counsel is struggling to find an embodiment in this patent that doesn't exist.  So I just want to be very clear about this disclosure here and how it works.

Again we are in a -- we are in an embodiment where

each catalog contains n entries corresponding to the N files. That's another list where there is one entry for each file, okay?  This is not an alternative embodiment in any sense that's relevant here.  We are contending that every catalog has to be a list and that it has to have one entry per file.  This is completely consistent with that.

And how does this lookup table work?  If you -- let me direct you down to the last couple of lines there.  It refers to this backup set Z, okay?  And the backup set is a backup tape.  That's a tape, okay?  And all this says is if you look at -- can I direct you to the next slide as an example, Slide 15?  All of these -- all of these catalogs have a column for backup set ID.  You see that?  Backup set ID.

**THE COURT:**  Um-hmm.

**MR. SCHERKENBACH:**  One, 2, 3, and so forth.  That's a tape number.  Backup set ID is a tape number.  All this lookup table means is, when you've already got a list and you've already got one entry per file, you can map, say, tape 2 in one of the backup set ID2, that tape can be mapped to a different tape using a lookup table, that's all it means.

And, in particular, in the example that counsel keeps quoting here on Slide 14, back up tape Z can be mapped to Y.

**THE COURT:**  When you say "tape," what do you mean?

**MR. SCHERKENBACH:**  Literally, we are talking about

magnetic tapes, robotic tape handlers that have these giant tapes on them that do these backups. That's all this is talking about, is saying, hey, you know, if you've got a table -- you know, it's a standard computer programming concept, that you can map A to B for any purpose, you know?

The table might tell you to look on tape 2, but because it's more convenient because tape 2 ran out of space, we can move some stuff from tape 2 to tape 3. And so the system can maintain a lookup table to say, hey, you were told here to look at tape 2 for that thing, go look at tape 3 instead. But that has nothing to do with what a catalog is and whether it has to have an entry per data file. This is a complete -- it's a sideshow.

And just to finish how this works here, so if you read this -- and I hope we are on the same page -- so you've got a backup tape Z that is specified, you can use a lookup table to go from Z to Y. And then look at the last line, look at the last line of this excerpt: The physical address of file X, and that's what we're looking for, is the address of the file that we want to restore, the physical address of file X on tape Y, because now we know what's on tape Y because the lookup table told us to go look at a different tape, okay, can be calculated by adding the offset, AQN, of the entry to a starting address of the tape Y, of the entry for that file in the catalog.

**THE COURT:**  What is offset AQN?

**MR. SCHERKENBACH:**  Offset is where you look for --
it's -- it's not quite right to say a distance, but it's
basically a location removed from a specified starting point on
a tape.

**THE COURT:**  Okay.

**MR. SCHERKENBACH:**  Right?

**THE COURT:**  So location within the tape.

**MR. SCHERKENBACH:**  Within the tape.  Go look here,
here is where file X starts.

So this is completely consistent with our
construction.  It's a tweak on a piece of one of the entries in
these catalogs, that's all it is.

**THE COURT:**  So there is still an entry for every
file, is what you are saying?

**MR. SCHERKENBACH:**  Absolutely, as it says at the
outset of this paragraph on its face, yes.

**THE COURT:**  All right, we are going to go ahead and
take a break.

I think that, as far as I'm concerned, covers what
we need to talk about for the '655.  Or is there more?

**MR. SCHERKENBACH:**  I agree with that.

**MR. NELSON:**  The only thing I didn't get to address
was the creating a new catalog that he did that I could address
real quickly, Your Honor, literally, like a minute.

**THE COURT:** Oh, let's just do that when we come back. She needs to take a break. And then we'll go on to the Acronis patent.

**THE CLERK:** How long for the break?

**THE COURT:** Let's take an hour, come back after 2:00 o'clock.

**(Luncheon recess taken at 1:02 p.m.)**

**(Proceedings resumed at 2:01 p.m.)**

**THE COURT:** Okay, Counsel, you had one thing left on the '655 issue.

**MR. NELSON:** Right, on this creating a new catalog term.

So just very briefly, Your Honor, I think from the briefing, we are in agreement that you can at least take information from existing catalogs and copy that forward. I'm not sure that Acronis' construction of new catalog captures that, but it seems from the briefing they were fine with that.

The only thing I wanted to address in addition, Your Honor, was I think there were some statements made that the catalog that's created can't make any reference back to earlier catalogs; in other words -- and this is kind of their idea of new as well, would obviously connote that kind of a limitation.

But if you looking in Column 9 of the patent, beginning at about line 20, there is a statement that says, "in an alternative embodiment, synthetic catalogs can be created

with one or more entries that include a file ID, a file offset, and a backup set ID, and with one or more entries that include a file ID and an entry number for a previous catalog that contains a file offset and a backup set ID."

So there are specific embodiments that are described where the current catalog would refer back to previous catalogs, make reference back to information that's contained in there.  So, in other words, you don't need to go ahead and copy forward all of the various information, you can make reference back.  And that's a specific embodiment that is described there, so I wanted to point that out to Your Honor.

THE COURT:  Okay.

MR. NELSON:  If have any questions, I would be happy to answer, but that was all I had.

THE COURT:  Nope.

All right, let's go on with the Acronis patents.  I guess the first question that arises with respect to the '211, a computer -- in the preamble that makes reference to providing backup copying of data without suspending an application program accessing that data.  The question is whether that is to be given any effect in terms of limiting the claim, right? That's so --

MR. SCHERKENBACH:  Your Honor?

THE COURT:  You want to make some comments, I certainly would hear those.

*MR. SCHERKENBACH:* Your Honor, two things: Number one, Mr. Katz is going to deal with the terms in our patents.

*THE COURT:* Okay.

*MR. SCHERKENBACH:* I was going to ask, with the Court's permission, to be excused so I could get back to a hearing on the East Coast.

I didn't want to be rude.

*THE COURT:* If you trust him.

**(Laughter.)**

*MR. SCHERKENBACH:* He's going to do a bang-up job, I'm sure.

*THE COURT:* All right.

*MR. SCHERKENBACH:* Thank you.

*THE COURT:* Thank you, appreciate it.

*MR. KATZ:* That's exactly the issue, Your Honor, with, you know -- the preamble, first of all, isn't limiting and therefore can't possibly be used to render a claim indefinite. And then setting aside whether it's limiting or not, there is nothing indefinite about the language here that would render this claim invalid.

You know, very simply, you know, this is an apparatus claim, Claim 1, and it has a storage device, backup storage, intermediate block data container, and then it has a little description.

And what the preamble is saying is really that it

goes to the purpose of the -- of the patent.  And so the purpose of this is, it allows an online backup.  And specifically, it allows a backup where you have to be able to suspend the application program.  That's the environment this is made to be used in.

It's unnecessary to suspend the application program specifically because you are going to suspend the write commands to get blocks to an intermediate data container.  And so the application, itself, doesn't know that that's even really happening.  And you don't need to actually stop what you're doing and do what would then become like an offline backup.

So, I mean, I have slides to go through, Your Honor, but I think this is a pretty clear, simple point, and I don't want to take up time unnecessarily.

THE COURT:  Yeah, well, if there is anything you wanted to add at this point?  I take it you've made your points in your papers.

MR. KATZ:  Yes, I think we have, Your Honor.

THE COURT:  Okay.

MR. WALL:  Thank you, Your Honor.

I think there are sort of two steps to go through here:  One is, as Your Honor pointed out, the question of whether the preamble is limiting; and secondly, whether it's indefinite.  So let me take the first part of this.

And if we could please put up Slide 125?

There are two reasons why the preamble is limiting. First, preambles serve as claim limitations when they state an essential feature or purpose of the invention.  And here, what that preamble is -- indicates is that -- or what the specification indicates is that a key portion of the invention of the '211 patent is providing a backup where an application is not suspended.

So, and that's apparent from two portions of the specifications which I have replicated here, the first in Column 8, which discusses the summary of the -- which is the summary of the invention section which is being quoted.  It says:

"Thus, the delays that result from writing to the main storage are reduced to a minimum, and the programs running on the computers connected to the data storage can continue working substantially without pause."

And then there is a second portion of the specification on Column 9 which discusses -- talks about the present invention, which is very significant language.  It's not talking about a particular embodiment, it's talking about the invention as a whole.  And what it says is:

"The present invention provides a system and method for file system backup without suspending online application programs using a file system snapshot.  Accordingly, the

present system and methods significantly increase computer system availability and allows backing up without interrupting computer services."

So the wording of the preamble captures exactly that, right?  The wording of the preamble states:

"A computer system providing backup copying of data without suspending an application program and accessing the data."

So that is one reason why you would give this preamble effect.  There is a second reason, though, and that is on Slide 126.  And what is shown on that slide is another proposition supported by the case law, which is that a preamble is limiting where a term in the preamble provides an antecedent basis to a term found in the claim.

As you see below, the term "computer system" is referred back to a number of times, both in the intermediate block data container portion of the claim and then in this second phrase which I'm going to get to in a moment.

So Symantec certainly believes that there are two independent reasons why the preamble is limiting.  Then we get to the second issue, which is, is the claim indefinite.

**THE COURT:**  Well, let me ask you --

**MR. WALL:**  Okay.

**THE COURT:**  You say it provides in this case an antecedent basis --

**MR. WALL:** Um-hmm.

**THE COURT:** -- simply by reference to the term "computer system" or "the computer system"?

**MR. WALL:** I'm sorry?  That's what I'm talking about.  And I may not have heard your question, Your Honor, so I apologize.

**THE COURT:** You are saying because it provides an antecedent basis for all the other --

**MR. WALL:** That's right.  Whenever it's talking about the computer system further down in the claim, what it's referring to is the preamble; in other words, there is no -- there is no further mention within the body of the claim under the preamble of a computer system that is independent.  The antecedent basis for -- for it states:

"An intermediate block data container storing block backup data wherein the computer system copies the data file." When it states "the computer system," it's referring to the preamble.  And that's what is meant by the antecedent basis.

**THE COURT:** The preamble that appears on the --

**MR. WALL:** In Claim 1.  We are talking just about Claim 1.

And so if you look at -- so you can look at the claim, itself.  Or, on Slide 126 of Symantec's presentation, we reproduce the relevant parts of the claim.

**THE COURT:** But the critical language that we're

talking about, computer system providing backup copying of data without suspending an application program accessing the data, right?

**MR. WALL:**  That's right.

**THE COURT:**  And that is -- okay.

**MR. WALL:**  So that's in the preamble.  And my only point is that when the claim continues to refer to what's in the preamble, it's sort of incorporating by reference what's in that preamble within the actual body of the claims, and therefore the preamble has significance in terms of limiting what that claim scope is.

**THE COURT:**  Okay.  All right.

**MR. WALL:**  Okay.  So that's the first step, right?  And for those two reasons, Symantec believes that the preamble is limiting in this case.

The next question is, is this claim indefinite.  And I'm going to focus on one of the indefiniteness arguments we raise in our briefs.

**THE COURT:**  Because that's something that is appropriately resolved now at the claim -- in a claim construction hearing?

**MR. WALL:**  Yes, it is, Your Honor, because the question of indefiniteness is whether the claim is susceptible to construction at all, whether it's so ambiguous as to not provide any guidance as to what the boundaries of the invention

are.  And so, yes, it's very appropriately juxtaposed with claim construction.

And, indeed, I can't come up with it off the top of my head, but we do cite an Eastern District of Texas case.  And I'm pretty -- I think in our brief.  I could even provide you with that briefing where indefiniteness is addressed in the context of claim construction.  It is in some of the authorities we cite, but I can provide that for the Court, if it wants.

THE COURT:  Okay.

MR. WALL:  So the grounds for indefiniteness I'd like to focus on is this mixed statutory class claim.  And this IPXL Holdings case, which is a Federal Circuit case, it basically held that a single claim that covers both an apparatus and a method of use of an apparatus is invalid as indefinite.  And the reason that is, is because you don't know when you infringe the claim.

If you have an apparatus claim, presumably, you might infringe it upon manufacture.  But if you have a method claim, you would infringe the claim upon use.  So the idea here is that you need to know what activity that you would engage in would constitute infringement.  And the problem with these mixed statutory class claims is, you don't know.

And Slide 128, please.

And the problem with Claim 1 is that it is a mixed

statutory class claim.  So we look at the preamble of Claim 1, which as counsel just said, indicates that this is an apparatus.  But further down in the claim, and this is in the second column, and we've just divided up Claim 1 into two columns here, there is this term:

"Wherein the computer system manages the online data backup process by," and then it lists various steps, "compiling a list of data storage blocks, copying a data storage block to the backup storage device, suspending a write command," and so on.

The problem is, we don't know when will we infringe the claim, when we make or provide the computer system or when the -- we operate the computer system to perform these steps.

THE COURT:  Well, the first column on the left is describing a computer system, but it also describes what it does.  I mean --

MR. WALL:  Well, the way I would phrase it is that the first column provides the components of that computer system, right?  The computer system includes a storage device.  It includes a backup storage device.  It includes an intermediate block data container.  Those are the things that the computer system includes.

Then we have the second part of the claim, which talks about steps that are performed, and that's the disconnect.  So there are two distinct parts of the claims:

One which describes what the apparatus is; the other that describes certain method steps that are performed.

**THE COURT:**  All right.

**MR. WALL:**  And so in its reply brief, Acronis tries to distinguish **IPXL**, and the way it does this is by contending that that process language is merely a functional description of the apparatus.  I think the problem with that argument is that, still looking at Claim 1, it says the -- "wherein the computer system manages the online data backup process," it doesn't say something like, wherein the computer system is operable to manage the online data backup process or the computer system is capable of managing the online data backup process, it requires these steps actually be performed.  And it doesn't have any qualifier that would make clear that what the claims are talking about is a computer system that merely has particular capabilities.

And so, I would submit that, certainly, that the case law that Acronis is relying on to distinguish **IPXL Holdings** is inapposite here.

**THE COURT:**  All right, let me hear the response.

**MR. KATZ:**  Your Honor, we view this as being a real -- not even a close case, a hail Mary pass by them.  I won't go into excruciating detail, but let me just point out a few things.

So number one is, they actually have that quote on

their slide, which isn't quite accurate.  In fact, if you go to Slide 75 of our presentation, the classic time where a preamble is not limiting is when it merely states the purpose.  And that is especially true for an apparatus claim.

So here you have an apparatus claim, and we just cite here a case that is also discussed, I believe in our brief, *Catalina Marketing International* 289 F3d 801 at 808. And here it clearly says that in general, a preamble limits the invention if it recites an essential structure.  And for an apparatus claim, it's always about structure.

And conversely, "a preamble is not limiting where the claim defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention."

And so here in Claim 1, it's an apparatus claim. They say that the computer system, part of the preamble, needs to be given effect.  That's kind of a red herring and irrelevant.  That wouldn't be structure, and we don't dispute this is a computer system.  The question is whether the described purpose, which is to allow the computer system to operate without suspending an application, is limiting.

And the key is that when you look at this claim, what this claim allows through the disclosed structures is a system that, of course, allows an online backup.  And so there is no doubt that when you implement these structures, the

result is you're able to have a computer system with application programs that are not being suspended.

Now, turning to the question of indefiniteness --

**THE COURT:**  What is the effect of whether the preamble is limiting or not?  If you are saying that the purpose described in the preamble is -- I think that's what you're saying, is consistent with the actual --

**MR. KATZ:**  It is consistent.  And the reason -- what that case law means, and it's actually, I believe, discussed in *Catalina Marketing*, the case we cite here, is the following:

If you describe a structure and put in the preamble, what it's used for, and I believe this case, if not this case a different one, has the example of like a new kind of polish, and you say a polish having the following composition for polishing shoes, and the question is, you have a structure, is that infringed if you polish something other than shoes?

And the other answer is yes.  You have stated the intended purpose, but you did not say wherein only a shoe is polished.  And so it's a helpful guide to give context to the invention, but this is an apparatus invention.

So in this case, Your Honor, how this plays out is as follows:  As we discussed in the tutorial, and we have some slides about how it works and we've copied some of them here, you back up data from blocks and then if a write command comes in and the data has already been backed up, you can modify the

block.

If the write command comes in and the block hasn't been backed up, you have to halt the write command and copy this block to an intermediate container for a later backup. So what this allows you to do is run the computer with applications not being suspended.

Now, because the preamble purpose is not limiting, what that would mean is that if someone is doing exactly what's described in the body but they in some other context, in fact, do suspend applications, it still infringes.

That's what it would mean that this is not limited, that the infringement is there because you are doing what the body of the claim says. And the benefit is that you can allow other applications to run without suspending them. But a defendant would not be able to say, well, wait a minute, we independently are just going to suspend our application, now we don't infringe. The answer is no, that was just the intended purpose of the invention; it's not one of the enumerated limitations.

**THE COURT:** Okay.

**MR. KATZ:** Okay. Now, turning to indefiniteness, I would say the defendants here, you know, have a peculiar position that they kind of say that the preamble is necessary to breathe life into the claim, and yet they don't know what it means and its indefinite. I don't actually know how they can

kind of reach both conclusions simultaneously.

On the one hand, they say it's insolubly ambiguous, but on the other hand, they say it's not necessary to fully understand the scope.  Doesn't make sense to me.

The body of the claim is very clear as to what the invention is.  And I just don't see how you can reconcile -- Your Honor, you need to treat the preamble as limiting because it's so, you know, so intertwined with what the invention is contemplating, and yet they don't understand what it means.  I don't understand that.

Specifically, on the *IPXL* issue and, you know, as we point out in our brief, *IPXL* was a once-in-a-lifetime case. Maybe one or two other cases followed it in very similar circumstances.  It certainly doesn't apply here by a long shot. We have cited numerous cases that say that the *IPXL* defense is worn out and is really not applicable to any normal situation. And let me elaborate on that very briefly.

In *IPXL*, they had at least two claims at issue, representative Claim 1 and a claim called Claim 25.  Claim 1 was not held indefinite, and yet Claim 1, if Your Honor goes and looks at it, it is repeated in the *IPXL* case, has a structure similar to what we have here, it has structures, and then it does have some functional language describing what those structures do.  That was not held indefinite.

The claim that was held indefinite in *IPXL* and what

makes it a very unique case was claim, I believe it was 25 or 35, I forgot the number off the top of my head.  And they added something to a structure claim and said, "and wherein the user uses something."  And that was the critical language, that it was clearly a method step in the middle of an apparatus claim and the user uses.

So it wasn't a functional description of what the -- the apparatus did, it was this user step, which was very unique and, frankly, is hardly ever, you know, I don't think it has been seen in other cases.

And so many cases have said you don't take **IPXL** and just declare all these patents invalid that have functional descriptions.  So, for example, you know, so there the issue, what they said is, because the "and the user uses" was a limitation, they said, well, does the apparatus infringe before a user uses it to do something?  It's like it's unclear this is improper.

But here we have an apparatus claim that has these elements and the "wherein" clause that they point to describes in functional language what the apparatus does.

Symantec says --

**THE COURT:**  How do you distinguish between simply describing a function of the apparatus and engaging in methods description?

**MR. KATZ:**  All right.  And the distinction really

is -- in the **_IPXL_** case, it was not -- again, functional language was described in Claim 1, it was not indefinite.  In the same, it was the language, and a user uses, very unique language.  Nothing comparable is found here.  This is functionally describing what the hardware components here and software components are doing, which is totally permissible.  In fact, it was permissible in **_IPXL_**.

The only thing where **_IPXL_** crossed the line and was rendered indefinite was, again, adding a clause that the user uses something because, obviously, "a user uses" is not a description of an apparatus.  And so that is the key difference here.

I mean, very simply, when is this claim infringed?  It's infringed if someone makes, uses, or sells something with the apparatus described here if it is designed to complete the complete claim, including this functional language.

And so the key is, it's wherein the computer system manages the online data backup process by, you know, compiling a list, copying data storage blocks to a backup storage container.

This is all stuff you will see in the software.  So if you have software that does compile the list, is designed to move the data over, you have an infringement.  Nowhere in here does it say the step that a list is compiled.  And that's the key, that would be, boom, the user uses.

THE COURT: So, in other words, you're saying that wherein the computer system essentially means is designed to manage the online data system by --

MR. KATZ: Configured -- yeah, it is configured wherein --

THE COURT: It doesn't say that, it just says manages, and therefore --

MR. KATZ: Well, the reason it says that --

THE COURT: Its capacity or function is not --

MR. KATZ: Exactly. I think you accurately captured what their argument is. And the answer, Your Honor, is that the "wherein" clause actually has that function.

This is a standard claim technique. Again, look at Claim 1 in **IPXL**, itself, what was held valid. What you have here are three things: Storage device, backup storage device, intermediate block data container, you know, described in the first three elements. And then "wherein the computer system manages the online process by" describes, you know, how the computer system uses these things.

THE COURT: Okay.

MR. KATZ: Yeah. I mean, this is standard claiming stuff. And that's not -- because it's a "wherein" clause, it's not a method step.

MR. WALL: Just a few points.

THE COURT: Briefly.

**MR. WALL:**  Very briefly.

**THE COURT:**  Yep.

**MR. WALL:**  I think the first thing is just that I don't think that Claim 1 was -- that issue was before the Federal Circuit, whether Claim 1 was indefinite or not, I mean, *IPXL*.  So I just wanted to clarify that.  That is based on a short reading here, but from what I can tell, that's the case.

Secondly, I'd just like to point out that, I mean, what counsel -- as I demonstrated before, the whole advantage of the '211 patent invention is supposed to be that you don't suspend the -- that you don't have to suspend the computer system.  And what he's saying is that if you just ignore the preamble, then, of course, you don't to have to do that.  So there is a practical effect of that.

And third, I would just like to point out that in case, you know, it's not the case that *IPXL* has never been applied since the time.  If you take a look at pages 12 to 13 of Symantec's responsive brief, there are some Federal Circuit cases applying *IPXL*.

**THE COURT:**  All right.  Let's move on to the next question, backup storage device, volatile versus nonvolatile.

I'm not sure why there needs to be any further definition here, frankly, but --

**MR. KATZ:**  And we would agree with Your Honor.

We do think that it would be inappropriate to read

in "nonvolatile" because we suspect they would use that as a means of pointing to some, you know, sort of memory or storage that they would declare is technically nonvolatile, even though it's part of a larger system that would be powered at all times.

I mean, in some sense, if you've got memory on a computer and you have a power backup system, I mean, it's going to stay on.  And so we just think there is mischief to be created here and any further elaborations are unnecessary.

THE COURT:  Okay.  We hear the counter-argument.

MR. WALL:  Your Honor, Symantec's position is basically that Acronis just needs to be held to what it told the Patent Office.

Slide 144, please?

So during prosecution, the Patent Office rejected pending claims over a reference called Ofek.  And the applicants distinguished Ofek as not disclosing both the source device and the backup storage device.  So here's the excerpt, it states:

"For example, as discussed during the interview, the office action regards Claim 14 as the source device and Claim 17 as the backup storage device.  However, after the migration, it is element 14, not 17, that would have to be the backup device.  The interpretation is clearly inconsistent.  Element 14 is either the source for the backup or the destination for

the backup, but it cannot be both."

So, in short, what they are arguing here is that this reference, Ofek, doesn't render their pending claims invalid because it doesn't have this distinct backup storage device.

Next slide, please.

And then after, in the course of distinguishing Ofek, the applicants gave the following definition:

"A collection of data stored on usually removable nonvolatile storage media for purposes of recovery in case the original copy of data is lost or becomes inaccessible."

And so this provided the Patent Office with an understanding of what was meant by "backup."  And this definition of "backup" defines by implication where the -- the backup they're referring to is the collection of data, but it's making clear where that -- that data is being stored.

Now --

**THE COURT:**  Is the fact that it's nonvolatile material to distinguishing the Ofek reference?

**MR. WALL:**  Well, the emphasis in the -- in their discussion of the Ofek reference was this last part about whether the source data image was in a consistent state.  So what I would say is that I don't think they focused, necessarily, on that particular part of the definition, but I don't think we can go and start parsing the definition that

finely.

The inventors were providing this definition in order to explain to the Patent Office what was meant by "backup." And they adopted this and represented to the Patent Office that that's how a backup should be defined. And in the course of so doing, they explained the media on which the backup would be stored as nonvolatile.

And I believe, as we were talking about in the tutorial, this makes sense: If you want to store some material safely for later recovery, you are going to want that backup to be not contingent on being hooked up to a power source, such as the memory on your computer. So what the definition evidences is that one of skill in the art would have understood a backup storage device to be nonvolatile in nature.

*THE COURT:* All right. Do you have any final on word this one?

*MR. KATZ:* Yeah.

I think if you go to Slide 78, Your Honor, there is more of the page than they presented and it brings up the point you made.

Obviously, their slide has highlighted material that wasn't highlighted in the original.

*THE COURT:* Slide 78?

*MR. KATZ:* Slide 78 of the Acronis dec, Your Honor.

*THE COURT:* All right.

**MR. KATZ:**  And so the key here is -- and so they've moved away from this is what "backup" means to there is some sort of disclaimer.  As I hear their argument, they are making a prosecution history disclaimer argument.

As the case law says, and I believe it should be cited in our brief, prosecution history disclaimers must be, you know, clear and unambiguous.  And specifically, when you look at an argument, you look at why the argument is being made, as Your Honor was just kind of intimating with counsel for Symantec.  And I think Your Honor has the law exactly correct in that regard, which is you say what was their argument with Ofek, and were they arguing that they were nonvolatile while Ofek wasn't?  Was this a distinction being made to get the patent?

The answer is, of course not.  The issue was whether Ofek was disclosing a consistent state.  And so they pulled a backup definition to emphasize the consistent portion, which you, if you see in the actual document, the word "consistent" in the definition is the one word that was highlighted.  So that's highlighting in the original.

So I mean, fundamentally, there was no argument that backup had to be limited to nonvolatile.  They happen to take this definition to focus on consistent.  There is certainly no rule of law that says should a patentee give a definition to the Patent Office for one reason, it's kind of bound to all

aspects of that definition.

**THE COURT:**  Okay.

Next one is the intermediate storage device.  Again, I'm not sure what the -- what the problem is here.

**MR. KATZ:**  Well, there are a number of issues which the defendants raise.  And I'll go to Slide 79, Your Honor.

Maybe if we can switch to our device?

Actually, you know what, we'll just go with the hard copy.

Okay.  So if you look at this, it has the issue. And so for an intermediate storage device, they first take the position that the term in Claim 1 is indefinite because there is also the immediate block data container.  And again, on the indefiniteness point, we say, look, the claim is quite clear that there is an intermediate device with, you know, two different names.

So if we actually turn to Claim 80 -- Slide 80.  The following slide --

-- we pictorially here show the structure of Claim 1, because you've got your storage element, which is Claim 1 of the patent -- excuse me, element 1 of Claim 1; you have the backup storage device on the right, which is the second element of Claim 1; and in the middle, you have this intermediate storage, which will allow the shuttling of some blocks back and forth.

That storage is given two different names in the claim. It's very clear from the context of the claim that's the case. And when you read a patent and it's clear from the text that that's the case, then you don't hold the patent indefinite.

THE COURT: Is the "container," is that a -- is that a typical word in the art for storage device, device? A "container" means a -- hardware?

MR. KATZ: I do not know if it's a typical term of art. In this case, there is no distinction drawn between "container" and "device." And, in fact, they are equated.

So if we actually turn to Slide 81, for example, what I've done with Slide 81 is show the two portions of the claim. And I think I will not have it bound in that manner again because my copy fell apart --

THE COURT: Yeah.

MR. KATZ: -- and I see your copy fell apart.

(Laughter.)

MR. KATZ: Would you like --

THE COURT: No, no, it still works. I'm good, thank you.

MR. KATZ: Let me know when you have found Slide 81.

THE COURT: I got it.

MR. KATZ: Okay.

So in Slide 81 I've highlighted the two different

terms, which are clearly in the context the same, they're underlined, which is the "intermediate block data container" and then later in the claim "intermediate storage device."

THE COURT: Um-hmm.

MR. KATZ: And so, you know, regardless of whether "container" might be a term of art or not, I'm actually not sure. In this patent, these things are not distinguished.

And I point to the highlighted language here, the yellow highlighting, because anyone reading the highlighting will see that they are the same thing, right? It says the computer system copies a data block from the storage device into the intermediate block data container. And it also copies a data block from that container into the backup storage device.

When you look later on, it says, specifically, you're copying a data storage block there is the subject of the write command, to the intermediate storage device, so the parallelism is there. And you execute a write command, and then you copy the block from the intermediate storage device to the backup storage device. And so the parallelisms, I think, are quite clear. So I think that disposes of the indefiniteness argument.

The next argument that they make is, well, the storage device should store blocks prior to storage on the backup storage device. And so if we go to 80, Slide 80, again,

Your Honor, which has a little picture, they are putting in a temporal limitation where one just doesn't necessarily belong.

And again, our position is, it's plain meaning and we should not do a construction because we are actually not even quite sure of the mischief that might be generated here. But let me walk through this very quickly again.

So you have the storage device and a backup storage device and there is an intermediate storage in the middle. It is certainly true that in some contexts you are going to copy the data from the storage device to the intermediate storage before you go to the backup storage device.

The key is, is that how you construe the term. And our position is, no, the plain meaning should suffice, because here the claim defines the relationship of the structures, right? You do copy data from the storage device to immediate storage, you do copy data from intermediate to backup. Nothing in the claim says the intermediate must necessarily be prior to the backup. While I, you know, certainly concede that that certainly is one normal way it would work --

**THE COURT:** How would it be otherwise?

**MR. KATZ:** You know, I would have to go and think through that. But there are -- there might be times, for instance, when you may copy data to the intermediate storage device that might already be in the backup device and they would claim, oh, we don't infringe because that's not prior.

You know, so I'm not sure where they're going.

I mean, the claim is quite detailed. And if they have the structures in the claim, then, you know, I think there is infringement here. And I am not sure -- again, I'm not sure the mischief, what they have in mind by the prior storage, how they are going to argue that it's not happening prior, but to us, it's an unnecessary limitation that is not based on any of the claim language.

**THE COURT:** So why read more into it than is already in the claim? There is already a relationship, or some relationship.

**MR. WALL:** Well, I want to sort of take a step back and take -- and just take the claim as a whole.

I mean, this is a very complicated claim. And I think the jury is going to be presented with quite a bit of difficulty understanding what all the components of this computer system is -- or are, excuse me, and how they interrelate to one another.

And, you know, we'll talk about it, I'm sure, in the ensuing terms, but the problem, you know, Acronis keeps alluding to some mischief that Symantec is going to make, but the fact is, is that there needs to be clarity as to what each of these components is.

And as another point, the Federal Circuit, of course, relies on claims as intrinsic evidence. Just because

the claim provides some context as to what something is doesn't mean, then, you don't go about construing it.  So fundamentally, we need some clarity as to what this is, or I'm certain that a jury is going to find this very confusing.

If we turn to -- I'd like to deal with the term "intermediate storage device" as it appears not in Claim 1, but it appears in a number of other claims.  So I'll take the indefiniteness argument second.

If we turn to Slide 35?

All Symantec's construction is attempting to do is to provide clarity as to what this intermediate storage device is.  And what I've reproduced here is the one slide from the animation of the tutorial that we went through a few weeks ago.

And what we're describing is, if you'll recall, right, and I don't want to belabor the point, but I think it's important:  We have three devices here:  We have the storage device; this cache over here; and a backup storage device.

So we have three different storage devices, and the then there is this process by which -- when -- during a backup when a write comes in, it's paused, and if a block hasn't been backed up yet and the write is directed to that block, it's stored in the cache.  And then at some point as the backup process continues, that original block gets into the backup storage device so that you have a consistent backup, right?

So all Symantec's proposed construction tries to do

is capture what that intermediate storage device is, is a storage device that stores data storage blocks prior to storage on the backup storage device.

Now, counsel just got up here, and he frankly didn't give an example of what else this intermediate storage device would be for other than to store blocks before they went into the backup storage device.  That's what the claims indicate.  And all Symantec's simply trying to do is to provide meaning for that.

And, you know, it's not as though Acronis' counsel has gone up and said, well, there is this contrary reading in the specification, or anything like that.  All they're saying is that it should be clear to a layperson what "intermediate storage device" means, and frankly, I don't think that's true.  This isn't a word used in common parlance, and therefore, some guidance needs to be given to the jury as to what this means.

**THE COURT:**  Well, maybe, maybe not.  I mean, the text of the claim terms, of the claim, lays out a pretty clear sequence.  And why isn't your proposed construction simply redundant of what's already in the claim?

**MR. WALL:**  Well, I think it's not -- I don't think it's redundant because it defines it as -- it makes clear that, for example, that the intermediate storage devices is something separate from this backup storage device.  It's a separate storage container.  And it also specifies the flow of

information from the -- from the intermediate storage device to that backup storage device.

THE COURT: All right.

Well, I understand your argument, so let's go on.

MR. WALL: And just very briefly on the indefiniteness point, if we turn to Slide 130, Symantec's argument, just very briefly, is that what we have here are two -- two separate terms used here: An intermediate block data container; and then an intermediate storage device. And there is no antecedent basis for intermediate storage device.

It's not clear from reading the claim whether this intermediate storage device refers to the intermediate block data container or not. The presumption under patent law is that different terms have different meanings. And, in fact, Acronis cites that proposition multiple times in its brief. So given that presumption, Acronis -- and the lack of any information in the specification as to whether the intermediate storage device is equivalent or not to the intermediate block the data container, Symantec contends that term is indefinite.

THE COURT: All right. That brings us to this question: The proposed definition of block data, block backup data, and data blocks.

Again, I'm not sure why we need much definition of "block data." I'm not sure what the ambiguity is here.

MR. KATZ: Your Honor, as you know, we agree. We've

gone for plain meaning here.

There are two issues.  I think they are very minor, and maybe we can actually resolve them here together.  Taking the second one first, you know, block data, you know, is data in a block format, while a data block holds block data.  So I'm not sure that we need to spend any more attorney or judge time on that one.

THE COURT:  I mean, one question:  Is the term "block," I mean, that doesn't need to be defined?

MR. KATZ:  No.  I mean, I think that certainly the experts will be describing that, but there is really no dispute, I think, as to what a block is.  And no one has requested that a block be particularly defined.  I mean, it is a unit.

Now, where we do have a difference of opinion, and we view that Symantec's just trying to read in limitations again from some embodiments and not even all embodiments where it's really not -- where it doesn't belong, is that they want to say that a block has to be a number unit.  And, you know, our position is that that's just plain wrong.

If you go to Slide 83 of our dec, and I hope Slide 83 has stayed in your collection.

THE COURT:  It's still here.

(Laughter.)

MR. KATZ:  Your Honor, the claim doesn't use the

word "numbered."  And if you look at the very bottom bullet point on Slide 83, you know, here's what the specification is they are relying on, it says:

"Typically, each data block is associated with a number or a label."

So, A, the word "typically" clues you in that that's typical but not necessary, so numbered doesn't apply.  And more so, what is typical is a number or a label, and yet they want to read number.  So we say that's improper.

In addition, they do say that the block has to be for reading and writing, and again, that is nowhere in the claim.  And it's important to remember that this is a patent about backup, and in backup -- I mean, of course, blocks, you know, can be read and written, and oftentimes they are, but this is a backup claim.  And the idea is, you'll write the backup, but if all goes well, you'll never have to read it.

So to inject the purposeful requirement that it has to be for reading when, in fact, the ideal case is it would never be read, there is just no reason to add it.  Again, not sure what mischief it may create, but why add that when, in fact, we know that?

What we don't want to have happen is that we then have to somehow prove that, in fact, these blocks have been read when, of course, in the ideal case they would never be read.  So it would be improper to kind of glom that onto the

claim term.

THE COURT:  Okay.

MR. WALL:  So the reason this term needs to be defined is, we want to make very clear that what this is talking about is data in block format and not data that is stored as files, for example, that's stored in some other format.

THE COURT:  Okay.  And one of their proposed constructions is data in a block format, which I --

MR. WALL:  Right, but there is no way that -- and to put the claim construction process -- the claim construction process has to come first.  We can't have the experts add, you know, start explaining whether a file is a block or not at trial or in the second portion of this process, which is the comparison process.

Right now, what's properly before the Court is to determine what a block is and then, at some later point, determine whether accused product or prior art store data in this -- have a storage device that stores data in this particular format.  So we need to know what a block is.  And we spent extensive time at the tutorial trying to explain what a block is within this art.

So I fear that the problem is, if we don't define clearly right now what block data is, later on down the road, there gets to be ambiguity as to, well, is a file something

that is block data or is it not?  And that's why we need certainty at this point to what block data is.

And I'm sure, you know, as Your Honor noted, there are a number of terms here with the term "block" in it, and the main purpose of all of those constructions is to make clear what a block is and to set that out right now so that we don't have arguments later on whether a particular type of -- what a block is and whether -- and what the parameters are for a piece of data being considered a block.

So that's the importance of resolving that issue now.  And that's why simply stating that it's plain meaning isn't going to provide anyone any guidance as to whether particular data is block data.

Now, there are two points that -- there are two criticisms that Acronis' counsel leveled at Symantec's proposed construction.  One had to do with this numbered feature, and I would like to go to 106 now.

So as an initial matter, Acronis' counsel pointed to this "typically" language within the patent and stated that, well, that somehow alludes to the fact that block data can be something other than numbered.  There is no disclosure in the patent of how else you might organize it.

And there is a clearer statement, actually further up, which states -- this is Column 9, lines 24 to 26, which states:

"The sequence of the blocks in the storage is ordered, and each block has its own number."

That's pretty plain -- plain meaning.

Further in the prosecution history, there is a submission made by inventors, I believe of a draft patent application, which they relied on for purposes of swearing behind prior art, that states:

"Each such block is supplied with the number."

There -- we also provided dictionary definitions, which are extrinsic evidence but also support that blocks are numbered.  That's cited in the brief.

So we're not trying to depart from some well-recognized meaning of blocks.  Blocks are typically numbered.  And there is an abundance of evidence in the record that that is --

**THE COURT:**  How do you deal with the specification in the language about typically each block is associated with a number or a label?

**MR. WALL:**  I think that it's simply stating that that happens in almost every case, is that that language is stated above.  They don't discuss some other labeling scheme for numbering blocks.

I mean, perhaps the language, you know, you can't -- well, the way I put it is this:  The specification talks about labeling, but that, in and of itself, doesn't -- is not

inconsistent with numbering.  And it doesn't talk about some other scheme of ordering blocks by -- by organizing them in some other fashion.

THE COURT:  Well, if you are going to rely on the specification to impose limitations on the claim, I mean, you got to look at all the specifications.  And that particular -- in Column 9, lines 54 through 60, pretty hard to ignore that.

MR. WALL:  I don't think I'm asking the Court to ignore that part of the specification.  I think the question is, I suppose is, how else would these blocks be -- blocks be organized by -- and I don't think Acronis' counsel has come up with, you know, has suggested any other scheme for doing that.  The specification points to one, which is numbering.

THE COURT:  All right.

Well, let's go on.  What else do you have?

MR. WALL:  The second portion of the construction that counsel has taken issue with is that these data blocks are for reading and writing.  On a fundamental level, this is data that is stored in, you know, storage devices.  The very purpose of it -- and this particular term, "block data," incidentally refers to data that is on the storage device; in other words, the very storage device from which the backup is being created.

So this isn't the case that Acronis' counsel is pointing out where we're dealing with a backup, though that, in and of itself, in order to be operable for something, you would

use the backup to read from it, to recreate or to restore your data.

And the specification in the '211 patent talks or refers multiple times to performing read-and-write operations on blocks.  But fundamentally, from everything we've been talking about today, that's the very purpose of this information, for the computer system to read and write them.

So I think those were the -- I'd like to point out one other portion of the specification.

If you can turn to Slide 109, please.

And this is sort of what we're trying to get at and why we're -- we really want this term defined, it's because the specification specifically distinguishes it over the prior art in that it operates at the block level.  This is from the '211 patent, Column 13, lines 29 to 35.  It states, and I'm reading a portion of that:

"The present invention differs from file systems such as Episode and WAFL in that the system and method of the present invention operates at the level of data storage blocks and not at the level of inodes or files."

And so in order for that statement to be given any meaning in the claims at all, it needs to be incorporated in some claim term.  And certainly, just giving it the plain meaning is not going to suffice to provide the jury guidance as to what these blocks are.  And if that's not done, then the

invention will potentially cover these prior art systems that the specification talks about.

**THE COURT:**  Well, but their proposal is to say data in block format, which is a signal, and it is consistent with the specification.

The question is, you say, well, we should eliminate confusion as to what a block is, but looking at your definition, I'm not sure -- you end up by saying to the storage device at the block level.  I mean, you can keep defining things more and more, the jury is not going to know, unless they are engineers, what "block level" means.  So are you going to further define that and add more stuff?

I mean, if the main point is to convey that that level of innovation here is that it is the block level format or level, you know, I could see that perhaps being stated, but you start imposing all these other additional requirements. Maybe that's the way it usually works, maybe it isn't, but I don't really see a basis for further limiting the claim.

**MR. WALL:**  Well, I think that the problem with just saying it's block data, that, in and of itself, is the dispute. There needs to be some guidance, at least.  A juror is not going to know what a block is.  And so it can be -- and so this, basically, is the time to say this is a data block.

Now, Acronis could have come forward and said, you know, what a block is, is not what Symantec's saying, it's

something else.  But this was the time to bring that argument up, and they haven't pointed to parts of the specification that --

**THE COURT:**  But I don't see how Symantec's proposed construction does anything in this regard.  It just says -- it requires numbered --

**MR. WALL:**  Um-hmm.

**THE COURT:**  -- reading and writing, not reading or writing.

**MR. WALL:**  Um-hmm.

**THE COURT:**  And then it says, "to the storage device at the block level"; how is that any more helpful or enlightening?

**MR. WALL:**  I think, at a minimum, knowing that these units of data are numbered.  And "are numbered" provides some level of understanding as to how the data is structured as distinct from files.

**THE COURT:**  Okay.

Do you have any issue -- you know, data block, again, I'm not sure whether that needs to be defined.

**MR. WALL:**  If you're --

**THE COURT:**  I guess -- well, I'll ask your opponent first, because your position is that it's plain meaning and we don't need to do anything.  There are some parts of the claim that almost seems to use interchangeably "data block" and

"block data."  I could see where they sort of imply something different, although in the end I'm not sure what difference it makes.

**MR. KATZ:**  We don't view it as helpful to further construe these things.  So we've offered on page 82 some compromise constructions, to the extent any ambiguity was, you know, was felt.  So data in block format, data blocks as blocks for data storage, we're fine with that.  Frankly, I'm not sure these are necessary.  I think the jury will understand what these terms are.

I will note, Your Honor, just counsel for Symantec did just refer to dictionary definitions; I think the numbered suggestion is already in the water, but just for the complete record, their own definition cited in their filing, I think in one of their briefs Document 122-2 Exhibit A, defines block as:

"Generally, a group or grouping of data read or written in one contiguous operation."

"Read or written," nothing about being numbered.  And so I don't know how they believe that definition supports anything they're saying here today.

**THE COURT:**  Let me ask you, getting back to -- you made a statement in your brief that data block may refer to either the content, which is what block data is, or, additionally, containers for data blocks.  Where does that come from?

*MR. KATZ:* Right. The idea is that, as Your Honor pointed out, is that there is some maybe loose usage in the patent. So a block, you know, is this unit that you fill with data. And so in some context, the data block could be referring to the data -- actually, which term are we referring to, by the way?

*THE COURT:* Data block.

*MR. KATZ:* Data block, right.

So a data block, generally, you would think of as the block that holds the data, but in some context it may describe the data in the block as being the data block and not differentiating between where the data is put and the actual unit of data, itself.

I'm not sure that that impacts any of the analysis here. I think at the end of the day, that doesn't really make a difference. I mean, the key is, we are talking about these, you know, units of data, these continuous units of data.

*THE COURT:* Yeah. No, what confused me is, you referenced the term "containers," which in your earlier discussion was interchangeable with "storage device."

*MR. KATZ:* Okay, yeah.

*THE COURT:* And I thought that was completely --

*MR. KATZ:* That way was a very poor choice of words, because the container in the claims has nothing to do with the block. That was a poor choice of words.

What we went meant is, you have data in a unit, and you could define a unit on a disk, for example, where you put data.  That is what we were referencing.  Just let me make the record very clear:  The block has nothing to do with the container in the claims.

THE COURT:  Okay.

MR. WALL:  Your Honor, I would only point out that, you know, we do have the term, and I don't know if we talked about it, "intermediate block data container" at that point.  So, at a minimum, we have an indefiniteness argument.  But we also contend that in some cases it should be defined, at a minimum defined as a storage device, which Symantec proposes would provide some clarity just exactly to, you know, resolve that level of ambiguity.

THE COURT:  And I think that makes sense, doesn't it?  Are we talking about going back to "intermediate block container" --

MR. WALL:  This is -- yeah, so we talked about, there are two terms which both start with "intermediate block," "intermediate block data container" and "intermediate storage device," I believe.

THE COURT:  Right.  And that does refer -- because you are equating that with -- to get around the indefinite problem.  It really means the same thing as "intermediate storage device."

**MR. KATZ:** Right.  We would have no problem with Your Honor construing "intermediate data block container" to be the same as "intermediate storage device."

**THE COURT:** Okay.

All right, good.

**MR. WALL:** I would just point out, Your Honor, of course, they don't provide a definition for that.  So I don't know where that -- I mean, I suppose all they are proposing is that you say an intermediate block data container is an intermediate storage device.  I don't think that provides a lot of clarity.  What Symantec's proposing --

**THE COURT:** I'm not sure it needs much clarification, because that term already appears earlier.  But I understand your point.

I think that gets us, then, to this last couple of issues.  One is suspending suspends a write command.  I guess your differences in the verbiage is you want to use the term "temporarily halting" or "halts execution," and they want to use "preventing the write command from executing."  And you feel that "preventing" is overbroad in some sense and requires too much.

**MR. KATZ:** Yeah.  This is a very simple point, Your Honor.  You are absolutely correct, we believe that their use of the word "prevent" -- we don't know why they haven't agreed with us, Your Honor, but we've -- our nervous point here is,

"prevent" could sound like a write command couldn't actually have been started.

And, you know, these commands are not low-level microprocessor machine code, right?  These commands are many, many machine cycles, many instructions.  And so we say "halt," implying you could start and then you stop, or you could prevent either one.

Our fear is, if they are trying to say that "prevent" means you to have stop it before it even gets started at all, you know, that's just too narrow.  And if that's not where they're going, then why can't they just accept "halt"?

**THE COURT:**  Okay.

**MR. WALL:**  Your Honor, I think we're pretty close here.  The only -- I would say that I think "prevent" -- "preventing execution" is the proper term, and in part because the "halt" distinction that they are drawing, they are saying that there might be some partial -- a command that's partially executed and that our construction excludes that, but there is nothing in the specification that talks about partial -- a command that's been partially executed or anything like that.

So I'm not sure where this concern comes from, but on the other hand, I don't know that the wording makes that much difference.  The real point was to make sure that we don't get into an area here where we're covering crashes and system crashes, and that sort of thing.  So I think we're pretty

close.

THE COURT:  Okay, good.

And then there is this term "not yet been backed up" in the '211 and the '380.

MR. KATZ:  Right.  And here, I mean, again, I guess we'll to have see what Symantec says, but just logically, "not yet been backed up," first of all, we don't think it should be construed.  There are so many constructions, the jury starts to lose focus of the claims, themselves, which are clear, and start having to kind of parse all these constructions.

But, you know, their definition cannot be correct, because it would exclude the situation where data went to the block data container.  And I have some slides here that explains why that can't be correct.

If you look at Slide 87, and this is taken out of our tutorial we provided two weeks ago, you can see that a write request to a particular block that hasn't been copied comes in, you suspend the write request, and you copy the block to the intermediate container, all right?  So the write request comes in, you say, oh-oh, you can't write to this block yet, it hasn't been copied, so let us copy it first.

Okay.  Now, if you turn the page to Slide 88, you have the issue that, under their construction where it has to make it to the backup container, it would mean that you would have to copy a block to the intermediate container, even though

it's already there, all right?  They say "not yet been backed up" means that you are going to copy it if it's not in the backup storage, while we say, no, you're going to copy it if it's not in either place, either in the intermediate storage or in the backup storage.

So, to be clear, under their construction it would mean that a system would not infringe if it didn't recopy a block to the intermediate container that was already there. And there is no basis in the specification or the claims to suggest that the way this claim must operate is, if the block is sitting in the intermediate container but not in the backup storage, you are obligated to copy it to the intermediate container a second time.

THE COURT:  Say that one more time.

MR. KATZ:  Okay.

Under their construction --

THE COURT:  Yeah?

MR. KATZ:  -- as we I understand it, the claim would require the following:

The write request would come in, and you would say, is this block in the backup storage container, all right, because they are interpreting "not yet backed up" to be not in the backup storage container.  And if it's not, you have to do a copy.  That's how I think they are interpreting the claim.

What I'm saying is that that doesn't make any sense,

because if the block is already in the intermediate container, there would be no reason to copy it, all right?

So what it's saying is, okay, a write request has come in, has this block been copied out of the primary storage, either to the backup or to the intermediate?  If so, there is no reason to copy it.

And so under their construction, it sounds like the patent is requiring a totally unnecessary double copying.  And nowhere in the spec does it suggest such a thing.

**MR. WALL:**  The purpose for our construction is very simple, which is that we are trying to make clear that what "backed up" means is to be copied to a backup storage device. And if you look at the context of the claim, if you go to 94, "Wherein" --

**THE COURT:**  Ninety-four?

**MR. WALL:**  Sorry.  Slide 94.  I apologize.

**THE COURT:**  Your 94?

**MR. WALL:**  Yes.

**THE COURT:**  Okay.

**MR. WALL:**  "Wherein when a write command is directed to a data storage block identified for backup that has not yet been backed up, the identified data storage block is copied from the storage device to the intermediate storage device."

So what the term is really doing is, it's creating a threshold test of whether a block has been copied over to the

backup storage device.

If we turn to Slide 95, you'll see the still from the presentation we gave during the tutorial.  And if you'll recall, what occurs is that the backup process begins and these blocks in the storage device are copied over to the backup storage device.

If a write command comes in, the determination that is made is whether the -- that piece of block data has been coped over yet.  If it -- copied over to the backup data storage unit.  If it hasn't been at that point, then that block is copied to this intermediate storage device.  And so we're clarifying the term, or we seek to define the term to make clear that that is the threshold test.

The point here is, by the way, is whether -- we're not trying to exclude information from being copied over to the intermediate -- what I would say is, the claim, itself, you know, talks about once that test is conducted, has that data block been copied to the backup storage device, then it talks about moving -- then it, itself, talks about moving that intermediate data storage block to -- or, I'm sorry, the storage block to the immediate storage device.

So it's very clear that the determination that's being made is, is this -- has this been copied to the backup storage unit at this point.

Well, what counsel, I think, is saying is that,

well, what if the block that's -- to which the write is directed has already been copied to the intermediate storage device?

What I would say is, the claim isn't contemplating that.  If you read what the claim says, it says once that test has been made, once it's determined that it hasn't been backed up yet, the identified data storage block is copied from the storage device to the intermediate storage device.  So it's not contemplating a case where that block has already been copied and then no further copy is made, or something like that.

THE COURT:  Well, why can't it be read to encompass the situation where there has been -- it's been copied into the intermediate storage device; therefore, it has been backed up, so there is no need to copy it again to the intermediate storage device?

MR. WALL:  Well, just because of what the plain meaning -- the plain wording of the claims.

THE COURT:  Well, the plain words are, "has not yet been backed up," and that's what we're trying to -- backed up where?

MR. WALL:  Right.

THE COURT:  And they want to say, well, or the intermediate storage device.

I don't know if that actually could happen, I guess, but that's where it is.  I mean, isn't that the dispute here?

**MR. WALL:**  Yeah, I think that is -- that is the dispute.  And it's a question of whether that block data needs to be identified as -- or whether it's been copied over to that storage device.

**THE COURT:**  And what's your best argument as to why it has not been backed up should be construed to mean not yet been backed up not only to either the backup storage device or the intermediate storage device?

**MR. WALL:**  I think it follows from the -- well, I think there are several reasons.

I think if you turn to Slide 97, we provide several examples in the specification that when it's talking about data that is subject to backup, it's referring to the data -- it distinguishes, for example -- if you take a look at the specification language at Column 10, lines 42 through 51, it states:

"Data subject to backup may be in two different states, data that has already backed up to the storage and data that has not yet been backed up but only scheduled for backup."

So the specification draws this dichotomy between information that has been copied over to the backup storage device and information that hasn't been.

**THE COURT:**  Let me ask the response to that.  Because if you look it, it says already been backed up to the storage 360, Figure 7, and 360 is the backup storage.

There's -- there's nothing here for intermediate.

MR. KATZ: Your Honor, I think -- I have to study it further, but I believe that the passage they are pointing to in Figure 7 is the prior art. So, of course, there won't be a reference to the intermediate data storage container.

The whole point of the patent is, it's saying instead of having one backup storage, there is two locations for backup storage there, the intermediate and then there is the final resting place.

THE COURT: Right. So you think this is just reference to prior art?

MR. KATZ: Yeah. There is no reference in the figures in Figure 27 to an intermediate at all, so it's not distinguishing intermediate from some other location.

I would have to study the patent more, but I believe it's a backup -- I mean, excuse me, I believe it's a reference to prior art.

THE COURT: Okay, go ahead.

MR. KATZ: I think, as Your Honor pointed out, the invention is about having a two-stage backup. You've got the intermediate container and this thing that is labeled the backup storage device, which is the permanent home. And as Your Honor pointed out, I think that's exactly correct, is you can back up to either of those locations, and it's still a backup.

And another reason why that is necessarily true is, if you think about what that term "backup" means, it really is to make a copy. That's the whole idea of backing up, you want to make a copy so that you have the original and a copy in case the original gets, you know, destroyed somehow.

And so if it's sitting in the intermediate container, it is a backup copy. It exists and it's there, and it can protect the data.

And finally, we'll just point out, I believe it's our final slide -- we just highlight -- I think the relevant text we've been talking about is Slide 89 of our presentation; which is, if it's sitting in the backup -- excuse me, if it's sitting in the intermediate container, then there is absolutely no reason to copy it again.

And under their construction, they have to concede that how they are interpreting the patent is that you have to do a gratuitous and unnecessary copy. And they claim the Court's bound to reach that conclusion, no matter how absurd, because of the words "not yet backed up" when, as Your Honor pointed out, the easy answer is, you can back up to either the intermediate or the backup storage.

THE COURT: All right.

Well, I think that we've covered everything, yes? What I'd like to do, though, you know, based on our discussion here today, and whether -- I think it would be useful for you

to take another shot at, at least if not narrowing your differences or not resolving some of your differences, narrowing them on whichever ones that you think you can. And let me know as well as the supplemental briefing on the question I asked about I think it was image --

**MR. NELSON:** That's correct.

**THE COURT:** It may be helpful. So I don't want to draw this out too long, but I think a bit of an iterative process may be helpful here.

So let's talk about how long it will take and when you want to submit something back to me so that I know what's left. And then we can move forward and issue my claim construction.

**MR. NELSON:** What would you like? I think that's probably the primary question.

**THE COURT:** Okay, well, I don't know. In the next two weeks, can you have something?

**MR. KATZ:** I think that's fine, Your Honor.

**MR. NELSON:** Yes.

**THE COURT:** Why don't we say two weeks from today.

**THE CLERK:** December 4th, Your Honor.

**THE COURT:** I mean, basically filing and identifying -- if you have resolved something, great, take those off the table. Or if you have refined your positions, narrowed them, just update that. I don't need a whole lot of

argument, we have enough here, but I would like to hear more on the question of image, and then I'll take it from there.

**MR. NELSON:**  We can provide the additional briefing by then, that's not a problem.  The only thing with -- and I don't know, in terms of the transcript --

**THE COURT REPORTER:**  Right away.

**MR. NELSON:**  -- because that's going to be helpful for us in terms of the back and forth.

**THE COURT:**  Sure.  If you need more time, we can go a little longer than that.

**MR. KATZ:**  Your Honor, I don't know if the transcript's going to be complete --

**THE COURT REPORTER:**  You'll have it.

**THE COURT:**  Okay.

**MR. NELSON:**  Then that will be fine.  We can just let Your Honor know when that is.

**THE COURT:**  Sure.

**MR. NELSON:**  It will certainly be before Christmas.

**THE COURT:**  Okay.

All right, where are we at now?

**THE CLERK:**  November 20th.

**THE COURT:**  Let's just set an outside date, December what?

**(Court and Clerk confer.)**

**THE COURT:**  We're not here the week after -- if

that's what you need, until then.

**MR. KATZ:** That's fine. I think we will be able to work it out. Certainly in December before the Christmas break, we'll have that.

**THE COURT:** All right. I'll just say the 21st.

**MR. NELSON:** The only complicating thing for me is I start trial again November 30th. But you can see that there is other people that can move the ball forward even absent my presence.

**THE COURT:** I can see that.

Well, good, let's do that. And, you know, again, if you are also having fruitful discussions, I don't want to truncate that, either. But, you know, at some point I want to make sure we've got all we've got and move forward on this thing.

**MR. NELSON:** Okay. We appreciate it, Your Honor.

**THE COURT:** All right. I'll set a date of the 21st on that.

**MR. NELSON:** And if we can do it sooner, we'll let you know. And we'll get it to you as soon as we can.

**MR. KATZ:** Thank you, Your Honor.

**THE COURT:** Oh, we don't have a further CMC on this? We probably should set a CMC as a control date. And assuming we get out our claim construction order sometime in January, maybe early February or early/mid February and see where we are

at.

        **THE CLERK:**  February 7th at 10:30.  And it's a Thursday.

        **THE COURT:**  Okay?

        As I recall -- was this the case where we talked about possible ADR once we get to the claim construction stage?  Have you all thought about once we get that done, whether there is any room for discussion in the ADR process?

        **MR. KATZ:**  I think so, Your Honor.  There is a mediation that is going to go forward at some point, omnibus mediation in the Delaware court.

        **THE COURT:**  When is that?

        **MR. KATZ:**  There is some --

        **MR. NELSON:**  It's right at the beginning -- I think it's around Valentine's Day.

        **THE COURT:**  Oh.

        **MR. NELSON:**  So that time frame.

        **THE COURT:**  That kind of works out, because if I get the claim construction out here, you will have that much more information.

        **MR. NELSON:**  Right.

        **THE COURT:**  Good.  So we will see you at the next CMC.

        **MR. NELSON:**  Thank you, Your Honor.  I appreciate it.

MR. WALL: Appreciate it.

MR. KATZ: Thank you very much.

(Proceedings adjourned at 3:29 p.m.)


---oOo---

*Sahar Bartlett, C.S.R. No. 12963, RPR*
*Official Court Reporter, U.S. District Court*
*(415) 626-6060*

## CERTIFICATE OF REPORTER

I, Sahar Bartlett, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.  The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


/s/ Sahar Bartlett

Sahar Bartlett, RPR, CSR No. 12963

United States Court Reporter

Monday, November 26, 2012